UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
IN ADMIRALTY

MARKEL AMERICAN INSURANCE
COMPANY,

       Plaintiff,

                                    CASE NO. 04-CIV-10795-MLW

vs.

ROBERT MADONNA,

       Defendant/Counter-Plaintiff,

vs.

MARKEL AMERICAN INSURANCE
COMPANY and CAPE WIDE INSURANCE
AGENCY, INC.,

       Counter-Defendants,
_____/

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, MARKEL AMERICAN INSURANCE COMPANY, by and through its undersigned attorneys, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, files this its Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment, and further thereto would state as follows:

       1.     The Plaintiff in this litigation, Markel American Insurance Company (hereinafter "Markel"), is a corporation in the business of writing and issuing policies of marine insurance, with its offices and principal place of business located at P.O. Box 906, Pewaukee, Wisconsin 53072-0905. The Defendant Robert Madonna (hereinafter

"Madonna") resides in Osterville, Massachusetts, while the Third Party Defendant Cape Wide Insurance Agency (hereinafter ("Cape Wide") is a corporation which maintains its office and principal place of business in West Chatham, Massachusetts.

2.    The dispute between the litigants, and the subject of this summary judgment motion, concerns coverage under a policy of marine insurance that was originally issued by Markel to Madonna, with Cape Wide acting on behalf of Madonna in the capacity of a marine insurance broker.

3.    The Plaintiff commenced the instant action under Rule 9(h) of the Federal Rules of Civil Procedure seeking a declaratory judgment that its policy of marine insurance affords no coverage for the loss of a vessel owned by Madonna, destroyed as a result of a fire that occurred at the Crosby Yacht Yard on or about December 10, 2003. Although the undersigned counsel for Plaintiff will be making reference in the instant motion to two (2) vessels owned by Madonna and allegedly insured with Markel, the Defendant after some confusion finally determined that his claim was for a 2000 30 ft Crosby Hawk. The said vessel for which coverage is in dispute is alleged by the Defendant to have had a value of $283,959.00.

4.    Coverage was rejected by Markel when following receipt of claim documents submitted by Cape Wide it was determined that Plaintiff had never received any request for coverage on the vessel that was destroyed in the fire at the storage yard.

5.    Madonna responded to the Plaintiff's declaratory judgment action with an Answer and Counterclaim, followed by a third party action against his broker, Cape Wide. It is critical to note that Cape Wide has never at any time asserted any claim against Markel American Insurance Company.

6.    As will be discussed more fully, *infra*, Madonna originally insured two (2) vessels with Markel, utilizing Cape Wide as his broker in both instances.

7.    One vessel owned by Madonna and insured by Markel was a 1996 41 ft Tiara yacht with an insured value of $379,000.00.

8.    The second vessel owned by Madonna and insured by Markel was a 2000 30 ft Pursuit power vessel with an insured value of $142,100.00.

9.    Although separate Declarations Pages were issued by Markel for the aforesaid vessels, both were insured under Markel's Policy No. RD0000503.

10.    Attached hereto as Exhibits "A" and "B" in support of Plaintiff's motion for summary judgment are true and correct copies of the aforesaid Declarations Pages for the vessels referenced herein.

11.    On or about December 11, 2003, Mr. William C. Eldridge of Cape Wide sent a fax to Markel, a true and correct copy of which is attached hereto as Exhibit "C" in support of Plaintiff's motion for summary judgment. The attached fax provided the first notice of a claim for the unfortunate destruction of a vessel owned by Mr. Madonna in the December 10, 2003 fire at Crosby Yacht Yard. However, as the Court will no doubt note, the vessel referenced in Mr. Eldridge's fax of December 11, 2003 was neither the 1996 41 ft Tiara yacht insured for $379,000.00, nor was it the 2000 30 ft Pursuit power vessel insured for $142,100.00.

