UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
IN ADMIRALTY

MARKEL AMERICAN INSURANCE
COMPANY,

       Plaintiff,

vs.

CASE NO. 04- CIV-10795-MLW

ROBERT MADONNA,

       Defendant/Counter-Plaintiff,

vs.

MARKEL AMERICAN INSURANCE
COMPANY and CAPE WIDE INSURANCE
AGENCY, INC.,

       Counter-Defendants.

_____/

## NOTICE OF FILING OF DEPOSITION TRANSCRIPT OF WILLIAM ELDREDGE

COMES NOW the Defendant, MARKEL AMERICAN INSURANCE COMPANY, by and through its undersigned attorneys and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of United States District Court for the District of Massachusetts, files this deposition transcript in further support of its Motion for Summary Judgment.

Dated:       December 30 , 2005
              Boston, Massachusetts

MORRISON MAHONEY LLP
Attorneys for Plaintiff
One Providence Washington Plaza
6th Floor
Providence, RI 02903-7141
(401) 331-4660

By: _____
    Lauren Motola-Davis, #638561
    Michael T. Farley, #640593

GOLDMAN & HELLMAN
Attorneys for Plaintiff
315 S.E. 7th Street
Suite 200
Fort Lauderdale, FL 33301
(954) 356-0460

I hereby certify that a true copy of the
above document was served upon the
party appearing pro se and the attorney
of record for each [other party]
(by hand) on PFF 12/30/05

2

```
 1                 UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2                     No. 04-10795-JGD

 3

   MARKEL AMERICAN INSURANCE              )
 4 COMPANY,                               )
                   Plaintiff,             )
 5                    vs                  )
   ROBERT MADONNA,                        )
 6                   Defendant/Counter    )
                   Plaintiff,             )
 7                    and                 )
   ROBERT MADONNA,                        )
 8                   Plaintiff in         )
                   Counterclaim,          )
 9                    vs                  )
   MARKEL AMERICAN INSURANCE              )
10 COMPANY and CAPE WIDE INSURANCE        )
   AGENCY, INC.,                          )
11                   Defendants in        )
                   Counterclaim,          )
12                    vs                  )
   CROSBY YACHT YARD, INC.,               )
13                   Third-Party          )
                   Defendant.             )
14
                      DEPOSITION of WILLIAM C. ELDREDGE,
15 a 30(b)(6) designated witness of CAPE WIDE
   INSURANCE AGENCY, INC., called on behalf of the
16 defendant/counter plaintiff, taken pursuant to
   the applicable provisions of the Federal Rules of
17 Civil Procedure, before Marie C. Leonard,
   Certified Shorthand Reporter, Registered
18 Professional Reporter, and a Notary Public in and
   for the Commonwealth of Massachusetts, at the
19 offices of Bartlett Hackett Feinberg P.C.,
   10 High Street, Boston, Massachusetts, on
20 Thursday, July 28, 2005, commencing at 10:58 a.m.

21
             NEAL A. SALLOWAY - COURT REPORTERS
22                  FIVE CARDIGAN ROAD
                 WEST PEABODY, MA 01960
23 781-581-3993 - 978-535-0313 - FAX 978-536-3142
```

1   APPEARANCES:

2
            Morrison Mahoney LLP
3                (By Michael T. Farley, Esq.)
                 One Providence Washington Plaza
4                Sixth Floor
                 Providence, Rhode Island 02903-7141
5                for the plaintiff

6           Bartlett Hackett Feinberg, P.C.
                 (By Richard E. Gentilli, Esq.)
7                10 High Street, Suite 920
                 Boston, Massachusetts 02110
8                for the defendant/counter
                 plaintiff

9           Folan & McGlone, P.C.
                 (By John F. Folan, Esq.)
10               401 County Street
                 New Bedford, Massachusetts 02740
11               for the defendants in
                 counterclaim
12

13

14

15

16

17

18

19

20

21

22

23

1                          I N D E X                    Page 3

2   Deposition of:
                                              Page
3   WILLIAM C. ELDREDGE

4           Examination by Mr. Gentilli              5

5

6
    Exhibits                                   Page
7
    No.  1      Four-Page Document              26
8
    No.  2      Five-Page Document              30
9
    No.  3      Portion of Bill Statement       31
10
    No.  4      Fax Cover Sheet with
11             Attachment                       37

12  No.  4A     Fax Cover Sheet                 67

13  No.  5      Cover Sheet dated 6/24/03       41

14  No.  6      Telephone Record                42

15  No.  7      Fax dated 7/3/03 with Marine
               Survey                          47
16
    No.  8      ACORD Property Loss Notice      49
17
    No.  9      Fax Cover Sheet dated 12/11/03  50
18
    No. 10      Letter dated 12/12/03           53
19
    No. 11      Renewal Insurance Policy        57
20
    No. 12      Renewal Insurance Policy        57
21

22

23

1                    P R O C E E D I N G S

2                    WILLIAM C. ELDREDGE, having been

3    satisfactorily identified by the production of

4    his Massachusetts driver's license, and duly

5    sworn by the Notary Public, was examined and

6    testified as follows:

7                    MR. GENTILLI:  And in terms of

8    stipulations, reserve all objections, except as

9    to the form of the question; reserve motions to

10   strike until the time of trial.

11                   MR. FOLAN:  Right.

12                   MR. GENTILLI:  You want to read

13   and sign I assume.  Waive notarization?

14                   MR. FOLAN:  Sure.

15                   MR. GENTILLI:  And also we've

16   agreed that because of Mr. Goldman's

17   unavailability today we will just proceed with

18   direct and then suspend and resume at such time

19   that's convenient to everybody.

20                   MR. FOLAN:  Yes.  And at a

21   location convenient to Mr. Eldredge.

22                   MR. GENTILLI:  Right.  For

23   resumption of the deposition for purposes of

1    cross-examination and put a different way,

2    Mr. Goldman hasn't waived any of his rights to

3    inquire of the witness.

4              MR. FARLEY:  Thank you.

5              MR. GENTILLI:  Everybody in

6    agreement?

7              MR. FOLAN:  Yes.

8              EXAMINATION BY MR. GENTILLI

9    Q.    Please state your full name.

10   A.    William Curtis Eldredge.

11   Q.    And where do you reside, Mr. Eldredge.

12   A.    Three Kendrick Road in Harwich, Mass.

13   Q.    And what is your date of birth?

14   A.    8/22/49.

15   Q.    And what is your highest level of

16   education?

17   A.    High school education, Grade 12.

18   Q.    And where did you graduate and what year?

19   A.    Chatham High School, 1968.

20   Q.    Okay.  Are you currently employed?

21   A.    Yes.

22   Q.    By whom?

23   A.    Cape Wide Insurance Agency, Inc.

1    Q.   And where is that company located?

2    A.   1455 Main Street in Chatham.

3    Q.   And are you the owner of Cape Wide

4  Insurance Agency, Inc.?

5    A.   Yes.

6    Q.   You alone?

7    A.   No.

8    Q.   Okay.

9    A.   It's a corporation.  I'm president.  My

10  daughter Cathy Spooner is vice president.

11    Q.   And how long have you been employed by

12  Cape Wide Insurance Agency, Inc.?

13    A.   Since it started in 1988.

14    Q.   Okay.  And was it always at the location

15  it is now?

16    A.   Yes.  Excuse me.  No.  I'm sorry.  It --

17  prior to 2000 I was located at 1715 Main Street

18  in West Chatham.

19    Q.   Okay.  And we'll come back to Cape Wide

20  shortly.  But what did you do before you caused

21  Cape Wide to be formed?

22    A.   Worked in the insurance business, also.

23    Q.   For whom?

1      A.    Prior to me starting my own business, I

2   worked for Pike Insurance Agency in Orleans for

3   eight years.  And prior to that I worked for

4   Eldredge & Lumpkin Insurance Agency in Chatham

5   for ten years.

