```
                                                                                          Page 1
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2                  No. 04-10795-JGD

 3
    MARKEL AMERICAN INSURANCE    )
 4  COMPANY,                     )
             Plaintiff,          )
 5       vs                      )
    ROBERT MADONNA,              )
 6           Defendant/Counter   )
             Plaintiff,          )
 7       and                     )
    ROBERT MADONNA,              )
 8           Plaintiff in        )
             Counterclaim,       )
 9       vs                      )
    MARKEL AMERICAN INSURANCE    )
10  COMPANY and CAPE WIDE INSURANCE )
    AGENCY, INC.,                )
11           Defendants in       )
             Counterclaim,       )
12       vs                      )
    CROSBY YACHT YARD, INC.,     )
13           Third-Party         )
             Defendant.          )
14
                DEPOSITION of WILLIAM C. ELDREDGE,
15  a 30(b)(6) designated witness of CAPE WIDE
    INSURANCE AGENCY, INC., called on behalf of the
16  defendant/counter plaintiff, taken pursuant to
    the applicable provisions of the Federal Rules of
17  Civil Procedure, before Marie C. Leonard,
    Certified Shorthand Reporter, Registered
18  Professional Reporter, and a Notary Public in and
    for the Commonwealth of Massachusetts, at the
19  offices of Bartlett Hackett Feinberg P.C.,
    10 High Street, Boston, Massachusetts, on
20  Thursday, July 28, 2005, commencing at 10:58 a.m.

21
           NEAL A. SALLOWAY - COURT REPORTERS
22               FIVE CARDIGAN ROAD
                WEST PEABODY, MA 01960
23    781-581-3993 - 978-535-0313 - FAX 978-536-3142
```

```
                                                             Page 2
 1  APPEARANCES:

 2       Morrison Mahoney LLP
           (By Michael T. Farley, Esq.)
 3         One Providence Washington Plaza
           Sixth Floor
 4         Providence, Rhode Island 02903-7141
           for the plaintiff
 5
         Bartlett Hackett Feinberg, P.C.
 6         (By Richard E. Gentilli, Esq.)
           10 High Street, Suite 920
 7         Boston, Massachusetts 02110
           for the defendant/counter
 8         plaintiff

 9       Folan & McGlone, P.C.
           (By John F. Folan, Esq.)
10         401 County Street
           New Bedford, Massachusetts 02740
11         for the defendants in
           counterclaim
```

```
                                                             Page 3
 1                      I N D E X

 2  Deposition of:                              Page

 3  WILLIAM C. ELDREDGE

 4       Examination by Mr. Gentilli              5

 5

 6  Exhibits                                    Page

 7  No.  1    Four-Page Document                 26

 8  No.  2    Five-Page Document                 30

 9  No.  3    Portion of Bill Statement          31

10  No.  4    Fax Cover Sheet with
              Attachment                         37
11
    No.  4A   Fax Cover Sheet                    67
12
    No.  5    Cover Sheet dated 6/24/03          41
13
    No.  6    Telephone Record                   42
14
    No.  7    Fax dated 7/3/03 with Marine
15            Survey                             47

16  No.  8    ACORD Property Loss Notice         49

17  No.  9    Fax Cover Sheet dated 12/11/03     50

18  No. 10    Letter dated 12/12/03              53

19  No. 11    Renewal Insurance Policy           57

20  No. 12    Renewal Insurance Policy           57
```

```
                                                             Page 4
 1               P R O C E E D I N G S
 2          WILLIAM C. ELDREDGE, having been
 3  satisfactorily identified by the production of
 4  his Massachusetts driver's license, and duly
 5  sworn by the Notary Public, was examined and
 6  testified as follows:
 7          MR. GENTILLI: And in terms of
 8  stipulations, reserve all objections, except as
 9  to the form of the question; reserve motions to
10  strike until the time of trial.
11          MR. FOLAN: Right.
12          MR. GENTILLI: You want to read
13  and sign I assume. Waive notarization?
14          MR. FOLAN: Sure.
15          MR. GENTILLI: And also we've
16  agreed that because of Mr. Goldman's
17  unavailability today we will just proceed with
18  direct and then suspend and resume at such time
19  that's convenient to everybody.
20          MR. FOLAN: Yes. And at a
21  location convenient to Mr. Eldredge.
22          MR. GENTILLI: Right. For
23  resumption of the deposition for purposes of
```

### Page 5

1  cross-examination and put a different way,
2  Mr. Goldman hasn't waived any of his rights to
3  inquire of the witness.
4         MR. FARLEY: Thank you.
5         MR. GENTILLI: Everybody in
6  agreement?
7         MR. FOLAN: Yes.
8         EXAMINATION BY MR. GENTILLI
9    Q. Please state your full name.
10   A. William Curtis Eldredge.
11   Q. And where do you reside, Mr. Eldredge.
12   A. Three Kendrick Road in Harwich, Mass.
13   Q. And what is your date of birth?
14   A. 8/22/49.
15   Q. And what is your highest level of
16  education?
17   A. High school education, Grade 12.
18   Q. And where did you graduate and what year?
19   A. Chatham High School, 1968.
20   Q. Okay. Are you currently employed?
21   A. Yes.
22   Q. By whom?
23   A. Cape Wide Insurance Agency, Inc.

### Page 6

1    Q. And where is that company located?
2    A. 1455 Main Street in Chatham.
3    Q. And are you the owner of Cape Wide
4  Insurance Agency, Inc.?
5    A. Yes.
6    Q. You alone?
7    A. No.
8    Q. Okay.
9    A. It's a corporation. I'm president. My
10  daughter Cathy Spooner is vice president.
11   Q. And how long have you been employed by
12  Cape Wide Insurance Agency, Inc.?
13   A. Since it started in 1988.
14   Q. Okay. And was it always at the location
15  it is now?
16   A. Yes. Excuse me. No. I'm sorry. It --
17  prior to 2000 I was located at 1715 Main Street
18  in West Chatham.
19   Q. Okay. And we'll come back to Cape Wide
20  shortly. But what did you do before you caused
21  Cape Wide to be formed?
22   A. Worked in the insurance business, also.
23   Q. For whom?

### Page 7

1    A. Prior to me starting my own business, I
2  worked for Pike Insurance Agency in Orleans for
3  eight years. And prior to that I worked for
4  Eldredge & Lumpkin Insurance Agency in Chatham
5  for ten years.
6    Q. And are you the Eldredge in Eldredge &
7  Lumpkin?
8    A. No.
9    Q. Who -- is it a relative?
10   A. A very distant relative, yes.
11   Q. Okay. So would it be fair to say that
12  your entire professional career, virtually all
13  your professional career has been in insurance?
14   A. Yes.
15   Q. Do you hold any particular licenses or
16  certificates or whatnot regarding insurance?
17   A. Yes.
18   Q. What are they?
19   A. The resident producer license. And my
20  corporation has the business producer license.
21   Q. And how long have you had these licenses?
22   A. Business producer license was issued in
23  1988 when the corporation was formed, and my

### Page 8

1  individual producer license was issued in 1979
2  approximately.
3    Q. Okay. And are there any -- can you sell
4  any type of insurance with these licenses?
5    A. All insurance, except for securities,
6  annuities.
7    Q. Okay. And the same with the company Cape
8  Wide?
9    A. That's correct.
10   Q. If you could just give me a thumbnail
11  sketch of Cape Wide Insurance Agency, what types
12  of insurance does it sell?
13   A. Specializes in selling homeowners and
14  auto and life and health insurance, commercial
15  business packages, workers' compensation. That's
16  about it.
17   Q. Marine insurance?
18   A. Oh, yes. I'm sorry. Yes. Marine
19  insurance, absolutely.
20   Q. What percentage of your business is
21  marine insurance or Cape Wide's business?
22   A. It's less than 1 percent.
23   Q. Okay. Has that always been the case?