12.    Rather, Mr. Eldridge was advising Markel of submission of a claim for destruction of a ___2003___ 41 ft Tiara, a completely different vessel than either of those referenced in the Declarations Pages attached hereto as Exhibits "A" and "B," respectively. Mr. Eldridge's fax states that he is providing documentation that "was originally faxed to Markel on 6/16/03 requesting coverage to be transferred from the 96

Tiara 41' to the new 03 Tiara 41 effective 6/16/03… Please correct the current policy & process the claim accordingly"

13.    Prior to June of 2003, Cape Wide had obtained insurance on behalf of Mr. Madonna for both the 1996 41 ft Tiara and the 2000 30 ft Pursuit (Depo. of Eldridge, p. 22). However, at some time in June of 2003, the broker was advised that Madonna had sold those vessels and had purchased two (2) other vessels (Depo. of Eldridge, p. 23).

14.    According to Mr. Madonna's own pleading, "[i]n or around June of 2003, Madonna purchased a 2003 42-foot Tiara…and a 2000 30-foot Crosby Hawk …" (*See,* para. 6 of Defendant's Counterclaim, p. 5). In connection with his June 2003 purchase of these two (2) new vessels, "Madonna's insurance agent, Cape Wide, was asked to undertake such steps as required so that the Tiara and Crosby were properly insured." (*Id.*, para. 7). "Cape Wide agreed to do so and Madonna relied on its expertise to obtain marine insurance." (*Id.*, para. 8).

15.    Immediately upon receiving Cape Wide's fax of December 11, 2003, personnel from Markel's Marine Claims Department reviewed all aspects of the insurance coverage involving Mr. Madonna, with special reference to the alleged documentation that according to Mr. Eldridge "was originally faxed to Markel on 6/16/03 requesting coverage to be transferred from the 96 Tiara 41' to the new 03 Tiara 41 effective 6/16/03…" However, Markel never found any record of receiving the fax allegedly sent by Mr. Eldridge back on June 16, 2003, nor did any Markel employee have ever any recollection of having received or having reviewed any such fax communication.

16.   In response to Cape Wide's submission of the claim for destruction of this "03 Tiara 41," Markel's Property Claims Supervisor, Thomas Conroy, sent a letter directly to Mr. Madonna, stating in pertinent part:

> In review of our underwriting file, we insure a 2000 Pursuit and a 1996 Tiara. We find no record of insuring a 2003 Tiara. Therefore, we have kept this information for records purposes only.

17.   A true and correct copy of Mr. Conroy's December 12, 2003 letter to Madonna is attached hereto as Exhibit "D" in support of Plaintiff's motion for summary judgment.

18.   Several months later, R.M.G. Investigations sent a letter to Markel recounting certain aspects of the investigation that it had carried out at the behest of Cape Wide's Errors & Omissions insurer. A copy of that letter, dated March 12, 2004, is attached hereto as Exhibit "E" in support of Plaintiff's motion for summary judgment.

19.   Then, less than a month later, a second letter from R.M.G. Investigations was received by Markel, correcting a rather glaring error in connection with the vessel for which a claim being submitted on behalf of Mr. Madonna. In this second letter, dated April 6, 2004, informed Markel that in point of fact the claim was not for the 2003 42 ft Tiara yacht as previously thought – Rather the claim was for the 2000 30-foot Crosby Hawk!

20.   Attached hereto as Exhibit "F" in support of Plaintiff's motion for summary judgment is a true and correct copy of R.M.G. Investigation's letter to Markel dated April 6, 2004.

21.   In the attached letter dated April 6, 2004, R.M.G. Investigations insists that there exists a second fax from Cape Wide to Markel, this one dated June 24, 2003, in

which Madonna's broker requested that Markel transfer coverage from the 2000 30 ft Pursuit to the 2000 30-foot Crosby Hawk!

22.    Attached hereto as Exhibits "G" and "H" are true and correct copies of the faxes which Cape Wide alleges were sent to Markel, on June 16, 2003 and on June 24, 2003, respectively.

23.    Therefore, Cape Wide and R.M.G. Investigations have both submitted to Markel what they purport to be the faxes sent by Mr. Eldridge, the first one on June 16, 2003 and the second one on June 24, 2003. Markel was notified that there was in fact no claim being made for the 2003 42 ft Tiara yacht, as that vessel was apparently undamaged in the December 10, 2003 fire at Crosby Yacht Yard. However, claim was being asserted for the destruction of Madonna's 2000 30 ft Crosby Hawk.