6      Q.    And are you the Eldredge in Eldredge &

7   Lumpkin?

8      A.    No.

9      Q.    Who -- is it a relative?

10     A.    A very distant relative, yes.

11     Q.    Okay.  So would it be fair to say that

12  your entire professional career, virtually all

13  your professional career has been in insurance?

14     A.    Yes.

15     Q.    Do you hold any particular licenses or

16  certificates or whatnot regarding insurance?

17     A.    Yes.

18     Q.    What are they?

19     A.    The resident producer license.  And my

20  corporation has the business producer license.

21     Q.    And how long have you had these licenses?

22     A.    Business producer license was issued in

23  1988 when the corporation was formed, and my

Page 8

1    individual producer license was issued in 1979

2    approximately.

3       Q.   Okay.  And are there any -- can you sell

4    any type of insurance with these licenses?

5       A.   All insurance, except for securities,

6    annuities.

7       Q.   Okay.  And the same with the company Cape

8    Wide?

9       A.   That's correct.

10      Q.   If you could just give me a thumbnail

11   sketch of Cape Wide Insurance Agency, what types

12   of insurance does it sell?

13      A.   Specializes in selling homeowners and

14   auto and life and health insurance, commercial

15   business packages, workers' compensation.  That's

16   about it.

17      Q.   Marine insurance?

18      A.   Oh, yes.  I'm sorry.  Yes.  Marine

19   insurance, absolutely.

20      Q.   What percentage of your business is

21   marine insurance or Cape Wide's business?

22      A.   It's less than 1 percent.

23      Q.   Okay.  Has that always been the case?

Page 9

1    A.    Yes.

2    Q.    Is there any specialized license one

3  needs to sell marine insurance --

4    A.    No.

5    Q.    -- or anything like it?

6    A.    Other than the property and casualty

7  license.

8    Q.    Which you have?

9    A.    Which I have.

10    Q.    How many employees does Cape Wide

11  insurance have today, including yourself?

12    A.    Five full-time and one part-time.

13    Q.    How about in 2003?

14    A.    The same.

15    Q.    Same.  Okay.  And has there been change

16  in personnel since the middle of 2003 and today?

17    A.    Let's see.  Let's see.  No.  I think, if

18  I'm not mistaken, the personnel is the same --

19    Q.    Okay.

20    A.    -- as it was.

21    Q.    Okay.  Do you know a Robert Madonna?

22    A.    Yes.

23    Q.    How long have you known Mr. Madonna?

1    A.    Approximately 25 years.

2    Q.    Okay.  And how did you first come to meet

3    him?

4    A.    Happened to be working in an area, in the

5    same building my wife worked.

6    Q.    And have you been Mr. Madonna's insurance

7    agent during that entire 25 years?

8    A.    No.

9    Q.    Okay.  When did you first have a business

10   relationship with Mr. Madonna involving the sale

11   of insurance of any kind?

12   A.    Originally -- it would be approximate --

13   I would say starting in 1995.

14   Q.    Okay.

15   A.    No.  Actually, it would be before that.

16   Early 19 -- 1990s.

17   Q.    Okay.  And at that time did you have a

18   social relationship with Mr. Madonna prior to

19   selling him insurance?

20   A.    On occasion, yes.

21   Q.    Okay.  And what types of insurance did

22   you start selling to Mr. Madonna in the 1990s?

23   A.    Auto insurance.

1     Q.   And did you continue to sell insurance to

2   Mr. Madonna through 2003?

3     A.   Yes.

4     Q.   Okay.  And in 2003 did you provide --

5   what types of insurance did you -- were you the

6   agent for with regard to Mr. Madonna?

7     A.   Let's see.  We wrote his auto at that

8   time, his homeowners, his marine insurance.

9   Prior to 19 -- to 2003 we wrote his business

10  insurance package.

11    Q.   That was with his former company Excel

12  Switching?

13    A.   Yes.

14    Q.   Now, just sort of switching gears and

15  we'll come back to this, are you familiar with a

16  company known as Markel American Insurance

17  Company?

18    A.   Yes.

19    Q.   And have you done business with that

20  company --

21    A.   Yes.

22    Q.   -- as an insurance agent?

23    A.   Yes.

1      Q.    And when did you first do business with

2    Markel American?

3      A.    Approximately 2000 is when we started.

4      Q.    And how did that -- did it come to pass

5    that you did business with Markel?

6      A.    A former employee had a friend that

7    worked at a brokerage firm that offered Markel as

8    one of their companies.

9      Q.    Okay.  So were you dealing with that

10    former employee, or did they recommend you deal

11    with Markel?  How did --

12      A.    A former employee of mine knew an

13    employee of the brokerage firm and through

14    insurance associations and was trying to get more

15    of our business, and what she was offering to us

16    was marine insurance.

17      Q.    Okay.  I guess what I'm trying to

18    understand is did you deal with this brokerage

19    firm, or did you deal with Markel when you first

20    started doing business with them?

21      A.    To first join up with Markel, we got

22    Markel, licensed with Markel through this

23    brokerage firm.

1     Q.   Okay.  So you did get a license with

2   Markel?

3     A.   Yes.  Oh -- yes.

4     Q.   And if I sound -- if my questions aren't

5   clear, please just tell me and I'll try and

6   rephrase it.  I am not that well versed with the

7   intricacies of the insurance business --

8     A.   Sure.

9     Q.   -- so I may state things

10   inappropriately.  Just correct me if I do.

11     A.   Sure.

12     Q.   So do I understand that there's a formal

13   document under which you do business with Markel

14   or did business with Markel?

15     A.   No.

16     Q.   Okay.  When you get licensed to sell

17   Markel Insurance, what is that -- embodied in

18   that permission, that license?

19     A.    My term probably wasn't exactly

20   accurate.  There was no license application that

21   we had to complete.  We had to complete

22   applications to use the brokerage firm,

23   XS Brokers, and they offered us their product.

1    Q.    Okay.

2    A.    So when we approached XS about the

3    marine, they sent a kit.  As far as I can recall,

4    I do not remember completing any other

5    application --

6    Q.    Okay.

7    A.    -- as far as Markel's personal

8    application.

9    Q.    And just so I understand, when the

10   XS Brokers send you this kit, are you at that

11   point purchasing marine insurance indirectly from

12   Markel through the XS Broker or directly from

13   Markel?

14   A.    Directly from Markel.

15   Q.    Okay.

16          MR. FOLAN:  Maybe just -- I don't

17   know -- just to clarify --

18          MR. GENTILLI:  Yeah.

19          MR. FOLAN:  -- it is X S --

20          MR. GENTILLI:  Okay.

21          MR. FOLAN:  -- not E X, which is

22   an XS Broker, but -- is that -- well, let

23   me --

Page 15

1    A.    Yes, that's correct.

2              MR. FOLAN:  That's just maybe --

3    and even for the stenographer -- X-S or XS?

4    A.    Just the letters XS Brokers Insurance

5    Agency.

6    Q.    Okay.  Do they then get a commission of

7    the -- on the sales you make of Markel Insurance,

8    for example --

9    A.    Yes.

10   Q.    -- since they -- okay.  So they're out of

11   the loop other than that they are -- they get

12   paid a certain commission?

13   A.    Correct.

14   Q.    Okay.  And was there anybody in

15   particular you would deal with at Markel when you

16   started doing business with them?

17   A.    No.

18   Q.    Okay.  Tell me, when you first started

19   doing business with Markel, the procedure you

20   would use and -- strike that.  Markel Insurance

21   -- Markel American Insurance Company is in the

22   business of writing marine insurance?

23   A.    Correct.

1    Q.    Is that pretty much the only insurance

2    they sell?

3    A.    Oh, no.  No.

4    Q.    Okay.  They sell other --

5    A.    Many other types.

6    Q.    Okay.  Did you deal with them primarily

7    or exclusively for marine insurance?