Page 9

1  A. Yes.
2  Q. Is there any specialized license one
3  needs to sell marine insurance --
4  A. No.
5  Q. -- or anything like it?
6  A. Other than the property and casualty
7  license.
8  Q. Which you have?
9  A. Which I have.
10 Q. How many employees does Cape Wide
11 insurance have today, including yourself?
12 A. Five full-time and one part-time.
13 Q. How about in 2003?
14 A. The same.
15 Q. Same. Okay. And has there been change
16 in personnel since the middle of 2003 and today?
17 A. Let's see. Let's see. No. I think, if
18 I'm not mistaken, the personnel is the same --
19 Q. Okay.
20 A. -- as it was.
21 Q. Okay. Do you know a Robert Madonna?
22 A. Yes.
23 Q. How long have you known Mr. Madonna?

Page 10

1  A. Approximately 25 years.
2  Q. Okay. And how did you first come to meet
3  him?
4  A. Happened to be working in an area, in the
5  same building my wife worked.
6  Q. And have you been Mr. Madonna's insurance
7  agent during that entire 25 years?
8  A. No.
9  Q. Okay. When did you first have a business
10 relationship with Mr. Madonna involving the sale
11 of insurance of any kind?
12 A. Originally -- it would be approximate --
13 I would say starting in 1995.
14 Q. Okay.
15 A. No. Actually, it would be before that.
16 Early 19 -- 1990s.
17 Q. Okay. And at that time did you have a
18 social relationship with Mr. Madonna prior to
19 selling him insurance?
20 A. On occasion, yes.
21 Q. Okay. And what types of insurance did
22 you start selling to Mr. Madonna in the 1990s?
23 A. Auto insurance.

Page 11

1  Q. And did you continue to sell insurance to
2  Mr. Madonna through 2003?
3  A. Yes.
4  Q. Okay. And in 2003 did you provide --
5  what types of insurance did you -- were you the
6  agent for with regard to Mr. Madonna?
7  A. Let's see. We wrote his auto at that
8  time, his homeowners, his marine insurance.
9  Prior to 19 -- to 2003 we wrote his business
10 insurance package.
11 Q. That was with his former company Excel
12 Switching?
13 A. Yes.
14 Q. Now, just sort of switching gears and
15 we'll come back to this, are you familiar with a
16 company known as Markel American Insurance
17 Company?
18 A. Yes.
19 Q. And have you done business with that
20 company --
21 A. Yes.
22 Q. -- as an insurance agent?
23 A. Yes.

Page 12

1  Q. And when did you first do business with
2  Markel American?
3  A. Approximately 2000 is when we started.
4  Q. And how did that -- did it come to pass
5  that you did business with Markel?
6  A. A former employee had a friend that
7  worked at a brokerage firm that offered Markel as
8  one of their companies.
9  Q. Okay. So were you dealing with that
10 former employee, or did they recommend you deal
11 with Markel? How did --
12 A. A former employee of mine knew an
13 employee of the brokerage firm and through
14 insurance associations and was trying to get more
15 of our business, and what she was offering to us
16 was marine insurance.
17 Q. Okay. I guess what I'm trying to
18 understand is did you deal with this brokerage
19 firm, or did you deal with Markel when you first
20 started doing business with them?
21 A. To first join up with Markel, we got
22 Markel, licensed with Markel through this
23 brokerage firm.

Page 13

1  Q. Okay. So you did get a license with
2  Markel?
3  A. Yes. Oh -- yes.
4  Q. And if I sound -- if my questions aren't
5  clear, please just tell me and I'll try and
6  rephrase it. I am not that well versed with the
7  intricacies of the insurance business --
8  A. Sure.
9  Q. -- so I may state things
10 inappropriately. Just correct me if I do.
11  A. Sure.
12  Q. So do I understand that there's a formal
13 document under which you do business with Markel
14 or did business with Markel?
15  A. No.
16  Q. Okay. When you get licensed to sell
17 Markel Insurance, what is that -- embodied in
18 that permission, that license?
19  A. My term probably wasn't exactly
20 accurate. There was no license application that
21 we had to complete. We had to complete
22 applications to use the brokerage firm,
23 XS Brokers, and they offered us their product.

Page 14

1  Q. Okay.
2  A. So when we approached XS about the
3  marine, they sent a kit. As far as I can recall,
4  I do not remember completing any other
5  application --
6  Q. Okay.
7  A. -- as far as Markel's personal
8  application.
9  Q. And just so I understand, when the
10 XS Brokers send you this kit, are you at that
11 point purchasing marine insurance indirectly from
12 Markel through the XS Broker or directly from
13 Markel?
14  A. Directly from Markel.
15  Q. Okay.
16     MR. FOLAN: Maybe just -- I don't
17 know -- just to clarify --
18     MR. GENTILLI: Yeah.
19     MR. FOLAN: -- it is X S --
20     MR. GENTILLI: Okay.
21     MR. FOLAN: -- not E X, which is
22 an XS Broker, but -- is that -- well, let
23 me --

Page 15

1  A. Yes, that's correct.
2     MR. FOLAN: That's just maybe --
3  and even for the stenographer -- X-S or XS?
4  A. Just the letters XS Brokers Insurance
5  Agency.
6  Q. Okay. Do they then get a commission of
7  the -- on the sales you make of Markel Insurance,
8  for example --
9  A. Yes.
10  Q. -- since they -- okay. So they're out of
11 the loop other than that they are -- they get
12 paid a certain commission?
13  A. Correct.
14  Q. Okay. And was there anybody in
15 particular you would deal with at Markel when you
16 started doing business with them?
17  A. No.
18  Q. Okay. Tell me, when you first started
19 doing business with Markel, the procedure you
20 would use and -- strike that. Markel Insurance
21 -- Markel American Insurance Company is in the
22 business of writing marine insurance?
23  A. Correct.

Page 16

1  Q. Is that pretty much the only insurance
2  they sell?
3  A. Oh, no. No.
4  Q. Okay. They sell other --
5  A. Many other types.
6  Q. Okay. Did you deal with them primarily
7  or exclusively for marine insurance?
8  A. Exclusively for marine.
9  Q. Okay. Tell me how you would go about, at
10 the beginning of the relationship, placing a
11 policy of insurance with Markel.
12  A. Complete one of their applications and
13 fax it to Markel American for review and quoting
14 and binding.
15  Q. Okay. Was there more than one fax number
16 that you were asked to use for --
17  A. No.
18  Q. No. Was it one fax number?
19  A. One fax number on the documents that we
20 had indicating their name, address, phone number,
21 and fax number.
22  Q. And what would they do upon receipt of an
23 application?