24.    Markel conducted precisely the same exhaustive investigation in connection with the claim for the 2000 30 ft Crosby Hawk as had been conducted in connection with the now withdrawn claim for the 2003 42 ft Tiara yacht. In precisely the same manner, Markel never found any record of receiving the fax allegedly sent by Mr. Eldridge back on June 24, 2003, nor did any Markel employee ever have any recollection of having received or having reviewed any such fax communication.

25.    It was and remains the contention of Cape Wide, and of Mr. Madonna, that there are two (2) separate occasions on which the Defendant's marine insurance broker sent faxes to Markel seeking transfer of coverage.

26.    Cape Wide and Madonna contend that on June 16, 2003, William Eldridge sent a fax to Markel asking that coverage be transferred from the 1996 42 ft Tiara yacht to the 2003 42 ft Tiara yacht.

6

27.    Cape Wide and Madonna contend that on June 24, 2003, William Eldridge sent a fax to Markel asking that coverage be transferred from the 2000 33 ft Pursuit to the 2000 30 ft Crosby Hawk.

28.    *__For purposes of this motion__*, Markel will stipulate that Mr. Eldridge sent the fax of June 24, 2003 asking for coverage to be transferred from the 2000 33 ft Pursuit to the 2000 30 ft Crosby Hawk. *__For purposes of this motion__*, Markel will stipulate that it received the said fax sent by Mr. Eldridge on June 24, 2003 asking for coverage to be transferred from the 2000 33 ft Pursuit to the 2000 30 ft Crosby Hawk.

29.    However, as will be discussed more fully, *infra*, the record is absolutely clear that Markel never, at any time nor in any manner, responded to Cape Wide's request for a transfer of coverage.

30.    The record is equally clear that Cape Wide and Mr. Eldridge were acting at all times in the familiar capacity of marine insurance brokers and therefore were agents of the insured, *i.e.*, agents for Mr. Madonna. Summary judgment must therefore be granted to Markel American Insurance Company based on the simple fact that Mr. Madonna's marine insurance broker negligently failed to obtain the coverage sought by the said Defendant.

31.    William Eldridge is the owner and president of Cape Wide Insurance Agency (Depo. of Eldridge, p. 6) and he has known Robert Madonna for twenty-five (25) years (Depo. of Eldridge, p. 9). Eldridge began his business relationship with Madonna in the 1990s, selling auto insurance to the Defendant (Depo. of Eldridge, p. 10) and thereafter reaching a point where Cape Wide acted as Madonna's broker in connection with auto, home, marine and even business insurance policies (Depo. of Eldridge, pp. 10-

11). Cape Wide has been acting as Madonna's broker in obtaining coverage for the Defendant's marine risks since about 2000 (Depo. of Eldridge, p. 12).

32.    At about that same time, back in 2000, Mr. Eldridge and Cape Wide began to utilize Markel American Insurance Company for marine risks (*Id.*), although Eldridge and Cape Wide also sold marine insurance policies to clients such as Madonna via other companies, including Quincy Mutual Fire Insurance Company and Foremost Insurance Company (Depo. of Eldridge, p. 20).

33.    Cape Wide never at ant time had any contractual or agency relationship with Markel, and never at any time was licensed to offer Markel insurance policies to the public (Depo. of Eldridge, p. 13).

34.    In seeking a marine insurance policy from Markel on behalf of some client, Mr. Eldridge and Cape Wide would complete an application form and either submit that completed form to another broker that was known to enjoy a formal agency relationship with Markel (Depo. of Eldridge, p. 13) or on other occasions would simply submit the application and supporting materials directly to Markel at the latter's offices in Pewaukee, Wisconsin (Depo. of Eldridge, p. 14).

35.    Mr. Eldridge's practice was to complete an application and then fax it to Markel, asking the marine insurance company to review the application and to offer a quote (Depo. of Eldridge, p. 16). Having received Markel's quote via fax, Eldridge would then ask Markel to actually bind coverage and issue a policy if Cape Wide's client was satisfied with the quote and instructed the broker to proceed (Depo. of Eldridge, p. 17).