8    A.    Exclusively for marine.

9    Q.    Okay.  Tell me how you would go about, at

10   the beginning of the relationship, placing a

11   policy of insurance with Markel.

12   A.    Complete one of their applications and

13   fax it to Markel American for review and quoting

14   and binding.

15   Q.    Okay.  Was there more than one fax number

16   that you were asked to use for --

17   A.    No.

18   Q.    No.  Was it one fax number?

19   A.    One fax number on the documents that we

20   had indicating their name, address, phone number,

21   and fax number.

22   Q.    And what would they do upon receipt of an

23   application?

1    A.    Quote the policy and fax that back to us.

2    Q.    Okay.

3    A.    And then we would request to bind if it's

4    so instructed by the insured.

5    Q.    What was the time line between your

6    faxing the application and your getting a

7    response generally?

8    A.    Generally -- we had so few that we did

9    with Markel.  I'm not sure I can even answer that

10    accurately.

11    Q.    Okay.  You said, "We had so few that we

12    did with Markel."  Approximately how many

13    policies of insurance did you place with Markel

14    from when you started doing business until the

15    end of 2003?

16    A.    Ten.

17    Q.    Okay.  Is that ten policies or

18    ten different customers?

19    A.    It would be ten policies.

20    Q.    Okay.  And would it be fair to say that

21    of those ten policies Mr. Madonna probably

22    accounted for approximately half?

23    A.    One, two -- three.  One policy had two

Page 18

1    boats.

2        Q.    Okay.   Did you have a different procedure

3    if an entity that was currently insured with

4    Markel -- well, not an entity, if a person who

5    had marine insurance with Markel traded in the

6    boat and got a different boat, was the procedure

7    the same, you'd submit an application and get

8    back a quote and a binder and then determine

9    whether to issue a binder?

10                    MR. FARLEY:  Objection.

11       Q.    Well, strike --

12                    MR. FARLEY:  You can answer.

13       Q.    You can answer.

14       A.    Okay.

15       Q.    Tell me what the procedure was.

16       A.    Completed one of our fax cover sheets

17    requesting the change and then attaching any

18    documents that we may have.

19       Q.    And what would they do in response

20    ordinarily?

21       A.    They would, depending on our request, you

22    know, take one boat off, add this one as follows,

23    and then send an endorsement to us to review and

1   forward on to the insurer.

2       Q.    What was usually the time line between

3   the submission of the change of the vessel being

4   insured and your receipt of the endorsement?

5       A.    It varied.  Ten days, two weeks, up to

6   six months.

7       Q.    Do you know why it varied so -- in such

8   large measure?

9       A.    No.

10      Q.    Okay.  And just jumping to the middle of

11  2003, was there a particular person you tended to

12  deal with at Markel?

13      A.    No.

14      Q.    Okay.  When was the first time you placed

15  a policy of insurance with Markel on behalf of

16  Mr. Madonna?

17              MR. FOLAN:  Let me just ask, when

18  you say "you," you're meaning Cape Wide --

19              MR. GENTILLI:  Cape Wide, yes.

20              MR. FOLAN:  -- as compared to --

21              MR. GENTILLI:  Yes.  He's here as

22  a representative of Cape Wide.

23              MR. FOLAN:  Yes, exactly.  I want

1    him to under -- you know, that when you're

2    answering it that that's --

3        A.    Right.   I'm not sure of the exact date

4    because it was a prior employee that originally

5    wrote Mr. Madonna's policy, and I -- he may have

6    been the initiator of us obtaining Markel.

7        Q.    Okay.

8        A.    So that would have been, I would say,

9    2000.

10       Q.    Did you sell marine insurance through any

11   other insurance company?

12       A.    Yes.

13       Q.    What other companies?

14       A.    Quincy Mutual Fire Insurance Company, we

15   at that time were also doing boat insurance with

16   Foremost.

17       Q.    What would determine selecting Markel as

18   opposed to Quincy Mutual or Foremost?

19       A.    Pretty much just sharing the business

20   with different markets.

21       Q.    Okay.   Prior to June of 2003 how many

22   vessels had Cape Wide Insurance Agency insured of

23   Mr. Madonna's with Markel?

1    A.    It would have been all his watercraft.

2   I'm not absolutely sure without looking at the

3   records.

4    Q.    Okay.   What records would you want to

5   look at?

6    A.    It would be actually my activity screen

7   on my computer.

8              MR. GENTILLI:   Has that been

9   printed or produced in --

10             MR. FOLAN:   We produced the file.

11   That's a hard copy.

12             MR. GENTILLI:   Okay.   If not, I

13   would ask that that just be printed, a screen

14   print of that, and it be produced.

15    A.    I tried that.  It doesn't -- it -- our

16   activity screen will -- if we click on a certain

17   icon, it will allow us to type in a conversation

18   we had with Mr. Madonna, but also in that -- on

19   that activity screen we would produce something

20   like that document there.  It would list it as a

21   memo.  But when I print the screen, it doesn't

22   print the -- it doesn't -- that doesn't show on

23   that printout at all.

1           It will print the spoke to

2    Mr. Madonna on such and such a date about --

3      Q.   Right.

4      A.   -- you know, making a change to the

5    policy.  But, actually, that memo that's on top

6    there would not show.

7      Q.   Well, I'd ask you to print whatever can

8    be printed --

9      A.   Sure.

10     Q.   -- and just -- I am not particularly

11   technically proficient; but you might want to try

12   and see if you can capture the screen and cut it,

13   paste it into a word processing document and

14   print that.  That's something that may work.

15     A.   That's a possibility, yes.

16     Q.   But I will ask that whatever can be

17   printed, that that be printed.

18     A.   Uh-huh.  Sure.

19     Q.   At some point you were insuring a 19 --

20   you were insuring a 2000 Pursuit and a 1996

21   31-foot Tiara for Mr. Madonna with Markel; is

22   that correct?

23     A.   Yes.

1    Q.    And do you know when that first came to

2    pass?

3    A.    I don't know the beginning date.

4    Q.    Okay.  With reference to June of '03,

5    would it have been more than a year prior?

6    A.    I'm sorry.  Could you repeat the

7    question?

8    Q.    Yeah.  With reference to June of '03,

9    which is the crux of this case --

10    A.    Uh-huh.

11    Q.    -- would it have been more than a year

12    before that?

13    A.    Uh-huh.  Oh, yes.  Yes.

14    Q.    So it had been for a while that they had

15    been insured?

16    A.    Right.

17    Q.    And at some point were you advised that

18    Mr. Madonna had sold those vessels and purchased

19    new vessels?

20    A.    Yes.

21    Q.    Okay.  And do you recall whether that was

22    two different transactions or a single

23    transaction?

1      A.   Two separate transactions.

2      Q.   And how did you -- starting with -- do

3  you remember which came first?

4      A.   Yes.

5      Q.   What?

6      A.   Changing the '96 Tiara to the 2003 Tiara,

7  if I'm not mistaken.

8      Q.   Tell me how you became aware of that

9  change?

10     A.   If I recall correctly, Mr. Madonna called

11  indicating that he was making this purchase, and

12  then I spoke to somebody at Crosby Yacht asking

13  for a fax of the documents, bill of sale, just so

14  I would have something to show me the serial

15  numbers and the price.

16     Q.   And did you get such a document from

17  Crosby Yacht?

18     A.   Yes.

19     Q.   And I'm looking at the documents you

20  produced in response to our request for

21  production of documents, and I don't see -- is

22  this -- I -- let me show you -- ask you if you

23  can identify that?

Page 25

1    A.    Yes.

2    Q.    What is that?

3    A.    It's just an agreement to purchase a

4    vessel.