Page 17

1  A. Quote the policy and fax that back to us.
2  Q. Okay.
3  A. And then we would request to bind if it's
4  so instructed by the insured.
5  Q. What was the time line between your
6  faxing the application and your getting a
7  response generally?
8  A. Generally -- we had so few that we did
9  with Markel. I'm not sure I can even answer that
10 accurately.
11 Q. Okay. You said, "We had so few that we
12 did with Markel." Approximately how many
13 policies of insurance did you place with Markel
14 from when you started doing business until the
15 end of 2003?
16 A. Ten.
17 Q. Okay. Is that ten policies or
18 ten different customers?
19 A. It would be ten policies.
20 Q. Okay. And would it be fair to say that
21 of those ten policies Mr. Madonna probably
22 accounted for approximately half?
23 A. One, two -- three. One policy had two

Page 18

1  boats.
2  Q. Okay. Did you have a different procedure
3  if an entity that was currently insured with
4  Markel -- well, not an entity, if a person who
5  had marine insurance with Markel traded in the
6  boat and got a different boat, was the procedure
7  the same, you'd submit an application and get
8  back a quote and a binder and then determine
9  whether to issue a binder?
10     MR. FARLEY: Objection.
11 Q. Well, strike --
12     MR. FARLEY: You can answer.
13 Q. You can answer.
14 A. Okay.
15 Q. Tell me what the procedure was.
16 A. Completed one of our fax cover sheets
17 requesting the change and then attaching any
18 documents that we may have.
19 Q. And what would they do in response
20 ordinarily?
21 A. They would, depending on our request, you
22 know, take one boat off, add this one as follows,
23 and then send an endorsement to us to review and

Page 19

1  forward on to the insurer.
2  Q. What was usually the time line between
3  the submission of the change of the vessel being
4  insured and your receipt of the endorsement?
5  A. It varied. Ten days, two weeks, up to
6  six months.
7  Q. Do you know why it varied so -- in such
8  large measure?
9  A. No.
10 Q. Okay. And just jumping to the middle of
11 2003, was there a particular person you tended to
12 deal with at Markel?
13 A. No.
14 Q. Okay. When was the first time you placed
15 a policy of insurance with Markel on behalf of
16 Mr. Madonna?
17     MR. FOLAN: Let me just ask, when
18 you say "you," you're meaning Cape Wide --
19     MR. GENTILLI: Cape Wide, yes.
20     MR. FOLAN: -- as compared to --
21     MR. GENTILLI: Yes. He's here as
22 a representative of Cape Wide.
23     MR. FOLAN: Yes, exactly. I want

Page 20

1  him to under -- you know, that when you're
2  answering it that that's --
3  A. Right. I'm not sure of the exact date
4  because it was a prior employee that originally
5  wrote Mr. Madonna's policy, and I -- he may have
6  been the initiator of us obtaining Markel.
7  Q. Okay.
8  A. So that would have been, I would say,
9  2000.
10 Q. Did you sell marine insurance through any
11 other insurance company?
12 A. Yes.
13 Q. What other companies?
14 A. Quincy Mutual Fire Insurance Company, we
15 at that time were also doing boat insurance with
16 Foremost.
17 Q. What would determine selecting Markel as
18 opposed to Quincy Mutual or Foremost?
19 A. Pretty much just sharing the business
20 with different markets.
21 Q. Okay. Prior to June of 2003 how many
22 vessels had Cape Wide Insurance Agency insured of
23 Mr. Madonna's with Markel?

Page 21

1  A. It would have been all his watercraft.
2  I'm not absolutely sure without looking at the
3  records.
4  Q. Okay. What records would you want to
5  look at?
6  A. It would be actually my activity screen
7  on my computer.
8      MR. GENTILLI: Has that been
9  printed or produced in --
10      MR. FOLAN: We produced the file.
11  That's a hard copy.
12      MR. GENTILLI: Okay. If not, I
13  would ask that that just be printed, a screen
14  print of that, and it be produced.
15  A. I tried that. It doesn't -- it -- our
16  activity screen will -- if we click on a certain
17  icon, it will allow us to type in a conversation
18  we had with Mr. Madonna, but also in that -- on
19  that activity screen we would produce something
20  like that document there. It would list it as a
21  memo. But when I print the screen, it doesn't
22  print the -- it doesn't -- that doesn't show on
23  that printout at all.

Page 22

1      It will print the spoke to
2  Mr. Madonna on such and such a date about --
3  Q. Right.
4  A. -- you know, making a change to the
5  policy. But, actually, that memo that's on top
6  there would not show.
7  Q. Well, I'd ask you to print whatever can
8  be printed --
9  A. Sure.
10 Q. -- and just -- I am not particularly
11 technically proficient; but you might want to try
12 and see if you can capture the screen and cut it,
13 paste it into a word processing document and
14 print that. That's something that may work.
15 A. That's a possibility, yes.
16 Q. But I will ask that whatever can be
17 printed, that that be printed.
18 A. Uh-huh. Sure.
19 Q. At some point you were insuring a 19 --
20 you were insuring a 2000 Pursuit and a 1996
21 31-foot Tiara for Mr. Madonna with Markel; is
22 that correct?
23 A. Yes.

Page 23

1  Q. And do you know when that first came to
2  pass?
3  A. I don't know the beginning date.
4  Q. Okay. With reference to June of '03,
5  would it have been more than a year prior?
6  A. I'm sorry. Could you repeat the
7  question?
8  Q. Yeah. With reference to June of '03,
9  which is the crux of this case --
10 A. Uh-huh.
11 Q. -- would it have been more than a year
12 before that?
13 A. Uh-huh. Oh, yes. Yes.
14 Q. So it had been for a while that they had
15 been insured?
16 A. Right.
17 Q. And at some point were you advised that
18 Mr. Madonna had sold those vessels and purchased
19 new vessels?
20 A. Yes.
21 Q. Okay. And do you recall whether that was
22 two different transactions or a single
23 transaction?

Page 24

1  A. Two separate transactions.
2  Q. And how did you -- starting with -- do
3  you remember which came first?
4  A. Yes.
5  Q. What?
6  A. Changing the '96 Tiara to the 2003 Tiara,
7  if I'm not mistaken.
8  Q. Tell me how you became aware of that
9  change?
10 A. If I recall correctly, Mr. Madonna called
11 indicating that he was making this purchase, and
12 then I spoke to somebody at Crosby Yacht asking
13 for a fax of the documents, bill of sale, just so
14 I would have something to show me the serial
15 numbers and the price.
16 Q. And did you get such a document from
17 Crosby Yacht?
18 A. Yes.
19 Q. And I'm looking at the documents you
20 produced in response to our request for
21 production of documents, and I don't see -- is
22 this -- I -- let me show you -- ask you if you
23 can identify that?

Page 25

1   A. Yes.
2   Q. What is that?
3   A. It's just an agreement to purchase a
4 vessel.
5   Q. Is that what was sent to you by Crosby
6 Yacht Yard --
7   A. Yes.
8   Q. -- with regard to the Tiara?
9   A. It -- oh, I'm sorry. No. That's Oyster
10 Harbor Marine that actually sent that. I
11 apologize. Correction to that. Oyster Harbor
12 Marine faxed this documentation.
13   Q. And is that what resulted in your
14 attempting to --
15   A. Yes.
16   Q. -- switch the insurance on the two
17 Tiaras, from the '96 to the 2003?
18   A. Yes.
19   Q. Okay. Now, was there a cover sheet that
20 went with this? Because I note it starts at
21 page 2 of 5.
22   A. Yes. And that's page 2 of 5 of their
23 fax.