36.    Although Cape Wide did have authority to actually bind certain other insurance companies with which it enjoyed a business relationship during 2003 (Depo. of Eldridge, p. 60), the said broker did not have any authority to bind Markel (*Id.*).

8

37.    As stated, *supra*, in the instant matter Mr. Madonna had in effect, via the services of Cape Wide as his broker, a policy of insurance with Markel in June 2003 which afforded coverage on two (2) vessels (Depo. of Eldridge, pp. 17-18, 22). At some point Eldridge was advised that Madonna had purchased two (2) new vessels (Depo. of Eldridge, p. 24).

38.    Eldridge first attempted to switch the coverage from Madonna's 1996 42 Tiara yacht to the newly acquired 2003 42 ft Tiara yacht (Depo. of Eldridge, p. 25), sending a fax to Markel on June 16, 2003 (Depo. of Eldridge, pp. 27, 30). As noted, *supra*, the fax cover page sent by Eldridge to Markel on June 16, 2003 is attached hereto as Exhibit "G."

39.    Mr. Eldridge never heard back from anybody at Markel, whether verbally or in writing, in response to his fax of June 16, 2003 (Depo. of Eldridge, p. 32).

40.    Mr. Eldridge never made any attempt to follow up on his fax of June 16, 2003, or to contact anybody at Markel with regard to the request for a transfer of coverage (*Id.*).

41.    Mr. Eldridge utilized two (2) separate and distinct systems or methods for ensuring that he personally followed up on requests for changes in coverage on vessels:

Q:    And what is that tickler system?

A:    There is a tickler system in our computer system which could have been used. I also have what I call a "pending folder," which I keep all correspondence such as that in there until the endorsement comes back from the company.

(Depo. of Eldridge, p. 32).

42.    Mr. Eldridge went on to testify about how he failed to make use of either of these methods that were there for the express purpose of reminding him to follow up with Markel in order to confirm the marine insurance company's receipt of the application materials:

Q:    Okay. Just covering them both, you said "could have been used." Was it used in this case?

A:    Not in this case.

Q:    Okay. And the pending folder – so would it be fair to say that from June to December this fax was in the pending folder?

A:    It was not.

Q:    Why not?

A:    I don't know.

Q:    Okay. It should have been?

A:    Should have been.

Q:    And had it been in the pending folder what would have happened?

A:    If it had not been received within 30 days, a second request would have been faxed to the company.

Q:    And if it had no response to that, was there a further action that would have been taken?

A:    A phone call.

Q:    Who was responsible for putting this in the pending folder?

A:    I was.

Q:    And do you know why it didn't end up in the pending folder?

A:     Purely by accident.

(Depo. of Eldridge, pp. 32-34)

43.     Mr. Eldridge, therefore made use of neither of the two (2) systems or methods that were a normal or even a routine aspect of his office procedure. He never made any effort to follow up with Markel as he himself admits he was supposed to have done and should have done. Instead, he simply forgot about his June 16, 2003 fax request to Markel and forgot about the fact that no response was ever forthcoming from the marine insurance company.

44.     The same sequence of events occurred when on June 24, 2003 Mr. Eldridge learned of his client's wish to transfer coverage from the 2000 33 ft Pursuit to the newly purchased 2000 33 ft Crosby Hawk (Depo. of Eldridge, pp. 35, 38). As noted, *supra*, the fax cover page sent by Eldridge to Markel on June 24, 2003 is attached hereto as Exhibit "H" and Mr. Eldridge testified at his deposition that he "followed the normal procedure by completing the fax cover sheet requesting the switch over of boats and attaching the documents and faxed it – faxed it to Markel" (Depo. of Eldridge, p. 40).

45.     Mr. Eldridge went on to testify about how he failed ***for a second*** time to make use of either of these methods that were there for the express purpose of reminding him to follow up with Markel in order to confirm the marine insurance company's receipt of the application materials:

Q:     With regard to the materials you faxed on – with – to the change to the 2000 Crosby –

A:     Uh-huh.

Q:    -- did you hear anything back from Markel at any time between June 24, 2003, and the fire at the Crosby Yacht Yard in December of '03?

A:    No.

Q:    Did any tickler system get put in place with regard to this change?

A:    No.