5    Q.    Is that what was sent to you by Crosby

6    Yacht Yard --

7    A.    Yes.

8    Q.    -- with regard to the Tiara?

9    A.    It -- oh, I'm sorry.  No.  That's Oyster

10   Harbor Marine that actually sent that.  I

11   apologize.  Correction to that.  Oyster Harbor

12   Marine faxed this documentation.

13   Q.    And is that what resulted in your

14   attempting to --

15   A.    Yes.

16   Q.    -- switch the insurance on the two

17   Tiaras, from the '96 to the 2003?

18   A.    Yes.

19   Q.    Okay.  Now, was there a cover sheet that

20   went with this?  Because I note it starts at

21   page 2 of 5.

22   A.    Yes.  And that's page 2 of 5 of their

23   fax.

Page 26

1    Q.    Right.    Do you have a cover sheet that

2    came with that?    Because I didn't see it in the

3    documents you produced.

4    A.    I'm not sure.    It seems to me that -- no,

5    that's not it.    I do not recall if there was a

6    cover sheet on that.    A lot of times when people

7    are faxing we say you don't have to put a cover

8    because I'm right there but --

9    Q.    Well, the fact that it starts at 2 of 5

10   would indicate that --

11   A.    Would indicate that there is, yes.

12   Q.    Okay.

13   A.    I unfortunately don't recall that.

14   Q.    Well, let me --

15            MR. GENTILLI:    Let me get a

16   stapler and then we'll mark this as -- hold on

17   one second.    Let me get a stapler.

18            (Recess)

19            MR. GENTILLI:    Okay.    Why don't we

20   mark this as Exhibit 1.

21            (Exhibit No. 1 Four-Page Document

22            marked for identification)

23   Q.    Okay.    Exhibit 1 will be the fax you

1    received from Oyster Harbor Marine relating to

2    the change from a '96 to a 2003 Tiara.  What did

3    you do or what did Cape Wide do upon receipt of

4    this document?

5        A.    Immediately made up the request to

6    transfer the coverage from one boat to another by

7    a fax cover sheet requesting that change.

8        Q.    Okay.  And let me show you a five-page

9    document and ask you if you can identify it?

10       A.    Yes.

11       Q.    What is that document?

12       A.    It's the fax cover sheet requesting the

13   changeover from the '03 Tiara from -- excuse me

14   -- the '96 Tiara to the '03 with the supporting

15   documents.

16       Q.    Okay.  And whose initials under --

17   there's a box in the bottom right-hand that says,

18   Faxed June 16, '03, and it's got two initials.

19       A.    B.E., that's me.  Bill Eldredge.

20       Q.    That's you.  Okay.  So you did this

21   personally?

22       A.    Yes.

23       Q.    And does that mean you put it personally

Page 28

1  into the machine?

2      A.    Yes.

3      Q.    What does the top -- it says, TF 6/16/03,

4  in handwriting.  What does that mean?

5      A.    That's -- "TF" represents transactional

6  filing, and the date there it's filed, 6/16.

7      Q.    '03?

8      A.    '03.

9      Q.    And that's in your filing system?  Is

10  that what that refers to?

11     A.    Yes.

12     Q.    Okay.  And then there's another.  It

13  says, Fax to Jessi.  And then it says -- can you

14  read that?

15     A.    Yes.  Fax to Jessi, 12/11 -- that would

16  have been '04 -- with ACORD.

17     Q.    Is that put on there after the fact?

18     A.    Yes, it was.

19     Q.    Does that relate to after the loss of the

20  vessels?

21     A.    Yes.

22     Q.    Okay.  Or the vessel?

23     A.    Jessi is from Markel.

1              MR. FOLAN:  In '03 or '04?

2      A.   Well, June '03 was the original

3  document.  12/11//04 is when I faxed it to Jessi

4  with the ACORD --

5      Q.   '03 or '04?

6      A.   -- the --

7              MR. FOLAN:  '03 or '04?  The fire

8  was December of '03.

9      A.   I mean -- oh, I'm sorry.  '03.  '03.  I'm

10  sorry.  That was right.

11              (Discussion off the record)

12      Q.   And the ACORD is a proof of loss; is that

13  correct?

14      A.   Yes.

15      Q.   Okay.  And you have again -- before we

16  mark it as one of -- there's a 9448 in

17  handwriting, and crossed out on the cover sheet

18  is a 3288.  Is that because Jessi was at a

19  different fax number?

20      A.   That's the fax number she requested it be

21  faxed to.

22              MR. GENTILLI:  Okay.  I'm going to

23  mark this five-page document, which is the fax

1   cover sheet with copies of what previously was

2   marked as Exhibit 1, as Exhibit 2.

3                   (Exhibit No. 2 Five-Page Document

4                   marked for identification)

5   Q.   And every page of this bears -- the

6   right-hand -- bottom right-hand side -- a box

7   with your initials in it.  Do you do that

8   customarily --

9   A.   Yes.

10  Q.   -- when you fax things?

11  A.   Most of the time.

12  Q.   And I think I asked you this, but I just

13  want to be certain.  You faxed this yourself?

14  A.   Yes.

15  Q.   You put it in the machine yourself?

16  A.   Yes.

17  Q.   You dialed the number yourself?

18  A.   Yes.

19  Q.   Okay.  And you also produced a telephone

20  record, and I'd ask you if you could identify

21  what that document is?

22  A.   Yes.  It is a document -- a copy of the

23  Verizon phone bill.

Page 31

1      Q.    For your phone number, Cape Wide's phone

2   number?

3      A.    Cape Wide's fax phone number.

4      Q.    And what does that reflect?

5      A.    It reflects a call to Wisconsin, to the

6   (262) 548-3288 fax number on -- excuse me --

7   June 16 -- June 16th.

8      Q.    Of what year?

9      A.    Of 2003.

10     Q.    And is it your testimony that that

11   reflects your transmission of Exhibit 2?

12     A.    Yes.

13     Q.    And what is the time on that fax

14   transmission?

15     A.    That is 2 minutes and 3 -- 2.3 minutes.

16           MR. GENTILLI:   Okay.   I'd like to

17   mark this --

18     Q.    This is a portion of your bill statement?

19     A.    Yes, it is.

20           MR. GENTILLI:   -- as Exhibit 3.

21           (Exhibit No. 3 Portion of Bill

22           Statement marked for identification)

23     Q.    Now, did you ever hear back from anybody

1   at Markel with regard to Exhibit 2?

2       A.   No.

3       Q.   Did you ever follow up with them about

4   it?

5       A.   No.

6       Q.   Would it be fair to say that -- the fire

7   was in December of '03 -- that at no time between

8   June 16th of '03 and December of '03 did you hear

9   from Markel or anybody representing Markel about

10  the change from the '96 Tiara to the 2003 Tiara?

11      A.   That's correct.

12      Q.   Was there any tickler system in place at

13  Cape Wide where you would follow up on a change

14  in insured vessel to make sure that everything

15  was -- had gone smoothly with the transfer?

16      A.   Yes.

17      Q.   And what is that tickler system?

18      A.   There is a tickler system in our computer

19  system which could have been used.  I also have

20  what I call a "pending folder," which I keep all

21  correspondence such as that in there until the

22  endorsement comes back from the company.

23      Q.   Okay.  Just covering them both, you said

Page 33

1    "could have been used."  Was it used in this

2    case?

3       A.    Not in this case.

4       Q.    Okay.  And the pending folder -- so would

5    it be fair to say that from June to December this

6    fax was in the pending folder?

7       A.    It was not.

8       Q.    Why not?

9       A.    I don't know.

10      Q.    Okay.  It should have been?

11      A.    Should have been.

12      Q.    And had it been in the pending folder

13   what would have happened?

14      A.    If it had not been received within

15   30 days, a second request would have been faxed

16   to the company.

17      Q.    And if it had no response to that, was

18   there a further action that would have been

19   taken?

20      A.    A phone call.

21      Q.    Who was responsible for putting this in

22   the pending folder?

23      A.    I was.

Page 34

1    Q.    And do you know why it didn't end up in

2    the pending folder?