Page 26

1   Q. Right. Do you have a cover sheet that
2 came with that? Because I didn't see it in the
3 documents you produced.
4   A. I'm not sure. It seems to me that -- no,
5 that's not it. I do not recall if there was a
6 cover sheet on that. A lot of times when people
7 are faxing we say you don't have to put a cover
8 because I'm right there but --
9   Q. Well, the fact that it starts at 2 of 5
10 would indicate that --
11   A. Would indicate that there is, yes.
12   Q. Okay.
13   A. I unfortunately don't recall that.
14   Q. Well, let me --
15       MR. GENTILLI: Let me get a
16 stapler and then we'll mark this as -- hold on
17 one second. Let me get a stapler.
18       (Recess)
19       MR. GENTILLI: Okay. Why don't we
20 mark this as Exhibit 1.
21       (Exhibit No. 1 Four-Page Document
22       marked for identification)
23   Q. Okay. Exhibit 1 will be the fax you

Page 27

1 received from Oyster Harbor Marine relating to
2 the change from a '96 to a 2003 Tiara. What did
3 you do or what did Cape Wide do upon receipt of
4 this document?
5   A. Immediately made up the request to
6 transfer the coverage from one boat to another by
7 a fax cover sheet requesting that change.
8   Q. Okay. And let me show you a five-page
9 document and ask you if you can identify it?
10   A. Yes.
11   Q. What is that document?
12   A. It's the fax cover sheet requesting the
13 changeover from the '03 Tiara from -- excuse me
14 -- the '96 Tiara to the '03 with the supporting
15 documents.
16   Q. Okay. And whose initials under --
17 there's a box in the bottom right-hand that says,
18 Faxed June 16, '03, and it's got two initials.
19   A. B.E., that's me. Bill Eldredge.
20   Q. That's you. Okay. So you did this
21 personally?
22   A. Yes.
23   Q. And does that mean you put it personally,

Page 28

1 into the machine?
2   A. Yes.
3   Q. What does the top -- it says, TF 6/16/03,
4 in handwriting. What does that mean?
5   A. That's -- "TF" represents transactional
6 filing, and the date there it's filed, 6/16.
7   Q. '03?
8   A. '03.
9   Q. And that's in your filing system? Is
10 that what that refers to?
11   A. Yes.
12   Q. Okay. And then there's another. It
13 says, Fax to Jessi. And then it says -- can you
14 read that?
15   A. Yes. Fax to Jessi, 12/11 -- that would
16 have been '04 -- with ACORD.
17   Q. Is that put on there after the fact?
18   A. Yes, it was.
19   Q. Does that relate to after the loss of the
20 vessels?
21   A. Yes.
22   Q. Okay. Or the vessel?
23   A. Jessi is from Markel.

Page 29

1    MR. FOLAN: In '03 or '04?
2    A. Well, June '03 was the original
3    document. 12/11//04 is when I faxed it to Jessi
4    with the ACORD --
5    Q. '03 or '04?
6    A. -- the --
7    MR. FOLAN: '03 or '04? The fire
8    was December of '03.
9    A. I mean -- oh, I'm sorry. '03. '03. I'm
10   sorry. That was right.
11   (Discussion off the record)
12   Q. And the ACORD is a proof of loss; is that
13   correct?
14   A. Yes.
15   Q. Okay. And you have again -- before we
16   mark it as one of -- there's a 9448 in
17   handwriting, and crossed out on the cover sheet
18   is a 3288. Is that because Jessi was at a
19   different fax number?
20   A. That's the fax number she requested it be
21   faxed to.
22   MR. GENTILLI: Okay. I'm going to
23   mark this five-page document, which is the fax

Page 30

1    cover sheet with copies of what previously was
2    marked as Exhibit 1, as Exhibit 2.
3    (Exhibit No. 2 Five-Page Document
4    marked for identification)
5    Q. And every page of this bears -- the
6    right-hand -- bottom right-hand side -- a box
7    with your initials in it. Do you do that
8    customarily --
9    A. Yes.
10   Q. -- when you fax things?
11   A. Most of the time.
12   Q. And I think I asked you this, but I just
13   want to be certain. You faxed this yourself?
14   A. Yes.
15   Q. You put it in the machine yourself?
16   A. Yes.
17   Q. You dialed the number yourself?
18   A. Yes.
19   Q. Okay. And you also produced a telephone
20   record, and I'd ask you if you could identify
21   what that document is?
22   A. Yes. It is a document -- a copy of the
23   Verizon phone bill.

Page 31

1    Q. For your phone number, Cape Wide's phone
2    number?
3    A. Cape Wide's fax phone number.
4    Q. And what does that reflect?
5    A. It reflects a call to Wisconsin, to the
6    (262) 548-3288 fax number on -- excuse me --
7    June 16 -- June 16th.
8    Q. Of what year?
9    A. Of 2003.
10   Q. And is it your testimony that that
11   reflects your transmission of Exhibit 2?
12   A. Yes.
13   Q. And what is the time on that fax
14   transmission?
15   A. That is 2 minutes and 3 -- 2.3 minutes.
16   MR. GENTILLI: Okay. I'd like to
17   mark this --
18   Q. This is a portion of your bill statement?
19   A. Yes, it is.
20   MR. GENTILLI: -- as Exhibit 3.
21   (Exhibit No. 3 Portion of Bill
22   Statement marked for identification)
23   Q. Now, did you ever hear back from anybody

Page 32

1    at Markel with regard to Exhibit 2?
2    A. No.
3    Q. Did you ever follow up with them about
4    it?
5    A. No.
6    Q. Would it be fair to say that -- the fire
7    was in December of '03 -- that at no time between
8    June 16th of '03 and December of '03 did you hear
9    from Markel or anybody representing Markel about
10   the change from the '96 Tiara to the 2003 Tiara?
11   A. That's correct.
12   Q. Was there any tickler system in place at
13   Cape Wide where you would follow up on a change
14   in insured vessel to make sure that everything
15   was -- had gone smoothly with the transfer?
16   A. Yes.
17   Q. And what is that tickler system?
18   A. There is a tickler system in our computer
19   system which could have been used. I also have
20   what I call a "pending folder," which I keep all
21   correspondence such as that in there until the
22   endorsement comes back from the company.
23   Q. Okay. Just covering them both, you said

Page 33

1  "could have been used." Was it used in this
2  case?
3  A. Not in this case.
4  Q. Okay. And the pending folder -- so would
5  it be fair to say that from June to December this
6  fax was in the pending folder?
7  A. It was not.
8  Q. Why not?
9  A. I don't know.
10 Q. Okay. It should have been?
11 A. Should have been.
12 Q. And had it been in the pending folder
13 what would have happened?
14 A. If it had not been received within
15 30 days, a second request would have been faxed
16 to the company.
17 Q. And if it had no response to that, was
18 there a further action that would have been
19 taken?
20 A. A phone call.
21 Q. Who was responsible for putting this in
22 the pending folder?
23 A. I was.

Page 34

1  Q. And do you know why it didn't end up in
2  the pending folder?
3  A. Purely by accident.
4  Q. Is that as a result of this TF 6/16/03 at
5  the top right-hand corner?
6  A. We were going through a transition going
7  from regular folder files to this transaction --
8  transactional filing, and that's the only logical
9  thing that I could think of that would have
10 happened in this case.
11 Q. You're certain it was not in the pending
12 folder at any time?
13 A. Reasonable -- reasonably certain, yes.
14 Q. Okay. Had there been a follow-up fax or
15 call, would that have been you or would it have
16 been somebody else at Cape Wide?
17 A. Me.
18 Q. And I'm going to just go over the same
19 thing for the -- switch from the Pursuit to the
20 2000 Crosby.
21 A. Uh-huh.
22 Q. Mr. Madonna had a Pursuit, a 2000 Pursuit
23 insured with Cape Wide Insurance?