Q:    Okay. So it wasn't put into the computerized tickler system?

A:    No.

Q:    And did this document not find its way into the pending folder?

A:    That's correct.

Q:    The same as the other one?

A:    Yes.

Q:    So no follow-up was made after 30 days or 60 days –

A:    That's correct.
Q:    -- to see what was going on?

A:    Right.

(Depo. of Eldridge, pp. 42-43)


46.    The agreed value of the 2000 33 ft Pursuit that was insured under Markel's existing policy of marine insurance was $142,100.00. This is to be contrasted with a value of $283,959.00 for the 2000 33 ft Crosby Hawk that was the subject of Mr. Eldridge's fax to Markel of June 24, 2003. Mr. Eldridge testified that this would have certainly resulted in a change in the premium that Markel would have charged (Depo. of

Eldridge, p. 58), and he admitted that he never received anything from Markel with respect to such an expected change in premium (Depo. of Eldridge, p. 59).

47.    To recap – having receiving instructions from his client to transfer coverage to the newly acquired vessels, Eldridge claims to have first sought coverage from Markel on June 16, 2003 for the 2003 42 ft Tiara yacht and subsequently on June 24, 2003 for the 2000 30 ft Crosby Hawk. No acknowledgement or response of any kind was ever received from Markel with respect to either alleged request, including the assessment of an increased premium reflecting the significantly greater values of these newly proposed risks, and Eldridge failed to utilize either of what he freely admits were at least two (2) methods that were part of his standard office procedure for following up on all such requests to Markel. Proceeding under the initial misapprehension that it was the 2003 42 ft Tiara worth $697,000.00 that had been destroyed, the investigator working for Cape Wide's malpractice insurer soon thereafter corrected this mistake and sought to have Markel accept coverage for the 2000 30 ft Crosby Hawk alleged to be worth $283,959.00.

48.    Although Plaintiff has included the story of the undamaged vessel in this its Statement of Material Facts in support of summary judgment, the dispute before this Court concerns only the denial of coverage for the 2000 30 ft Crosby Hawk alleged to be worth $283,959.00

48.    Finally, a settlement has recently been entered into between Madonna and Cape Wide, the terms of which call for the broker to pay $270,000.00 in exchange for a dismissal of the Defendant's third party action against his broker. As a result of that settlement, counsel for Cape Wide apparently believes his client to now be subrogated to whatever rights Madonna may still retain as against Markel.

49.    Attached hereto as Exhibit "I" in support of Plaintiff's motion for summary judgment is a true and correct copy of a letter from Cape Wide's malpractice insurer, wherein the latter asserts that "[w]e have secured an assignment of Robert Madonna's rights as concerns the above subject claim."

50.    As stated, *infra*, at paragraph 5 of this Statement of Undisputed Material Facts, Cape Wide has never at any time asserted any independent claim against Markel American Insurance Company. Any claim or right of action that Cape Wide might conceivably have can only derive from whatever claim or right of action Madonna might retain in the wake of the settlement agreement entered into between Madonna and Cape Wide.

51.    Regardless of precisely who it is that is making the decisions for Madonna, or who it is that is presently seeking to pursue whatever rights Madonna might still retain as against Markel in the wake of his acceptance of $270,000.00 from Cape Wide, the undersigned counsel for Plaintiff has been unable to bring this litigation to a conclusion other than by the instant motion for summary judgment.


Dated:  December 30 , 2005
        Providence, Rhode Island


                                          MARKEL AMERICAN INSURANCE
                                          COMPANY
                                          By its Attorneys

I hereby certify that a true copy of the
above document was served upon each
party appearing pro se and the attorney
of record for each (other) party by mail
(by hand) on ____ EGF ___ 12/30/05

                                          Lauren Motola-Davis, #638561
                                          Michael T. Farley, #640593
                                          **MORRISON MAHONEY LLP**
                                          One Providence Washington Plaza, 6th Floor
                                          Providence, RI 02903-7141
                                          (401) 331-4660  Fax (401) 621-4660

GOLDMAN & HELLMAN
Attorneys for Plaintiff
315 S.E. 7th Street
Suite 200
Fort Lauderdale, FL 33301
(954) 356-0460