3    A.    Purely by accident.

4    Q.    Is that as a result of this TF 6/16/03 at

5    the top right-hand corner?

6    A.    We were going through a transition going

7    from regular folder files to this transaction --

8    transactional filing, and that's the only logical

9    thing that I could think of that would have

10   happened in this case.

11   Q.    You're certain it was not in the pending

12   folder at any time?

13   A.    Reasonable -- reasonably certain, yes.

14   Q.    Okay.  Had there been a follow-up fax or

15   call, would that have been you or would it have

16   been somebody else at Cape Wide?

17   A.    Me.

18   Q.    And I'm going to just go over the same

19   thing for the -- switch from the Pursuit to the

20   2000 Crosby.

21   A.    Uh-huh.

22   Q.    Mr. Madonna had a Pursuit, a 2000 Pursuit

23   insured with Cape Wide Insurance?

1    A.    Yes.

2    Q.    And it was -- that insurance was placed

3    with Markel American?

4    A.    Yes.

5    Q.    Okay.  And was that on a different policy

6    of insurance or the same policy of insurance as

7    the Tiara?

8    A.    That, if I'm not mistaken, was on the

9    same policy.

10    Q.    At some point did you learn that

11    Mr. Madonna had sold the 2000 Pursuit and

12    purchased a 2000 Crosby Hawk?

13    A.    Yes.

14    Q.    How did you learn about that?

15            Are you --

16    A.    I'm not -- I'm not sure if it was

17    Mr. Madonna or if it was somebody from Crosby

18    Yacht.

19    Q.    Okay.  At some point did you receive some

20    materials from Crosby Yacht concerning --

21    A.    Yes.

22    Q.    And what did you receive from Crosby

23    Yacht, do you recall?

Page 36

1     A.    It was a copy of the sales and purchase

2  agreement, if I'm not mistaken.

3     Q.    Okay.  And let me show you two documents

4  and -- and -- excuse me.  Let me show you a

5  series of documents, but I want to keep the

6  record clear.  I have a copy of a fax cover sheet

7  which says, Re: Bob Madonna binder from Crosby

8  Yacht to Cape Wide; but it's got some other

9  writing underneath it.  And I also have -- and

10  that appears to be page 1 to a page 2, which is a

11  purchase and sale agreement.

12              I also have another version of it

13  which doesn't have the writing under the word

14  "binder."  And just because I want to keep the

15  record clear, would it be fair to say that when

16  you received it you received the cover sheet

17  without the writing and the writing was put on

18  after?

19     A.    That's correct.

20     Q.    Okay.  So if I were to give you the cover

21  sheet simply with the purchase and sale

22  agreement, would that be what you received?

23     A.    Yes.

Page 37

1     Q.    Are you comfortable if I mark that

2   document therefore as Exhibit 4?

3     A.    Exactly.

4               MR. GENTILLI:  Okay.  Let's mark

5   this as Exhibit 4.

6               (Exhibit No. 4 Fax Cover Sheet

7               with Attachment marked for

8               identification)

9     Q.    Okay.  And so Exhibit 4 would have been

10  what you received from Cape Wide?

11    A.    Received by Cape Wide?

12    Q.    From Crosby?

13    A.    Yes.  Yes.

14    Q.    I'm sorry.  Did you have any prior

15  knowledge that this was coming over?  Did

16  somebody call you ahead of time?

17    A.    If I'm not mistaken, Mr. Madonna had

18  called saying that he was buying some -- making

19  some changes on his watercraft --

20    Q.    Okay.

21    A.    -- through Crosby Yacht.

22    Q.    So you were expecting this?

23    A.    Yes.

1    Q.   Okay.   And this came in around, it

2    appears, 4:18 in the afternoon on June 23rd?

3    A.   That's correct.   Uh-huh.

4    Q.   What did you do when you received that

5    document?

6    A.   Followed the same procedure by completing

7    a fax cover sheet requesting the change and

8    attaching the documents.

9    Q.   Okay.   Now, I have another version of

10   this fax cover sheet which has some writing, as

11   we talked about earlier, underneath it.   Can you

12   tell me when that writing was placed on the fax

13   cover sheet?

14   A.   That would have been the same day that

15   Exhibit 4 was received.

16   Q.   And what is that writing?

17   A.   That's my writing asking for the hull ID

18   number because the original purchase and sale

19   agreement did not have the ID number written in

20   there.

21   Q.   Did you send this fax cover sheet back to

22   Crosby Yacht Yard?

23   A.   Yes.

Page 39

```
 1      Q.    Okay.   Can you read just for the record

 2   what you've written underneath?

 3      A.    No. 1, Need hull serial number.  No. 2,

 4   Do you know if this is an additional watercraft,

 5   or did he trade one in?  No. 3, Need length.  And

 6   I had indicated no loan.

 7      Q.    And who did you send that to?

 8      A.    Crosby Yacht.

 9      Q.    Okay.  What did you get, if anything, in

10   response?

11      A.    I received -- I wrote in the serial

12   number.

13      Q.    Okay.  So that -- on the second page of

14   Exhibit 4, that was added by you, the serial

15   number?

16      A.    Yes.  That's my writing, yes.

17      Q.    Okay.  And is the length added, too?

18      A.    Yes, it is.  It is here.

19      Q.    Okay.  So you just -- you got a phone

20   call back basically?

21      A.    Right.

22      Q.    Okay.  And what did you do once you got

23   that information?
```

Page 40

1     A.    Then I followed the normal procedure by

2  completing the fax cover sheet requesting the

3  switch over of boats and attaching the documents

4  and faxed it -- faxed it to Markel.

5     Q.    Okay.  Let me show you what you produced

6  and ask you if this is a cover sheet that you

7  used?

8     A.    Yes.

9     Q.    Okay.  Now, it says, See attached P&S?

10     A.    Purchase and sale, yes.

11     Q.    Is that the same attachment as was the

12  second page of Exhibit 4?

13     A.    Correct.

14     Q.    Okay.  And there's an account number next

15  to the name Madonna.  Is that the insurance

16  policy?

17     A.    That's correct.

18     Q.    Okay.  And it doesn't have initials where

19  it says faxed.  Do you know who faxed that?

20     A.    I did.

21     Q.    You personally?

22     A.    Yes.

23     Q.    Do you recall doing it?

Page 41

1      A.    Yes, I do.

2      Q.    Okay.  And this was June 24th which is

3   the next day; is that correct?

4      A.    That's correct.

5      Q.    Okay.  So do you know when you got this

6   additional information?

7      A.    It was the following day.

8      Q.    Okay.  And apparently you put this in the

9   file as well.  It says 6/20 -- TF 6/24/03?

10     A.    That's correct.

11               MR. GENTILLI:  Why don't me mark

12   this cover sheet as Exhibit 5.

13               (Exhibit No. 5 Cover Sheet dated

14               6/24/03 marked for identification)

15     Q.    Now, with regard to Exhibit 5, I note

16   that among the -- there is not among the

17   documents you produced a copy of the second page

18   of Exhibit 4 bearing the fax stamp that you

19   used.  Do you know why that is?

20     A.    No, I don't.

21     Q.    I also note you didn't initial this one.

22   Is there any reason you didn't initial it?

23     A.    No reason.

Page 42

1    Q.    Okay.  And you produced another record of

2    a phone statement.  Do you know what that is?

3    A.    Yes.  It was a fax to Markel at

4    (262) 548-3288 and 1.4 minutes, which is -- which

5    was faxing Exhibit 5.

6    Q.    Okay.  What time of day does it say it

7    was faxed?

8    A.    It says 4:02 p.m.

9            MR. GENTILLI:  I'd like to mark

10   this telephone record as Exhibit 6.