Page 35

1  A. Yes.
2  Q. And it was -- that insurance was placed
3  with Markel American?
4  A. Yes.
5  Q. Okay. And was that on a different policy
6  of insurance or the same policy of insurance as
7  the Tiara?
8  A. That, if I'm not mistaken, was on the
9  same policy.
10 Q. At some point did you learn that
11 Mr. Madonna had sold the 2000 Pursuit and
12 purchased a 2000 Crosby Hawk?
13 A. Yes.
14 Q. How did you learn about that?
15   Are you --
16 A. I'm not -- I'm not sure if it was
17 Mr. Madonna or if it was somebody from Crosby
18 Yacht.
19 Q. Okay. At some point did you receive some
20 materials from Crosby Yacht concerning --
21 A. Yes.
22 Q. And what did you receive from Crosby
23 Yacht, do you recall?

Page 36

1  A. It was a copy of the sales and purchase
2  agreement, if I'm not mistaken.
3  Q. Okay. And let me show you two documents
4  and -- and -- excuse me. Let me show you a
5  series of documents, but I want to keep the
6  record clear. I have a copy of a fax cover sheet
7  which says, Re: Bob Madonna binder from Crosby
8  Yacht to Cape Wide; but it's got some other
9  writing underneath it. And I also have -- and
10 that appears to be page 1 to a page 2, which is a
11 purchase and sale agreement.
12   I also have another version of it
13 which doesn't have the writing under the word
14 "binder." And just because I want to keep the
15 record clear, would it be fair to say that when
16 you received it you received the cover sheet
17 without the writing and the writing was put on
18 after?
19 A. That's correct.
20 Q. Okay. So if I were to give you the cover
21 sheet simply with the purchase and sale
22 agreement, would that be what you received?
23 A. Yes.

Page 37

1  Q. Are you comfortable if I mark that
2  document therefore as Exhibit 4?
3  A. Exactly.
4       MR. GENTILLI: Okay. Let's mark
5  this as Exhibit 4.
6       (Exhibit No. 4 Fax Cover Sheet
7        with Attachment marked for
8        identification)
9  Q. Okay. And so Exhibit 4 would have been
10 what you received from Cape Wide?
11 A. Received by Cape Wide?
12 Q. From Crosby?
13 A. Yes. Yes.
14 Q. I'm sorry. Did you have any prior
15 knowledge that this was coming over? Did
16 somebody call you ahead of time?
17 A. If I'm not mistaken, Mr. Madonna had
18 called saying that he was buying some -- making
19 some changes on his watercraft --
20 Q. Okay.
21 A. -- through Crosby Yacht.
22 Q. So you were expecting this?
23 A. Yes.

Page 38

1  Q. Okay. And this came in around, it
2  appears, 4:18 in the afternoon on June 23rd?
3  A. That's correct. Uh-huh.
4  Q. What did you do when you received that
5  document?
6  A. Followed the same procedure by completing
7  a fax cover sheet requesting the change and
8  attaching the documents.
9  Q. Okay. Now, I have another version of
10 this fax cover sheet which has some writing, as
11 we talked about earlier, underneath it. Can you
12 tell me when that writing was placed on the fax
13 cover sheet?
14 A. That would have been the same day that
15 Exhibit 4 was received.
16 Q. And what is that writing?
17 A. That's my writing asking for the hull ID
18 number because the original purchase and sale
19 agreement did not have the ID number written in
20 there.
21 Q. Did you send this fax cover sheet back to
22 Crosby Yacht Yard?
23 A. Yes.

Page 39

1  Q. Okay. Can you read just for the record
2  what you've written underneath?
3  A. No. 1, Need hull serial number. No. 2,
4  Do you know if this is an additional watercraft,
5  or did he trade one in? No. 3, Need length. And
6  I had indicated no loan.
7  Q. And who did you send that to?
8  A. Crosby Yacht.
9  Q. Okay. What did you get, if anything, in
10 response?
11 A. I received -- I wrote in the serial
12 number.
13 Q. Okay. So that -- on the second page of
14 Exhibit 4, that was added by you, the serial
15 number?
16 A. Yes. That's my writing, yes.
17 Q. Okay. And is the length added, too?
18 A. Yes, it is. It is here.
19 Q. Okay. So you just -- you got a phone
20 call back basically?
21 A. Right.
22 Q. Okay. And what did you do once you got
23 that information?

Page 40

1  A. Then I followed the normal procedure by
2  completing the fax cover sheet requesting the
3  switch over of boats and attaching the documents
4  and faxed it -- faxed it to Markel.
5  Q. Okay. Let me show you what you produced
6  and ask you if this is a cover sheet that you
7  used?
8  A. Yes.
9  Q. Okay. Now, it says, See attached P&S?
10 A. Purchase and sale, yes.
11 Q. Is that the same attachment as was the
12 second page of Exhibit 4?
13 A. Correct.
14 Q. Okay. And there's an account number next
15 to the name Madonna. Is that the insurance
16 policy?
17 A. That's correct.
18 Q. Okay. And it doesn't have initials where
19 it says faxed. Do you know who faxed that?
20 A. I did.
21 Q. You personally?
22 A. Yes.
23 Q. Do you recall doing it?

Page 41

1   A. Yes, I do.
2   Q. Okay. And this was June 24th which is
3   the next day; is that correct?
4   A. That's correct.
5   Q. Okay. So do you know when you got this
6   additional information?
7   A. It was the following day.
8   Q. Okay. And apparently you put this in the
9   file as well. It says 6/20 -- TF 6/24/03?
10  A. That's correct.
11      MR. GENTILLI: Why don't me mark
12  this cover sheet as Exhibit 5.
13      (Exhibit No. 5 Cover Sheet dated
14      6/24/03 marked for identification)
15  Q. Now, with regard to Exhibit 5, I note
16  that among the -- there is not among the
17  documents you produced a copy of the second page
18  of Exhibit 4 bearing the fax stamp that you
19  used. Do you know why that is?
20  A. No, I don't.
21  Q. I also note you didn't initial this one.
22  Is there any reason you didn't initial it?
23  A. No reason.

Page 42

1   Q. Okay. And you produced another record of
2   a phone statement. Do you know what that is?
3   A. Yes. It was a fax to Markel at
4   (262) 548-3288 and 1.4 minutes, which is -- which
5   was faxing Exhibit 5.
6   Q. Okay. What time of day does it say it
7   was faxed?
8   A. It says 4:02 p.m.
9       MR. GENTILLI: I'd like to mark
10  this telephone record as Exhibit 6.
11      (Exhibit No. 6 Telephone Record
12      marked for identification)
13  Q. With regard to the materials you faxed on
14  -- with -- to the change to the 2000 Crosby --
15  A. Uh-huh.
16  Q. -- did you hear anything back from Markel
17  at any time between June 24, 2003, and the fire
18  at the Crosby Yacht Yard in December of '03?
19  A. No.
20  Q. Did any tickler system get put in place
21  with regard to this change?
22  A. No.
23  Q. Okay. So it wasn't put into the