11           (Exhibit No. 6 Telephone Record

12           marked for identification)

13   Q.    With regard to the materials you faxed on

14   -- with -- to the change to the 2000 Crosby --

15   A.    Uh-huh.

16   Q.    -- did you hear anything back from Markel

17   at any time between June 24, 2003, and the fire

18   at the Crosby Yacht Yard in December of '03?

19   A.    No.

20   Q.    Did any tickler system get put in place

21   with regard to this change?

22   A.    No.

23   Q.    Okay.  So it wasn't put into the

Page 43

1    computerized tickler system?

2        A.    No.

3        Q.    And did this document not find its way

4    into the pending folder?

5        A.    That's correct.

6        Q.    The same as the other one?

7        A.    Yes.

8        Q.    So no follow-up was made after 30 days or

9    60 days --

10       A.    That's correct.

11       Q.    -- to see what was going on?

12       A.    Right.

13       Q.    Okay.  So would it be fair to say that at

14   no time between December 24th and the fire loss

15   did you have any further contact with Markel

16   American --

17               MR. FOLAN:  June.

18       Q.    -- June 24th of '03 --

19               MR. FOLAN:  You said --

20               MR. GENTILLI:  I'm sorry.

21       Q.    -- June 24, '03, and the fire loss did

22   you have any further conversation with Markel

23   American about the insurance for the 2000 Crosby

1    Hawk?                                                    Page 44

2        A.    I did not.

3        Q.    Now, at some point in July, early July of

4    '03 did you receive a fax from Racepoint

5    Management regarding Mr. Madonna's Crosby?

6        A.    Yes, I did.

7        Q.    Okay.  And what was that fax?  What did

8    it provide you with?

9        A.    It was a marine survey of the Crosby.

10       Q.    Was that usually required for insurance

11   for a vessel?

12       A.    No, not in all situations.

13       Q.    Okay.  Why was one sent to you in this

14   situation, if you know?

15       A.    For information purposes only.

16       Q.    Do you --

17       A.    It was not required by Markel.

18       Q.    Had you requested it?

19       A.    No.

20       Q.    Okay.  This is something that Mr. Madonna

21   obtained and sent to you?

22       A.    Had Racepoint Management fax it to me,

23   yes.

Page 45

1    Q.    Okay.    Did you get a similar document for

2    the Tiara?

3    A.    No.

4    Q.    Okay.    Do you know why you got one for

5    the Crosby, but not the Tiara?

6    A.    No.

7    Q.    Okay.    What did you do with this document

8    when you received it?

9    A.    I T filed, transactional filed.

10    Q.    Okay.    It didn't find its way in the

11    pending folder either?

12    A.    No.

13    Q.    And you would not have forwarded this to

14    Markel?

15    A.    No, because it wasn't requested.

16    Q.    Okay.    And what is a "marine survey"?

17    A.    It's a document that is produced to

18    indicate value, description of -- a detailed

19    description of a vessel.

20    Q.    Is it an appraisal basically?

21    A.    Yes, basically.

22    Q.    And have you ever heard of Edwin C.

23    Boice, Inc., before?

Page 46

1    A.    Yes.

2    Q.    Are they a company that generally does

3    marine surveys?

4    A.    Yes.

5    Q.    Have you dealt with them in the past?

6    A.    Yes.

7    Q.    And is it your experience that the values

8    they ascribe to vessels are fair and reasonable?

9    A.    Yes.

10    Q.    Okay.  Do you have any reason as we sit

11    here today or at any time in the past to question

12    the value ascribed to the Crosby?

13    A.    No.

14    Q.    Okay.  And is the value consistent with

15    the value in the purchase and sale agreement for

16    the Crosby?

17    A.    Close.

18    Q.    Okay.  The appraisal is -- or the marine

19    survey is 275 to 280, and the purchase price is

20    280?

21    A.    283, 284.

22             MR. GENTILLI:  And then mark this

23    fax with the marine survey as Exhibit 7.

Page 47

1        (Exhibit No. 7 Fax dated 7/3/03

2            with Marine Survey marked for

3            identification)

4    Q.   Just before we get to -- I believe you

5  produced -- strike that.  Did you have any

6  discussions with anybody at Markel at any time

7  about the two requested changes of the insured

8  vessel that we've just gone over with these faxes

9  of June of '03?

10   A.   No.  Not until the time of the loss.

11   Q.   Okay.  I mean at any time?  You did have

12  one around the time of the loss or shortly after

13  the loss?

14   A.   At the time of the loss, reporting it,

15  there was a discussion about it.

16   Q.   Okay.  That's what I'm going to ask you

17  about.

18   A.   Yup.  Uh-huh.

19   Q.   How did you first report it?  In writing

20  or verbally?

21   A.   In writing.

22   Q.   Okay.  And leaving aside the handwriting,

23  which we'll get to, is this what you're referring

Page 48

1   to?

2      A.    Part of it, yes.

3      Q.    Okay.  When you say "part of have," what

4   else was with it?

5      A.    The original -- the original

6   communication between Cape Way Insurance and

7   Markel was the ACORD claim form.

8      Q.    Is that this document right here?

9      A.    Yes.

10     Q.    Okay.  Now, was this ACORD claim form

11  relating to Crosby or was it relating to the

12  Tiara?

13     A.    Tiara.

14     Q.    Okay.  Was that -- why was it on the

15  Tiara?  You understand now that the Crosby was

16  destroyed, correct?

17     A.    Yes, I do.

18     Q.    And not the Tiara?

19     A.    Correct.

20     Q.    Why was the claim form put in for the

21  Tiara, if you know?

22     A.    I assume -- excuse me.  I did not

23  assume.  I thought it was the Tiara that Bob was

1    talking about when he made that --

2       Q.    When he called you about the loss?

3       A.    Yes.

4       Q.    So this was the first thing you sent, and

5    it's got a fax December 11, 2003, 3:20 p.m., and

6    your initials; is that correct?

7       A.    That's correct.

8       Q.    And this was faxed with regard to when

9    you first heard of the loss?

10      A.    Yes.

11                 MR. GENTILLI:  Mark that ACORD

12   property loss notice as Exhibit 8.

13                 (Discussion off the record)

14                 (Exhibit No. 8 ACORD Property Loss

15                 Notice marked for identification)

16      Q.    I was showing you a document I believe.

17   Is this a copy of the fax you sent after the fire

18   loss?

19      A.    Yes.

20      Q.    So let me just get the chronology.  You

21   sent the ACORD property loss and then what

22   happened?  Did they call you and say what are you

23   talking about?

1      A.    Yes.

2      Q.    Who called you, do you know who?

3      A.    I want to say it was Jessi, yes.

4      Q.    Do you know her last name?

5      A.    It begins with a "C."

6      Q.    And so what did you -- did you re-fax

7   what had been faxed previously?

8      A.    I re-faxed the original request for the

9   boat changes.

10      Q.    Okay.  So you re-faxed Exhibits 2 and 5;

11   is that correct?

12      A.    Yes.

13      Q.    And you did that on December 11th at

14   3;20?

15      A.    That's correct.

16      Q.    And this is -- you personally faxed this

17   document?

18      A.    Yes.

19              MR. GENTILLI:  Why don't we mark

20   this as Exhibit 9.

21              (Exhibit No. 9 Fax Cover Sheet

22              dated 12/11/03 marked for

23              identification)

1    Q.    And did you have any conversations

2    following your sending of Exhibit 9 with anybody

3    at Markel?

4    A.    Yes.

5    Q.    And I'd like you to tell me who you spoke

6    to, what was said?

7    A.    I spoke with Tom Conroy at Markel.

8    Q.    Did he call you back or -- call you or

9    did you call him?

10    A.    I don't recall.

11    Q.    Okay.  So tell me what --

12    A.    I spoke to Tom Conroy in reference to the

13    fax and just reviewed my procedure as to when the

14    original request change of the boats was faxed in

15    and what documents were attached, and he

16    indicated that there was no record of that.