Page 43

1   computerized tickler system?
2   A. No.
3   Q. And did this document not find its way
4   into the pending folder?
5   A. That's correct.
6   Q. The same as the other one?
7   A. Yes.
8   Q. So no follow-up was made after 30 days or
9   60 days --
10  A. That's correct.
11  Q. -- to see what was going on?
12  A. Right.
13  Q. Okay. So would it be fair to say that at
14  no time between December 24th and the fire loss
15  did you have any further contact with Markel
16  American --
17      MR. FOLAN: June.
18  Q. -- June 24th of '03 --
19      MR. FOLAN: You said --
20      MR. GENTILLI: I'm sorry.
21  Q. -- June 24, '03, and the fire loss did
22  you have any further conversation with Markel
23  American about the insurance for the 2000 Crosby

Page 44

1   Hawk?
2   A. I did not.
3   Q. Now, at some point in July, early July of
4   '03 did you receive a fax from Racepoint
5   Management regarding Mr. Madonna's Crosby?
6   A. Yes, I did.
7   Q. Okay. And what was that fax? What did
8   it provide you with?
9   A. It was a marine survey of the Crosby.
10  Q. Was that usually required for insurance
11  for a vessel?
12  A. No, not in all situations.
13  Q. Okay. Why was one sent to you in this
14  situation, if you know?
15  A. For information purposes only.
16  Q. Do you --
17  A. It was not required by Markel.
18  Q. Had you requested it?
19  A. No.
20  Q. Okay. This is something that Mr. Madonna
21  obtained and sent to you?
22  A. Had Racepoint Management fax it to me,
23  yes.

Page 45

1  Q. Okay. Did you get a similar document for
2  the Tiara?
3  A. No.
4  Q. Okay. Do you know why you got one for
5  the Crosby, but not the Tiara?
6  A. No.
7  Q. Okay. What did you do with this document
8  when you received it?
9  A. I T filed, transactional filed.
10 Q. Okay. It didn't find its way in the
11 pending folder either?
12 A. No.
13 Q. And you would not have forwarded this to
14 Markel?
15 A. No, because it wasn't requested.
16 Q. Okay. And what is a "marine survey"?
17 A. It's a document that is produced to
18 indicate value, description of -- a detailed
19 description of a vessel.
20 Q. Is it an appraisal basically?
21 A. Yes, basically.
22 Q. And have you ever heard of Edwin C.
23 Boice, Inc., before?

Page 46

1  A. Yes.
2  Q. Are they a company that generally does
3  marine surveys?
4  A. Yes.
5  Q. Have you dealt with them in the past?
6  A. Yes.
7  Q. And is it your experience that the values
8  they ascribe to vessels are fair and reasonable?
9  A. Yes.
10 Q. Okay. Do you have any reason as we sit
11 here today or at any time in the past to question
12 the value ascribed to the Crosby?
13 A. No.
14 Q. Okay. And is the value consistent with
15 the value in the purchase and sale agreement for
16 the Crosby?
17 A. Close.
18 Q. Okay. The appraisal is -- or the marine
19 survey is 275 to 280, and the purchase price is
20 280?
21 A. 283, 284.
22     MR. GENTILLI: And then mark this
23 fax with the marine survey as Exhibit 7.

Page 47

1       (Exhibit No. 7 Fax dated 7/3/03
2        with Marine Survey marked for
3        identification)
4  Q. Just before we get to -- I believe you
5  produced -- strike that. Did you have any
6  discussions with anybody at Markel at any time
7  about the two requested changes of the insured
8  vessel that we've just gone over with these faxes
9  of June of '03?
10 A. No. Not until the time of the loss.
11 Q. Okay. I mean at any time? You did have
12 one around the time of the loss or shortly after
13 the loss?
14 A. At the time of the loss, reporting it,
15 there was a discussion about it.
16 Q. Okay. That's what I'm going to ask you
17 about.
18 A. Yup. Uh-huh.
19 Q. How did you first report it? In writing
20 or verbally?
21 A. In writing.
22 Q. Okay. And leaving aside the handwriting,
23 which we'll get to, is this what you're referring

Page 48

1  to?
2  A. Part of it, yes.
3  Q. Okay. When you say "part of have," what
4  else was with it?
5  A. The original -- the original
6  communication between Cape Way Insurance and
7  Markel was the ACORD claim form.
8  Q. Is that this document right here?
9  A. Yes.
10 Q. Okay. Now, was this ACORD claim form
11 relating to Crosby or was it relating to the
12 Tiara?
13 A. Tiara.
14 Q. Okay. Was that -- why was it on the
15 Tiara? You understand now that the Crosby was
16 destroyed, correct?
17 A. Yes, I do.
18 Q. And not the Tiara?
19 A. Correct.
20 Q. Why was the claim form put in for the
21 Tiara, if you know?
22 A. I assume -- excuse me. I did not
23 assume. I thought it was the Tiara that Bob was

Page 49

1  talking about when he made that --
2  Q. When he called you about the loss?
3  A. Yes.
4  Q. So this was the first thing you sent, and
5  it's got a fax December 11, 2003, 3:20 p.m., and
6  your initials; is that correct?
7  A. That's correct.
8  Q. And this was faxed with regard to when
9  you first heard of the loss?
10  A. Yes.
11       MR. GENTILLI: Mark that ACORD
12  property loss notice as Exhibit 8.
13       (Discussion off the record)
14       (Exhibit No. 8 ACORD Property Loss
15       Notice marked for identification)
16  Q. I was showing you a document I believe.
17  Is this a copy of the fax you sent after the fire
18  loss?
19  A. Yes.
20  Q. So let me just get the chronology. You
21  sent the ACORD property loss and then what
22  happened? Did they call you and say what are you
23  talking about?

Page 50

1  A. Yes.
2  Q. Who called you, do you know who?
3  A. I want to say it was Jessi, yes.
4  Q. Do you know her last name?
5  A. It begins with a "C."
6  Q. And so what did you -- did you re-fax
7  what had been faxed previously?
8  A. I re-faxed the original request for the
9  boat changes.
10  Q. Okay. So you re-faxed Exhibits 2 and 5;
11  is that correct?
12  A. Yes.
13  Q. And you did that on December 11th at
14  3;20?
15  A. That's correct.
16  Q. And this is -- you personally faxed this
17  document?
18  A. Yes.
19       MR. GENTILLI: Why don't we mark
20  this as Exhibit 9.
21       (Exhibit No. 9 Fax Cover Sheet
22       dated 12/11/03 marked for
23       identification)

Page 51

1  Q. And did you have any conversations
2  following your sending of Exhibit 9 with anybody
3  at Markel?
4  A. Yes.
5  Q. And I'd like you to tell me who you spoke
6  to, what was said?
7  A. I spoke with Tom Conroy at Markel.
8  Q. Did he call you back or -- call you or
9  did you call him?
10  A. I don't recall.
11  Q. Okay. So tell me what --
12  A. I spoke to Tom Conroy in reference to the
13  fax and just reviewed my procedure as to when the
14  original request change of the boats was faxed in
15  and what documents were attached, and he
16  indicated that there was no record of that.
17  Q. Did you talk to anyone else at Markel?
18  A. Yes, I did. And I'm sorry, I can't
19  recall who it was.
20  Q. And what was the nature of that
21  discussion?
22  A. Pretty much the same thing as was said to
23  Tom Conroy. And I think that person that I don't

Page 52

1  know the name of was the one I spoke to first who
2  referred me to Tom Conroy.
3  Q. And --
4  A. Oh, here we go. If I could read my own
5  writing. Mark Rip --
6       MR. FOLAN: No.
7  A. Oh, no. He's from Utica. I'm sorry.
8  Utica Mutual.
9  Q. And did Markel give you any indication,
10  the person you spoke to, as to what had happened
11  to your faxes, if anything?
12  A. Yes. They had -- they said they had no
13  record of requesting any change.
14  Q. Okay. And did they tell you they were
15  going to look into any records, or were they
16  going to do anything to investigate it further?
17  A. No. They were going to deny the claim
18  and asked if I wanted to contact the insured or
19  just let the denial letter notify the insured.
20  Q. And what did you tell them?
21  A. I said I would notify the insured.
22  Q. Okay. Do you know if, in fact, they sent
23  a denial letter on December 12th?