17    Q.    Did you talk to anyone else at Markel?

18    A.    Yes, I did.  And I'm sorry, I can't

19    recall who it was.

20    Q.    And what was the nature of that

21    discussion?

22    A.    Pretty much the same thing as was said to

23    Tom Conroy.  And I think that person that I don't

1    know the name of was the one I spoke to first who

2    referred me to Tom Conroy.

3         Q.    And --

4         A.    Oh, here we go.  If I could read my own

5    writing.  Mark Rip --

6                     MR. FOLAN:  No.

7         A.    Oh, no.  He's from Utica.  I'm sorry.

8    Utica Mutual.

9         Q.    And did Markel give you any indication,

10   the person you spoke to, as to what had happened

11   to your faxes, if anything?

12        A.    Yes.  They had -- they said they had no

13   record of requesting any change.

14        Q.    Okay.  And did they tell you they were

15   going to look into any records, or were they

16   going to do anything to investigate it further?

17        A.    No.  They were going to deny the claim

18   and asked if I wanted to contact the insured or

19   just let the denial letter notify the insured.

20        Q.    And what did you tell them?

21        A.    I said I would notify the insured.

22        Q.    Okay.  Do you know if, in fact, they sent

23   a denial letter on December 12th?

1    A.    They did send a denial letter, yes.

2    Q.    Is this a copy of the denial letter?

3    A.    Yes, it is.

4    Q.    Again, that is with regard to the Tiara

5    because of the confusion as to --

6    A.    That's correct, yes.

7    Q.    -- which vessel was lost?

8    A.    Yes.

9    Q.    Okay.  And you got a copy of this letter,

10   too?

11   A.    Yes.

12   Q.    And it's dated December 12th?

13   A.    Yes.

14          MR. GENTILLI:  Okay.  Mark that as

15   Exhibit 10, please, a letter from Markel American

16   to Robert Madonna.

17                (Exhibit No. 10 Letter dated

18                12/12/03 marked for

19                identification)

20   Q.    Let me show you -- and did you -- strike

21   that.  Did you have any other discussions with

22   anybody at Markel besides those about their

23   receipt or nonreceipt of the change in vessel

1    descriptions?

2      A.    None other than stating that I would just

3    contact my E&O carrier.

4      Q.    Now, let me show you a couple of

5    documents you produced.   I believe they're

6    different documents.   Tell me if you can identify

7    what those are?

8      A.    These are copies of the renewal policies

9    -- renewal policy.   Excuse me.

10     Q.    And would that be for the policy that

11   would have insured the original Tiara and the

12   original Pursuit?

13     A.    Yes.

14     Q.    And who generated those documents?

15     A.    Markel.

16     Q.    And what -- were they sent to you?

17     A.    Yes.

18     Q.    And then what do you do with them?

19     A.    They're sent to me along with a copy for

20   the insured and any lien holder, if there was

21   any, and there was not.

22     Q.    And what do you do when you get those --

23   or what did you do in this case when you got

Page 55

1    those?

2        A.    Forwarded a copy to Mr. Madonna and then

3    T filed our agency copy.

4        Q.    Is that a bill basically?

5        A.    No.

6        Q.    What is that?

7        A.    That -- this is the actual policy itself.

8        Q.    Okay.  Now, whose handwriting is it, the

9    changes of the 2003 Tiara, on the one form?

10       A.    That's mine.

11       Q.    Okay.  And so you wrote that in after the

12   fact because this came in -- why did you write

13   that?

14       A.    May I look at that again, please?

15       Q.    Yes.

16       A.    Okay.  This was pulled when we were

17   notified to change from the '96 to the 2003 and

18   just indicated what I was doing with this.

19       Q.    Okay.  When you say "This was pulled,"

20   what do you mean, taken out of the file?

21       A.    Pulled out of the T file, transactional

22   file.

23       Q.    Do you recall when that was?

1      A.    That was June 13th or --

2      Q.    Okay.

3      A.    Is it?  I'm sorry.  Is that the correct

4    date?

5      Q.    I'm confused.  Let me just ask you

6    because I'm just -- I'm a little confused.

7      A.    Uh-huh.

8      Q.    This appears to have been issued

9    June 19th --

10     A.    Oh, June 19th.

11     Q.    -- and the TF indication is 6/3,

12    June 3rd, and I'm just confused.

13     A.    I had one just the other day.  A renewal

14    policy came in.  This date is way in advance.

15     Q.    What do you mean?  So, in other words,

16    it's sent before -- that's not the date it was

17    sent -- oh, okay.  There's another date down

18    here, 5/27/03.

19     A.    That's correct.

20     Q.    Okay.

21              MR. GENTILLI:  Okay.  Let's mark

22    this document we've been looking at, the

23    statement, the insurance for I guess the original

Page 57

1    Tiara but your notation on it in pen to the 2003

2    Tiara as Exhibit 11.

3                    (Discussion off the record)

4                    (Exhibit No. 11 Renewal Insurance

5                    Policy marked for identification)

6    Q.    When you pulled this out of the TF file

7    to note the change, that was too soon -- or

8    strike that -- that didn't trigger you to do a

9    follow-up; is that correct?

10   A.    That is correct.

11   Q.    Okay.  Is that because it's shortly after

12   or at the time of the fax?

13   A.    It was the same time as the fax, yes.

14   Q.    And let me show you this other document

15   that we looked at.

16                    MR. GENTILLI:  And why don't we

17   mark this as Exhibit 12, which is also an

18   insurance for the Pursuit.

19                    (Exhibit No. 12 Renewal Insurance

20                    Policy marked for identification)

21   Q.    On this document I can't tell what was

22   crossed out and written.  Can you tell me?  I see

23   some handwriting on it.

1    A.    I had accidentally marked this one as the

2    changing to the 2003 Tiara, and then I scribbled

3    over that because I realized I was writing on the

4    wrong renewal policy.

5    Q.    Okay.  So there's no reference there to

6    the Crosby though; is that correct?

7    A.    Not at this time, no.

8    Q.    Okay.  Now, would it be fair to say that

9    at all times prior to the fire Mr. Madonna had

10   been timely in his payment of any premiums due on

11   the insurance policy --

12   A.    That's correct.

13   Q.    -- for the Crosby and for the Tiara?

14   A.    He was prompt on his payment for the

15   vessels that were on the original renewal policy.

16   Q.    Right.  In other words, he had not not --

17   he had not been late in paying any bills he

18   received?

19   A.    No.

20   Q.    Okay.  Would you have expected a change

21   in premium with the change in vessels?

22   A.    Yes.

23   Q.    Did you ever receive a change in premium?

1    A.   No.

2    Q.   And, again, that's just because it was

3    not in the pending file, it never registered that

4    we haven't gotten a change in premium; is that

5    correct?

6    A.   I would not have seen the change in

7    premium, except by a processed endorsement to the

8    original policy.

9    Q.   Got you.  Okay.  In fact -- and I'm not

10   sure I'm going to mark it -- but among your

11   records it appears that there was a renewal

12   billing that came out of '04 for the '96 Tiara

13   and the 2000 Pursuit from -- out of Markel; is

14   that correct?

15   A.   Yes.

16   Q.   Now, you also produced some materials or

17   Cape Wide produced from Markel which appear to be

18   -- and I'm not sure I want to clutter the record

19   with them.  Do you know what these documents I'm

20   just showing you are?  Because they're -- yacht

21   endorsement, agreed value -- do you know what --

22   A.   It's part of their kit or explains their

23   guidelines.

Page 60

1    Q.    Were you able to bind Markel under your

2    agreement with them?

3    A.    No.  We had to request binders.  We could

4    not --

5    Q.    You couldn't yourself issue the binder?

6    A.    That's correct.

7    Q.    Okay.  Are there circumstances when an

8    agent can bind the insurance company?