Page 53

1  A. They did send a denial letter, yes.
2  Q. Is this a copy of the denial letter?
3  A. Yes, it is.
4  Q. Again, that is with regard to the Tiara
5  because of the confusion as to --
6  A. That's correct, yes.
7  Q. -- which vessel was lost?
8  A. Yes.
9  Q. Okay. And you got a copy of this letter,
10 too?
11 A. Yes.
12 Q. And it's dated December 12th?
13 A. Yes.
14     MR. GENTILLI: Okay. Mark that as
15 Exhibit 10, please, a letter from Markel American
16 to Robert Madonna.
17     (Exhibit No. 10 Letter dated
18      12/12/03 marked for
19      identification)
20 Q. Let me show you -- and did you -- strike
21 that. Did you have any other discussions with
22 anybody at Markel besides those about their
23 receipt or nonreceipt of the change in vessel

Page 54

1  descriptions?
2  A. None other than stating that I would just
3  contact my E&O carrier.
4  Q. Now, let me show you a couple of
5  documents you produced. I believe they're
6  different documents. Tell me if you can identify
7  what those are?
8  A. These are copies of the renewal policies
9  -- renewal policy. Excuse me.
10 Q. And would that be for the policy that
11 would have insured the original Tiara and the
12 original Pursuit?
13 A. Yes.
14 Q. And who generated those documents?
15 A. Markel.
16 Q. And what -- were they sent to you?
17 A. Yes.
18 Q. And then what do you do with them?
19 A. They're sent to me along with a copy for
20 the insured and any lien holder, if there was
21 any, and there was not.
22 Q. And what do you do when you get those --
23 or what did you do in this case when you got

Page 55

1  those?
2  A. Forwarded a copy to Mr. Madonna and then
3  T filed our agency copy.
4  Q. Is that a bill basically?
5  A. No.
6  Q. What is that?
7  A. That -- this is the actual policy itself.
8  Q. Okay. Now, whose handwriting is it, the
9  changes of the 2003 Tiara, on the one form?
10 A. That's mine.
11 Q. Okay. And so you wrote that in after the
12 fact because this came in -- why did you write
13 that?
14 A. May I look at that again, please?
15 Q. Yes.
16 A. Okay. This was pulled when we were
17 notified to change from the '96 to the 2003 and
18 just indicated what I was doing with this.
19 Q. Okay. When you say "This was pulled,"
20 what do you mean, taken out of the file?
21 A. Pulled out of the T file, transactional
22 file.
23 Q. Do you recall when that was?

Page 56

1  A. That was June 13th or --
2  Q. Okay.
3  A. Is it? I'm sorry. Is that the correct
4  date?
5  Q. I'm confused. Let me just ask you
6  because I'm just -- I'm a little confused.
7  A. Uh-huh.
8  Q. This appears to have been issued
9  June 19th --
10 A. Oh, June 19th.
11 Q. -- and the TF indication is 6/3,
12 June 3rd, and I'm just confused.
13 A. I had one just the other day. A renewal
14 policy came in. This date is way in advance.
15 Q. What do you mean? So, in other words,
16 it's sent before -- that's not the date it was
17 sent -- oh, okay. There's another date down
18 here, 5/27/03.
19 A. That's correct.
20 Q. Okay.
21     MR. GENTILLI: Okay. Let's mark
22 this document we've been looking at, the
23 statement, the insurance for I guess the original

Page 57

1 Tiara but your notation on it in pen to the 2003
2 Tiara as Exhibit 11.
3     (Discussion off the record)
4     (Exhibit No. 11 Renewal Insurance
5     Policy marked for identification)
6  Q. When you pulled this out of the TF file
7 to note the change, that was too soon -- or
8 strike that -- that didn't trigger you to do a
9 follow-up; is that correct?
10  A. That is correct.
11  Q. Okay. Is that because it's shortly after
12 or at the time of the fax?
13  A. It was the same time as the fax, yes.
14  Q. And let me show you this other document
15 that we looked at.
16     MR. GENTILLI: And why don't we
17 mark this as Exhibit 12, which is also an
18 insurance for the Pursuit.
19     (Exhibit No. 12 Renewal Insurance
20     Policy marked for identification)
21  Q. On this document I can't tell what was
22 crossed out and written. Can you tell me? I see
23 some handwriting on it.

Page 58

1  A. I had accidentally marked this one as the
2 changing to the 2003 Tiara, and then I scribbled
3 over that because I realized I was writing on the
4 wrong renewal policy.
5  Q. Okay. So there's no reference there to
6 the Crosby though; is that correct?
7  A. Not at this time, no.
8  Q. Okay. Now, would it be fair to say that
9 at all times prior to the fire Mr. Madonna had
10 been timely in his payment of any premiums due on
11 the insurance policy --
12  A. That's correct.
13  Q. -- for the Crosby and for the Tiara?
14  A. He was prompt on his payment for the
15 vessels that were on the original renewal policy.
16  Q. Right. In other words, he had not not --
17 he had not been late in paying any bills he
18 received?
19  A. No.
20  Q. Okay. Would you have expected a change
21 in premium with the change in vessels?
22  A. Yes.
23  Q. Did you ever receive a change in premium?

Page 59

1  A. No.
2  Q. And, again, that's just because it was
3 not in the pending file, it never registered that
4 we haven't gotten a change in premium; is that
5 correct?
6  A. I would not have seen the change in
7 premium, except by a processed endorsement to the
8 original policy.
9  Q. Got you. Okay. In fact -- and I'm not
10 sure I'm going to mark it -- but among your
11 records it appears that there was a renewal
12 billing that came out of '04 for the '96 Tiara
13 and the 2000 Pursuit from -- out of Markel; is
14 that correct?
15  A. Yes.
16  Q. Now, you also produced some materials or
17 Cape Wide produced from Markel which appear to be
18 -- and I'm not sure I want to clutter the record
19 with them. Do you know what these documents I'm
20 just showing you are? Because they're -- yacht
21 endorsement, agreed value -- do you know what --
22  A. It's part of their kit or explains their
23 guidelines.

Page 60

1  Q. Were you able to bind Markel under your
2 agreement with them?
3  A. No. We had to request binders. We could
4 not --
5  Q. You couldn't yourself issue the binder?
6  A. That's correct.
7  Q. Okay. Are there circumstances when an
8 agent can bind the insurance company?
9  A. Certain companies, yes.
10  Q. Markel was not one of them?
11  A. We did not have binding authority.
12  Q. Had you previous to June of '03 affected
13 any change of insured watercraft with Markel
14 using the procedure you used with regards to
15 Mr. Madonna's vessels?
16  A. Yes.
17  Q. On how many occasions?
18  A. Three occasions possibly.
19  Q. And was it exactly the same procedure, a
20 fax cover sheet --
21  A. Yes.
22  Q. -- with some attachments?
23  A. Yes.