9    A.    Certain companies, yes.

10   Q.    Markel was not one of them?

11   A.    We did not have binding authority.

12   Q.    Had you previous to June of '03 affected

13   any change of insured watercraft with Markel

14   using the procedure you used with regards to

15   Mr. Madonna's vessels?

16   A.    Yes.

17   Q.    On how many occasions?

18   A.    Three occasions possibly.

19   Q.    And was it exactly the same procedure, a

20   fax cover sheet --

21   A.    Yes.

22   Q.    -- with some attachments?

23   A.    Yes.

Page 61

1    Q.    And in those cases were the transfers

2  effective?

3    A.    Yes.

4    Q.    The transfer of coverage I mean?

5    A.    Yes.

6    Q.    And do you recall how soon after them you

7  got confirmation?

8    A.    I do recall one situation where it was

9  approximately a two-week turnaround time and a

10  second situation where it was a three-month

11  turnaround time.

12    Q.    Did you ever have occasion to see the

13  Crosby or what was left of it after the fire?

14    A.    No.

15    Q.    Do you have any reason to question that

16  it was totally destroyed by the fire at Crosby

17  Yacht Yard?

18    A.    No question.

19    Q.    And was RMG Investigations and Robert

20  Burkitt somebody employed on your behalf to

21  investigate the issues surrounding the placement

22  -- or the attempted placement of insurance with

23  Markel on Mr. Madonna's behalf?

1    A.    He was employed by Utica Mutual to

2    investigate.

3    Q.    Okay.  And at some point he had the wrong

4    vessel, he was investigating the wrong vessel; is

5    that correct?

6    A.    Yes.

7    Q.    Is that as a result of your initial

8    misunderstanding?

9    A.    Yes.

10              MR. GENTILLI:  Why don't we go off

11   record because I hate to clutter the record with

12   stuff.

13              (Discussion off the record)

14   Q.    Were you aware that Markel had limits as

15   to the amount of -- the value of a vessel that

16   they would insure?

17   A.    No.

18   Q.    Okay.  And I -- again, is there some sort

19   of restriction on or different procedure that has

20   to be used on vessels that are over a certain

21   value?

22   A.    Yes.

23   Q.    And what is that, do you know?  What

Page 63

1    value, first of all, and then what's the

2    difference?

3        A.    I don't know the breakdown of values.

4    There are different applications for different

5    types of boats.  Whether the value has anything

6    to do with the type of application, I'm not quite

7    sure.

8        Q.    Do you still do business with Markel?

9        A.    I have not written any new business.

10   There is still some remaining business on their

11   books.

12       Q.    Have you had any occasion to change an

13   insured vessel with Markel since December of '03?

14       A.    No.

15       Q.    Okay.  And has Markel -- are you still

16   permitted to write policies with Markel?

17       A.    Yes.

18       Q.    Okay.  So you still have a -- just you've

19   chosen not to or you haven't for other reasons?

20       A.    Just haven't for other reasons.

21       Q.    Okay.  Now, you told me earlier that

22   there is a screen which has the activity, if you

23   will, on an account.  Would that have your

1    telephone conversations with Mr. Madonna and with

2    Crosby Yacht Yard about the change in vessels?

3        A.    Possibly, yes.

4        Q.    And is it generally just -- if you put

5    something down, would it just be a summary of a

6    discussion?

7        A.    Yes.

8        Q.    Okay.  Did Mr. Madonna ever call to

9    inquire as to whether the transfer of the

10   insurance to new vessels, the new Tiara and the

11   2000 Crosby, had gone through?

12       A.    No.

13       Q.    Okay.  Did you have any discussions with

14   Mr. Madonna or any representative of Mr. Madonna

15   at any time after June of '03 concerning the

16   status of the change in vessels being insured?

17       A.    No.

18       Q.    Did you talk to Mr. Madonna at any time

19   between June 24th of '03 and December 10th of

20   '03?

21       A.    No.

22       Q.    Okay.  When Mr. Madonna called you to

23   tell you that he was buying the Crosby or the

Page 65

1    newer Tiara, did you tell him that you would take

2    care of obtaining insurance on it?

3        A.    Yes.

4        Q.    Okay.

5                    MR. GENTILLI:  I have no further

6    questions at this time.  Suspend.  I just want to

7    reserve the right based on that screen shot thing

8    that you're going to produce, and I know there

9    may be some redirect, I guess, after Mr. Goldman

10   cross-examines.  But other than that, I'm done.

11                   MR. FARLEY:  Okay.  Thank you.

12                   MR. GENTILLI:  You want to reserve

13   your rights until later?

14                   MR. FARLEY:  Yes.  I would like to

15   reserve the rights of Markel's designated counsel

16   to cross-examine.

17                   MR. FOLAN:  Let me just --

18                   MR. GENTILLI:  Yeah.  Do you want

19   to ask some questions?

20                   MR. FOLAN:  No, no.  Just for

21   marking, just for purposes of the record, there

22   was one we had the blank.  Was that No. 4 or

23   No. 5 or --

Page 66

1           MR. GENTILLI:  Yes.

2           MR. FOLAN:  And then there was one

3   with the handwriting.  Can you just mark -- only

4   so that when we have all that so that it will be

5   together.

6           MR. GENTILLI:  I marked both, I

7   think.

8           MR. FOLAN:  No.  I think we just

9   marked -- my memory is we marked just the one.

10          MR. GENTILLI:  I'm sorry, my

11  mistake.  I'm glad you pointed that out.  Why

12  don't we mark --

13          MR. FOLAN:  Mark that 4A.

14          MR. GENTILLI:  Yes.  I'd like to

15  do that 4A.  Is it four?  It's either four or

16  five.

17          MR. FARLEY:  That's it.

18          MR. FOLAN:  Right there.

19          MR. GENTILLI:  Okay.  It's

20  Exhibit 4.  So counsel is correct.  I

21  inadvertently did not mark the document we

22  discussed following Exhibit 4 with the

23  handwriting requesting serial number and length

1    and the like.  Why don't we mark that copy of the

2    cover page, which includes additional information

3    which I believe the witness said he then got on

4    the telephone and added to the purchase and sale

5    agreement -- I think that's what it was -- as

6    Exhibit 4A.

7                    (Exhibit No. 4A Fax Cover Sheet

8                    marked for identification)

9                    MR. GENTILLI:  That's it.

10                   MR. FOLAN:  Great.

11                   MR. GENTILLI:  Thank you.

12                   (Whereupon the deposition

13                   was suspended at 12:24 p.m.)

14

15

16

17

18

19

20

21

22

23

Page 68

```
1                    CERTIFICATE

 2

 3

 4          I, WILLIAM C. ELDREDGE, do hereby

 5   certify that I have read the foregoing transcript

 6   of my testimony, and further certify that said

 7   transcript is a true and accurate record of said

 8   testimony.

 9          Dated at _____

10   this _____ day of _____, 2005.

11

12

13

14                        _____

15                        WILLIAM C. ELDREDGE

16

17   In re:  Markel American Insurance Company vs
             Robert Madonna
18           7/28/05 - Depo of WILLIAM C. ELDREDGE

19

20

21

22

23
```

Page 69

```
 1                    CERTIFICATE

 2

 3   Commonwealth of Massachusetts

 4   Norfolk, ss.

 5

 6            I, Marie C. Leonard, Certified

 7   Shorthand Reporter, Registered Professional

 8   Reporter, and a Notary Public in and for the

 9   Commonwealth of Massachusetts, do hereby certify:

10            That WILLIAM C. ELDREDGE, the

11   witness whose deposition is hereinbefore set

12   forth, was duly sworn by me and that such

13   deposition is a true record of the testimony

14   given by the said witness.

15            IN WITNESS WHEREOF, I have

16   hereunto set my hand and notarial seal this 15th

17   day of August, 2005.

18

19

20            _____

21                    Marie C. Leonard
                       CSR, RPR
22
     My commission expires
23   on June 29, 2008
```