Page 61

1  Q. And in those cases were the transfers
2  effective?
3  A. Yes.
4  Q. The transfer of coverage I mean?
5  A. Yes.
6  Q. And do you recall how soon after them you
7  got confirmation?
8  A. I do recall one situation where it was
9  approximately a two-week turnaround time and a
10 second situation where it was a three-month
11 turnaround time.
12 Q. Did you ever have occasion to see the
13 Crosby or what was left of it after the fire?
14 A. No.
15 Q. Do you have any reason to question that
16 it was totally destroyed by the fire at Crosby
17 Yacht Yard?
18 A. No question.
19 Q. And was RMG Investigations and Robert
20 Burkitt somebody employed on your behalf to
21 investigate the issues surrounding the placement
22 -- or the attempted placement of insurance with
23 Markel on Mr. Madonna's behalf?

Page 62

1  A. He was employed by Utica Mutual to
2  investigate.
3  Q. Okay. And at some point he had the wrong
4  vessel, he was investigating the wrong vessel; is
5  that correct?
6  A. Yes.
7  Q. Is that as a result of your initial
8  misunderstanding?
9  A. Yes.
10    MR. GENTILLI: Why don't we go off
11 record because I hate to clutter the record with
12 stuff.
13    (Discussion off the record)
14 Q. Were you aware that Markel had limits as
15 to the amount of -- the value of a vessel that
16 they would insure?
17 A. No.
18 Q. Okay. And I -- again, is there some sort
19 of restriction on or different procedure that has
20 to be used on vessels that are over a certain
21 value?
22 A. Yes.
23 Q. And what is that, do you know? What

Page 63

1  value, first of all, and then what's the
2  difference?
3  A. I don't know the breakdown of values.
4  There are different applications for different
5  types of boats. Whether the value has anything
6  to do with the type of application, I'm not quite
7  sure.
8  Q. Do you still do business with Markel?
9  A. I have not written any new business.
10 There is still some remaining business on their
11 books.
12 Q. Have you had any occasion to change an
13 insured vessel with Markel since December of '03?
14 A. No.
15 Q. Okay. And has Markel -- are you still
16 permitted to write policies with Markel?
17 A. Yes.
18 Q. Okay. So you still have a -- just you've
19 chosen not to or you haven't for other reasons?
20 A. Just haven't for other reasons.
21 Q. Okay. Now, you told me earlier that
22 there is a screen which has the activity, if you
23 will, on an account. Would that have your

Page 64

1  telephone conversations with Mr. Madonna and with
2  Crosby Yacht Yard about the change in vessels?
3  A. Possibly, yes.
4  Q. And is it generally just -- if you put
5  something down, would it just be a summary of a
6  discussion?
7  A. Yes.
8  Q. Okay. Did Mr. Madonna ever call to
9  inquire as to whether the transfer of the
10 insurance to new vessels, the new Tiara and the
11 2000 Crosby, had gone through?
12 A. No.
13 Q. Okay. Did you have any discussions with
14 Mr. Madonna or any representative of Mr. Madonna
15 at any time after June of '03 concerning the
16 status of the change in vessels being insured?
17 A. No.
18 Q. Did you talk to Mr. Madonna at any time
19 between June 24th of '03 and December 10th of
20 '03?
21 A. No.
22 Q. Okay. When Mr. Madonna called you to
23 tell you that he was buying the Crosby or the

Page 65

1 newer Tiara, did you tell him that you would take
2 care of obtaining insurance on it?
3   A. Yes.
4   Q. Okay.
5       MR. GENTILLI: I have no further
6 questions at this time. Suspend. I just want to
7 reserve the right based on that screen shot thing
8 that you're going to produce, and I know there
9 may be some redirect, I guess, after Mr. Goldman
10 cross-examines. But other than that, I'm done.
11      MR. FARLEY: Okay. Thank you.
12      MR. GENTILLI: You want to reserve
13 your rights until later?
14      MR. FARLEY: Yes. I would like to
15 reserve the rights of Markel's designated counsel
16 to cross-examine.
17      MR. FOLAN: Let me just --
18      MR. GENTILLI: Yeah. Do you want
19 to ask some questions?
20      MR. FOLAN: No, no. Just for
21 marking, just for purposes of the record, there
22 was one we had the blank. Was that No. 4 or
23 No. 5 or --

Page 66

1       MR. GENTILLI: Yes.
2       MR. FOLAN: And then there was one
3 with the handwriting. Can you just mark -- only
4 so that when we have all that so that it will be
5 together.
6       MR. GENTILLI: I marked both, I
7 think.
8       MR. FOLAN: No. I think we just
9 marked -- my memory is we marked just the one.
10      MR. GENTILLI: I'm sorry, my
11 mistake. I'm glad you pointed that out. Why
12 don't we mark --
13      MR. FOLAN: Mark that 4A.
14      MR. GENTILLI: Yes. I'd like to
15 do that 4A. Is it four? It's either four or
16 five.
17      MR. FARLEY: That's it.
18      MR. FOLAN: Right there.
19      MR. GENTILLI: Okay. It's
20 Exhibit 4. So counsel is correct. I
21 inadvertently did not mark the document we
22 discussed following Exhibit 4 with the
23 handwriting requesting serial number and length

Page 67

1 and the like. Why don't we mark that copy of the
2 cover page, which includes additional information
3 which I believe the witness said he then got on
4 the telephone and added to the purchase and sale
5 agreement -- I think that's what it was -- as
6 Exhibit 4A.
7       (Exhibit No. 4A Fax Cover Sheet
8       marked for identification)
9       MR. GENTILLI: That's it.
10      MR. FOLAN: Great.
11      MR. GENTILLI: Thank you.
12      (Whereupon the deposition
13      was suspended at 12:24 p.m.)

Page 68

1                CERTIFICATE
2
3
4       I, WILLIAM C. ELDREDGE, do hereby
5 certify that I have read the foregoing transcript
6 of my testimony, and further certify that said
7 transcript is a true and accurate record of said
8 testimony.
9       Dated at _____
10 this _____ day of _____, 2005.
11
12
13
14           _____
                WILLIAM C. ELDREDGE
15
16 In re: Markel American Insurance Company vs
17        Robert Madonna
18 7/28/05 - Depo of WILLIAM C. ELDREDGE

Page 69

1    CERTIFICATE
2
3  Commonwealth of Massachusetts
4  Norfolk, ss.
5
6       I, Marie C. Leonard, Certified
7  Shorthand Reporter, Registered Professional
8  Reporter, and a Notary Public in and for the
9  Commonwealth of Massachusetts, do hereby certify:
10       That WILLIAM C. ELDREDGE, the
11  witness whose deposition is hereinbefore set
12  forth, was duly sworn by me and that such
13  deposition is a true record of the testimony
14  given by the said witness.
15       IN WITNESS WHEREOF, I have
16  hereunto set my hand and notarial seal this 15th
17  day of August, 2005.
18
19
20  _____
          Marie C. Leonard
21         CSR, RPR
22  My commission expires
23  on June 29, 2008

Page 70

1  Re: Markel American Insurance Company vs
     Robert Madonna
2     C.A. No. 04-10795-JGD
   Deposition of: William C. Eldredge
3  Taken: July 28, 2005
4       E R R A T A
5
6  Page, Line    As Transcribed    Corrections
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23  Date: