VOLUME I
PAGES 1-125
EXHIBITS: Per Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
IN ADMIRALTY

No. 04-CV-10795-MLW

MARKEL AMERICAN INSURANCE COMPANY, )
    Plaintiff,             )
                      )
v.                   )
                      )
ROBERT MADONNA,         )
    Defendant/           )
    Plaintiff-In-Counterclaim,  )
                      )
v.                   )
                      )
MARKEL AMERICAN INSURANCE COMPANY  )
and CAPE WIDE INSURANCE AGENCY,    )
INC.,                   )
    Defendants-In-Counterclaim,  )
                      )
v.                   )
                      )
CROSBY YACHT YARD, INC.,     )
    Third-Party Defendant.    )

\* \* \* \* \* \* \*

DEPOSITION OF THOMAS CONROY
August 17, 2005

Page 2

```
 1
 2
 3        DEPOSITION OF THOMAS E. CONROY, a
 4   witness called on behalf of Cape Wide
 5   Insurance Agency, pursuant to the applicable
 6   provisions of the Federal Rules of Civil
 7   Procedure, before Mary E. Rinne, Registered
 8   Professional Reporter and Notary Public for
 9   the Commonwealth of Massachusetts, at the
10   offices of Bartlett Hackett Feinberg, P.C.,
11   10 High Street, Boston, Massachusetts, on
12   Wednesday, August 17, 2005, commencing at
13   10:55 a.m.
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1   APPEARANCES (cont'd):
 2   HOLBROOK & MURPHY
 3     BY: Seth S. Holbrook, Esq.
 4     150 Federal Street, 12th Floor
 5     Boston, Massachusetts 02110
 6     (617) 428-1151
 7     holbrook_murphy@msn.com
 8     On behalf of Crosby Yacht Yard.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1   APPEARANCES:
 2   GOLDMAN & HELLMAN
 3     BY: Steven E. Goldman, Esq.
 4     315 Southeast 7th Street, Suite 200
 5     Fort Lauderdale, Florida 33301
 6     (954) 356-0460
 7     On behalf of Markel American Insurance
 8       Company.
 9
10   BARTLETT HACKETT FEINBERG, P.C.
11     BY: Richard E. Gentilli, Esq.
12     10 High Street, Suite 920
13     Boston, Massachusetts 02110
14     (617) 422-0200
15     reg@bostonbusinesslaw.com
16     On behalf of Robert Madonna.
17
18   FOLAN & McGLONE, P.C.
19     BY: John F. Folan, Esq.
20     P.O. Box 2095
21     401 County Street
22     New Bedford, Massachusetts 02741
23     (508) 992-9800
24     On behalf of Cape Wide Insurance.
```

Page 5

```
 1                 INDEX
 2   DEPONENT:                       PAGE
 3   THOMAS E. CONROY
 4   Examination by Mr. Folan          8,112
 5   Examination by Mr. Gentilli         92
 6   Examination by Mr. Holbrook        109
 7
 8
 9
10            EXHIBITS
11   NO. DESCRIPTION               PAGE
12    1  Notice of Deposition pursuant    13
          to F.R.C.P. 30(b)(5)
13
      2  Notice of Deposition pursuant    14
14        to F.R.C.P. 30(b)(6)
15    3  Underwriting Files            36
16    4  Underwriting File for          37
          Policy No. RD0000503
17
      5  Letter from Williette Wagoner    59
18
      6  Multipage document            61
19
      7  Fax cover sheet from Cape       65
20        Wide Ins. to Markel, 6/24/03,
          with attachment
21
      8  Letter from Thomas Conroy to     79
22        Robert Madonna, 12/12/03
23    9  Two-page document, brochure     89
24
```

2  (Pages 2 to 5)

Page 6

1       EXHIBITS
          (cont'd)
2   NO.  DESCRIPTION            PAGE
3   10   1995 Markel American Watercraft   90
          Programs
4
5   11   Document entitled "Distribution"   90
6   12   Markel Marine Service Center       91
          Watercraft Programs document
7   13   Markel American Ins. Co.           91
          document
8
9   14   Yacht & High Performance           92
          Insurance Application
10  15   15-page document with             101
          fax cover sheet, 12/11/03
11
12  (Exhibits attached to original transcript.)
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1           PROCEEDINGS
2           MR. FOLAN: Steve, usual
3    stipulations? Reserve all objections except
4    to form.
5           MR. GOLDMAN: Objections reserved
6    to time of trial.
7           MR. FOLAN: Reading and signing,
8    I'll leave that up to you, Steve. Do you
9    want him to read and sign?
10          MR. GOLDMAN: He will read and
11   sign.
12          MR. FOLAN: Should we send it to
13   you and you'll get it to him?
14          MR. GOLDMAN: That's correct.
15          MR. GENTILLI: Waive notarization?
16          MR. FOLAN: Waive notarization.
17          * * * * * * *
18          THOMAS E. CONROY, satisfactorily
19   identified and duly sworn.
20          * * * * * * *
21          MR. GENTILLI: Just in terms of
22   usual stips, we're reserving not just
23   motions to strike except as to -- not just
24   objections except as to form of the question

Page 8

1    but also motions to strike till the time of
2    trial?
3           MR. GOLDMAN: That's my
4    understanding.
5           MR. FOLAN: That's my
6    understanding.
7           EXAMINATION BY MR. FOLAN:
8    Q. Could I have your full name, sir?
9    A. Sure. Thomas Edward Conroy, C-o-n-r-o-y.
10   Q. And where do you live, sir?
11   A. I live in Waukesha, Wisconsin.
12   Q. Can you spell that?
13   A. W-a-u-k-e-s-h-a.
14   Q. And by whom are you employed?
15   A. Markel American Insurance Company.
16   Q. And where are they located?
17   A. Pewaukee, P-e-w-a-u-k-e-e, Wisconsin.
18   Q. Is Pewaukee and Waukesha, are they
19      adjoining -- abutting towns or however
20      they're described?
21   A. They're in close proximity.
22   Q. And what is your position with Markel
23      America?
24   A. I currently hold the title of marine

Page 9

1    director.
2    Q. What are your duties?
3    A. I oversee the underwriting of marine risk,
4       agency contact and management.
5    Q. And that's --
6    A. There's obviously more, but I don't know how
7       far down you want to go.
8    Q. What are some of your other duties?
9    A. Overseeing personnel, being involved in
10      product reviews and reg. making to a lesser
11      degree. Most of that duty falls within the
12      marketing department.
13   Q. And how long have you been with Markel
14      America?
15   A. I started with the company in 1989.
16   Q. And where was that? What location? Excuse
17      me.
18   A. Same location.
19   Q. In Pewaukee?
20   A. Correct.
21   Q. And what is the address in Pewaukee, the
22      street address?
23   A. The street address is N14 W23833 Stone Ridge
24      Drive. The mailing address is Waukesha,

3  (Pages 6 to 9)

Page 10

1  W-a-u-k-e-s-h-a, and the zip cope is 53188.
2  Q. And have you been in the marine division --
3     if that's the correct terminology or if it's
4     incorrect, let me know -- since your
5     commencement with Markel America?
6  A. Actually, I've spent the majority of my
7     career on the claim side.
8  Q. On the marine claim side or just on the
9     general claim side of insurance?
10 A. The majority with marine. Some motorcycle
11    as well.
12 Q. Why don't you just give me some of your
13    background in terms of working from 1989 to
14    the present.
15 A. I started in 1989 predominantly focusing on
16    motorcycle claims. Probably over a year
17    period or so I started working with
18    watercraft claims. And then my major focus
19    was predominantly watercraft claims.
20    · However, my progression was from an
21    examiner to the senior claim examiner to the
22    property claim supervisor. From that
23    position, I then became the marine
24    director.

Page 11

1  Q. When did you become marine director?
2  A. February 2004.
3  Q. So up until you said February 2004, up until
4     that time had you been associated with the
5     claims department?
6  A. Yes.
7  Q. And there is a difference in departments? I
8     mean, there's the claims department as
9     compared to underwriting?
10 A. It's two separate departments.
11 Q. And you had not been in the underwriting
12    department at all prior to February of 2004?
13 A. That's correct.
14 Q. What was your position in June of 2003?
15 A. Property claims supervisor.
16 Q. And what were your duties as the property
17    claims supervisor?
18 A. To oversee incoming marine losses,
19    personnel, as well as handling some of the
20    more complex watercraft claims.
21 Q. Is that essentially an inside job rather
22    than going out in the field and doing the
23    claims work at the locations of the losses?
24 A. Predominantly, yes.

Page 12

1  Q. Sir, we had scheduled the deposition of
2     designees of Markel America Insurance
3     Company. I represent the Cape Wide
4     Insurance Agency in this matter. And we had
5     served on your counsel a notice of
6     deposition pursuant to Federal Rules of
7     Civil Procedure, Rule 30(b)(5), and there
8     were areas designated in which that person
9     designated by Markel America would be
10    testifying and there would be the production
11    of documents. And I'm just going to show
12    you --
13       MR. GOLDMAN: He's here as the
14    designee.
15       MR. FOLAN: Okay. All right.
16       MR. GOLDMAN: He's a layperson.
17    You're not certainly not going to ask him to
18    comment on a pleading, are you?
19       MR. FOLAN: No. But there are
20    different areas and every area that is
21    covered in that document --
22       MR. GOLDMAN: That's what he's here
23    for.
24       MR. FOLAN: -- he's the person

Page 13

1     producing any of those records if they
2     exist. Is that correct?
3        MR. GOLDMAN: All the records that
4     have been requested pursuant to request for
5     production are in your possession. He
6     hasn't brought any documents with him here
7     today because all the documents that would
8     have been responsive have been produced.
9        MR. FOLAN: And just so it's clear,
10    and responsive to all the requests in this
11    30(b)(5).
12       MR. GOLDMAN: That's correct.
13       MR. FOLAN: Can we just have that
14    marked?
15       (Exhibit 1 marked for
16    identification.)
17 Q. Sir, there was also a request for the
18    designee of Markel America and notice of
19    deposition under a Federal Rule -- Civil
20    Federal Rule 30(b)(6) requesting Markel
21    America have designee as to certain topics
22    that we're going to be doing some inquiring
23    on today.
24       MR. GOLDMAN: He is here as that

4  (Pages 10 to 13)

Page 14

1   designee.
2           MR. FOLAN: Can I just have that
3   marked?
4           (Exhibit 2 marked for
5   identification.)
6   Q. Had you been involved in the insurance field
7   prior to 1989?
8   A. I had not.
9   Q. What's your highest level of education?
10  A. I graduated from high school in 1982 and
11  then have taken some insurance-related
12  courses.
13  Q. And what high school was that?
14  A. Pewaukee.
15  Q. And what did you do after Pewaukee High
16  School?
17  A. I've taken insurance courses. I hold my INS
18  designation as well as my AIC Insurance
19  Institute designation.
20  Q. The first one is IM or IN?
21  A. INS.
22  Q. What is the INS?
23  A. Basically, general insurance.
24  Q. That's a designation?

Page 15

1   A. Yes.
2   Q. In any particular field of insurance?
3   A. It's general.
4   Q. And the AIC?
5   A. Is associate in claims.
6   Q. Any other designations in the insurance
7   field?
8   A. Not yet.
9   Q. Are you studying for any particular areas?
10  A. Just started taking CPCU.
11  Q. And where did you go to work or what was
12  your experience after graduating from high
13  school in 1982?
14  A. It was in the motorcycle industry. I was in
15  sales. I was the parts manager. I was in
16  sales at a number of different motorcycle
17  shops.
18  Q. And when did you change from the motorcycle
19  business to another business?
20  A. When?
21  Q. Yes.
22  A. In 1989.
23  Q. So you were essentially in the motorcycle
24  field from high school until 1989, and then

Page 16

1   1989 in the insurance field?
2   A. Correct.
3   Q. And with Markel America --
4   A. Yes.
5   Q. -- all the time?
6   A. Yes. If I may, Markel American Insurance
7   Company actually bought American
8   Underwriting Managers in about 1990 or
9   1991. So even though it's been in the same
10  office, same personnel, it wasn't Markel
11  American from the very beginning.
12  Q. But you said it was 1991 that Markel --
13  A. It was in that range.
14  Q. Just in reference to what would be Exhibit
15  No. 2 --
16          MR. FOLAN: And if you want to put
17  that in front of him, Mr. Goldman.
18  Q. That's the 30(b)(6) designation. And if you
19  would look at the second page and No. 1, it
20  says for the designee to testify to, 1, The
21  practices and procedures of Markel America
22  Insurance Company regarding applications for
23  marine/boat insurance by independent
24  insurance agents or brokers from January 1,

Page 17

1   2000 to the present. Did I read that
2   correctly?
3           MR. GOLDMAN: You're asking him if
4   that's what it says?
5           MR. FOLAN: Yes.
6   A. I was listening and reading. I didn't
7   compare it.
8           MR. GOLDMAN: Do you want him to
9   read it out loud?
10  Q. Whichever is easiest for you. If you want
11  to read No. 1 --
12          MR. GOLDMAN: Why don't you read it
13  out loud.
14  Q. Yeah, read it out loud.
15  A. The practices and procedures of Markel
16  American Insurance Company ("Markel")
17  regarding applications for marine/boat
18  insurance by independent insurance agents or
19  brokers from January 1, 2000 to the present.
20  Q. Can you tell me what were the practices and
21  procedures of Markel regarding applications
22  for marine insurance from independent
23  brokers from January 1, 2000 to the
24  present?

G&M Court Reporters, Ltd.
617-338-0030

Page 18

1    MR. GOLDMAN: I'm gonna object to
2    the form of that question. On its face it
3    is so incredibly broad, it's beyond any type
4    of rational answer. But if you can frame
5    some response, please do.
6    A. From 2000 forward, I cannot. There are a
7    lot of variances that would occur.
8    Q. What would the variances be?
9    A. Whether or not the agent or broker had
10   authority in the field would be the most
11   significant.
12   Q. Are there direct brokers, agents for Markel
13   America in January of 2000, January 1 of
14   2000?
15   A. I believe Markel had remote agents with
16   authority in 2000.
17   Q. When you say "remote agents," what do you
18   mean?
19   A. They are their own independent agency and we
20   grant them authority via contract.
21   Q. Are you familiar with -- was it XS? That's
22   the letters XS Insurance Agency.
23   A. I am aware of XS, yes.
24   Q. And what's your knowledge of XS?

Page 19

1    A. XS is a marketing general agent. How long
2    they've gone back with the company, I'm not
3    certain but it's been at least 10, 12 years.
4    Q. And does XS have a contract with Markel?
5    A. Yes.
6    Q. And XS, are they what you would call a
7    excess lines broker?
8    A. I would not call them an excess lines. They
9    may be, in fact.
10   Q. What's your understanding of -- just your
11   understanding of an excess lines broker?
12   A. My category?
13   Q. Yes.
14   A. Categorization of excess?
15   Q. Yes.
16        MR. GOLDMAN: I think he's asking
17   you of what your understanding is of what an
18   excess lines broker is. Do you know what an
19   excess lines broker is?
20   A. I would have to -- I want would want to get
21   a legal definition of what an excess lines
22   broker is because there's a lot of different
23   interpretations on insurance terminology.
24   Q. Well, do you have any understanding that as

Page 20

1    of, say, June of 2000 that -- it gets
2    confusing, I'll use the term XS, the
3    letters --
4    A. Mm-hmm.
5    Q. -- could write policies for other agents in
6    Markel policies?
7        MR. GOLDMAN: I'm going to object
8    to the form. First of all, you did say June
9    of 2000?
10       MR. FOLAN: Correct.
11       MR. GOLDMAN: Write policies for
12   other agents?
13       MR. FOLAN: Yes.
14       MR. GOLDMAN: Object to the form of
15   the question. If you can understand it, go
16   ahead.
17   A. I have no idea what the question asked was
18   and what you were asking for. I'm sorry.
19   Q. Well, in this matter I represent Cape Wide
20   Insurance, and Cape Wide contends that their
21   dealings with Markel commencing in about
22   June of 2000 at least commenced with a
23   relationship with XS, letters, Insurance.
24   A. Okay.

Page 21

1        MR. GOLDMAN: Is there a question?
2    Q. And is that a way that Markel was doing
3    business through XS, letters --
4        MR. GOLDMAN: Object to the form.
5    Q. -- in June of 2000?
6    A. Well, I'm sorry. Could you rephrase that?
7    Q. Are you aware in June of 2000 --
8    A. Mm-hmm.
9    Q. -- that XS Insurance, letters --
10   A. Mm-hmm.
11   Q. -- acted as a broker for other insurance
12   agents in dealing with Markel America in
13   selling its products?
14   A. Other brokers?
15   Q. Yes. Other agents or brokers.
16       MR. GOLDMAN: You're asking whether
17   XS acted as a broker for other brokers?
18       MR. FOLAN: Other agents or
19   brokers, that's correct.
20   A. I don't know what XS did or didn't do. I
21   can only speak to what they did with us.
22   Q. What were the practices and procedures of
23   Markel in June of 2000 with regard to
24   receiving and processing applications for

6 (Pages 18 to 21)

Page 22

1  marine insurance?
2         MR. GOLDMAN: Object to the form of
3  the question. That was your first question
4  that I objected to as being so impossibly
5  broad. Why don't you ask specific questions
6  about procedure. You're asking this witness
7  to tell you generically what their practices
8  and procedures were?
9         MR. FOLAN: Correct.
10        MR. GOLDMAN: What do they do when
11 something comes in in a fax? What do they
12 do if something comes in by mail?
13 Q. What did they require?
14 A. What did we require?
15 Q. Yes.
16        MR. GOLDMAN: In what sense?
17        MR. FOLAN: With regard to
18 receiving applications, handling
19 applications for marine insurance.
20        MR. GOLDMAN: From who?
21        MR. FOLAN: From agents.
22        MR. GOLDMAN: Any agent?
23 Authorized agents? Agents that had binding
24 authority? Independent ones like your

Page 23

1  client? What do you mean?
2  Q. From agents with whom you had contracts.
3         MR. GOLDMAN: That's at least a bit
4  more specific.
5  A. Okay. Could you repeat the question?
6  Q. Sir, you're here to testify as to the
7  practices and procedures of Markel in
8  selling with regard to applications for
9  marine insurance by independent agents or
10 brokers from January 1, 2000 to the
11 present. Do you understand that?
12 A. Yes, I do.
13 Q. Was there a procedure in January of 2000
14 with regard to handling the applications for
15 marine and boating insurance from
16 independent agents that had contracts with
17 Markel?
18        MR. GOLDMAN: Same objection to
19 form. But if you can make heads or tails of
20 the question and give an answer in some
21 sense, please do.
22 A. Independent remote agents with authority in
23 the field have the ability to write certain
24 classes of business within a certain --

Page 24

1  within certain limitations. They would
2  submit business only if it fell outside the
3  scope of what was provided by the
4  underwriting guideline and their given
5  contract.
6         In that scenario, they would enter
7  the information into the system and then fax
8  us the supporting documentation whereby that
9  information was routed to an underwriter to
10 review to make sure that both the rate and
11 the information provided on the application
12 was eligible and correctly rated.
13 Q. It was faxed, and did you say it was faxed
14 to an underwriter?
15 A. It was faxed into the department and routed
16 to an underwriter.
17 Q. And did the department have a specific fax
18 number in January of 2000?
19 A. It is my understanding faxes could have come
20 in from a number of different -- to a number
21 of different faxes which would have then
22 determined where they would have been
23 routed.
24 Q. And was there a practice and procedure with

Page 25

1  regard to independent insurance agencies
2  that did not have direct contracts with
3  Markel to apply for marine or boat insurance
4  in January of 2000?
5  A. There was a practice.
6  Q. And what was that practice?
7  A. The practice was that once the application
8  or information that was provided was
9  received, it would have been sent to an
10 underwriter again, same process, whereby the
11 information was quoted, the risk was
12 evaluated for eligibility, and a quotation
13 sheet would have been released.
14 Q. And where would the quotation sheet go?
15 A. The quotation sheet would be faxed back to
16 the person who sent us the information.
17 Q. And that would be the agency that had faxed
18 to your underwriting department the
19 application. Is that correct?
20 A. Yes.
21 Q. And that fax, the returned fax would say
22 accepted coverage or not accept coverage?
23        MR. GOLDMAN: Objection. He didn't
24 say that.

G&M Court Reporters, Ltd.
617-338-0030

Page 26

1      MR. FOLAN: I'm not saying what he
2   said, it's a question.
3      MR. GOLDMAN: I think your question
4   insinuated what he had said.
5      MR. FOLAN: If he doesn't
6   understand the question, let him say so.
7      MR. GOLDMAN: Do you understand the
8   question?
9      MR. FOLAN: These speaking
10  objections are --
11     MR. GOLDMAN: Counsel, I'm trying
12  to help you frame questions which you seem
13  to be having some difficulty doing. He's
14  not here to answer Questions --
15     MR. GENTILLI: Can I ask both
16  counsel --
17     MR. GOLDMAN: -- 1 through 10 which
18  you seem to be suggesting you want him to
19  do.
20     MR. FOLAN: Correct.
21     MR. GOLDMAN: Go ahead.
22     MR. GENTILLI: Can I ask both
23  counsel to kind of keep the colloquy down?
24  I hate to spend what transcripts cost to see

Page 27

1   counsel talk. Let's ask questions. You can
2   object. He can answer, he can't answer.
3   But let's keep it at least to -- so that
4   we're paying for words of substance as
5   opposed to colloquy here.
6   A. I'm sorry. At this point, could you ask it
7   again, please?
8   Q. What would be contained in the response once
9   the application is received by fax?
10  A. What would be in the application?
11  Q. No. What could be the varying responses
12  that would be made by Markel's underwriting
13  department?
14  A. Loosely or the general responses would be
15  either, Here is the quote sheet, additional
16  information is required. Or, This is simply
17  not eligible for the program.
18  Q. Now, with regard to areas where there would
19  have been any changes or amendments to
20  coverage in existing policies, what was the
21  procedure in January of 2000?
22     MR. GOLDMAN: Objection to the
23  form. As I said, you seem to be thinking
24  that these areas of inquiry are somehow akin

Page 28

1   to questions. They are not.
2      Your question is improper. It is
3   so broad that, just as I indicated at the
4   beginning of this deposition, I don't think
5   it's possible for an answer to be framed.
6      If you will please ask a precise
7   question about practices or procedures for
8   amending, this witness is here to answer.
9   Q. And my question is, what were the practices
10  and procedures --
11     MR. GOLDMAN: Same objection, as to
12  form.
13  Q. -- for amending policies in existence in
14  January of 2000?
15  A. Again, it's a question that I just cannot
16  answer because there are different
17  scenarios.
18  Q. What are the different scenarios?
19  A. It can be a remote agent. It could be a
20  direct customer. It could be a broker. And
21  there's different process.
22  Q. Would it be by facsimile communication from
23  the broker or agent requesting an amendment
24  to a policy?

Page 29

1   A. Facsimile is one method.
2   Q. What other methods?
3   A. It could have been mailed.
4   Q. Any other methods?
5   A. It would be unlikely; however, a phone
6   conversation could also occur.
7   Q. Now, has that procedure with regard to the
8   use of facsimiles with regard to amendments
9   to policies changed from January of 2000 to
10  the present?
11  A. With regard to process, more is certainly
12  done via e-mail; however, the review by an
13  underwriter would stay the same.
14  Q. And that being what?
15  A. I'm sorry. What was the question?
16  Q. Could one still do as of today by request
17  for changing or amending existing policies
18  done by facsimile transmission today?
19  A. Yes.
20  Q. So that procedure has been used by Markel
21  America from January of 2000 to the present
22  time?
23  A. Correct.
24  Q. Have there been any changes in terms of

8   (Pages 26 to 29)

CRITICAL

Page 30

1  publications by Markel from January of 2000
2  to the present to agents concerning the
3  procedures for amending policies?
4  A. Not that I can think of. However, more is
5  being done via e-mail. We may have sent
6  some correspondence out now with e-mail
7  addresses so that it's a little bit more
8  streamlined.
9  Q. And would those notifications go to your
10  contract agents only?
11  A. Typically, yes.
12  Q. When we were discussing amending policies
13  from January of 2000 to the present, does
14  that amending policies include changing
15  vessels on a policy? The procedures would
16  be the same, it could be done by fax?
17  A. I'm sorry. Could you ask that again,
18  please?
19  Q. Changing identification of a vessel on an
20  existing policy from January of 2000 to the
21  present, was the use of facsimile by the
22  agent a means accepted by Markel America?
23  A. We would accept facsimile for a change of
24  request to a vessel.

Page 31

1  Q. And has the facsimile telephone number or
2  numbers been deleted from January of 2000 to
3  the present?
4  A. I don't know.
5  Q. In receiving a request by an agent by
6  facsimile to change a vessel, exclude one
7  vessel and add another vessel, what were the
8  procedures of the underwriting department
9  with regard to doing the change?
10  A. The -- if the vessel was acceptable, we
11  would process the request. A new
12  declarations page would be issued generating
13  an invoice. If it was a more expensive
14  vessel or if the boat was ineligible for the
15  program, we would notify the individual who
16  sent us that request.
17  Q. You used the term "the program." Is there
18  just one marine program for pleasure vessels
19  with Markel America?
20  A. No.
21  Q. What are the different programs?
22  A. We have a personal watercraft program.
23  Q. And what is that?
24  A. Small, jet-powered boats. To use brand

Page 32

1  names, Wave Runners, Jet Skis, Sea Doos. We
2  have what we refer to as a regular
3  watercraft program, which is small
4  runabouts. We have a seasoned yacht program
5  intended for older boats, typically 26 feet
6  and larger. And we also have a high
7  performance feet for boats 26 feet and
8  longer, 55 miles per hour and higher.
9      Of course, that was the reader's
10  condensed version of the programs. There's
11  many more rules and regulations.
12  Q. No, I understand. I'm just trying to get a
13  general sense as to the programs that Markel
14  America has.
15      And were those same practices in
16  existence in January of 2000?
17  A. Yes.
18  Q. And they're still in existence today?
19  A. Yes.
20  Q. Have there been any changes, additional
21  programs added?
22  A. We also have two preferred marine products,
23  the helmsman yacht and also the compass
24  program. Both are limited in scope as to

Page 33

1  who may use those programs.
2  Q. It is my understanding, sir, by
3  representation of counsel that -- I'm going
4  to show you a correspondence from your
5  counsel to Attorney Gentilli in this matter
6  dated June 15, 2005. This is a copy that
7  I've made, and ask you if that represents
8  the underwriting file or maybe -- or what
9  that does represent.
10      MR. GOLDMAN: I'm sorry they're
11  such poor copies, Gentlemen. It was
12  inadvertent.
13  A. On the existing vessels?
14      MR. GOLDMAN: Sorry. I'm ashamed
15  for having sent out such poor copies. I
16  wish you'd brought it to my attention.
17      MR. FOLAN: These were -- take a
18  look. These were produced earlier in
19  another response. It appears to be better
20  copies. You tell me if they're the same.
21      MR. GOLDMAN: Obviously, if it's on
22  the 2000 Pursuit, this is going to be the
23  policy.
24      MR. FOLAN: Make sure that he's

9  (Pages 30 to 33)

Page 34

1    comfortable with that.
2         MR. GOLDMAN: Again, I'm so sorry
3    that I produced such a terrible dec. page.
4    Someone should have called and hollered at
5    me.
6         (Witness reviews documents.)
7    A. Yes, it does appear to be the underwriting
8    files.
9    Q. And you say "files." Are there two separate
10   policies, at least from my review of it?
11   A. It's hard to see the policy numbers.
12        MR. GOLDMAN: If you'd like to use
13   these, that'll be fine.
14        MR. FOLAN: I believe -- and I'll
15   just -- this may be the RD503 which would be
16   the -- I don't think this was the smaller
17   boats because I think that's included in --
18        MR. GOLDMAN: The RD503 would be on
19   the 2000 33-foot Pursuit.
20   A. I can make out that the Edgewater was also
21   included here, which would have been the
22   smaller boat, which would have been in the
23   regular watercraft program versus the
24   seasoned yacht program.

Page 35

1    Q. And once again, correct me if I'm wrong.
2    It's my understanding that that had a
3    different policy number for the Edgewater,
4    the 15-foot?
5    A. Yes.
6    Q. And is that because it was in a different
7    program?
8    A. Yes.
9    Q. So that's a smaller boat program. Was the
10   program for the larger boats that are there,
11   the policy RD -- I guess it's 503, I'll
12   leave out all the zeros, is that -- what
13   program is that?
14   A. Seasoned yacht.
15   Q. So it's my understanding that so long as the
16   craft fell within a particular -- whether it
17   was a seasoned yacht or -- the number of
18   boats didn't change the policy, you could
19   have more than one boat on a policy so long
20   as it fell within the seasoned yacht or the
21   small craft or whatever it is?
22   A. You can have more than one boat, yes.
23   Q. Okay.
24        MR. GOLDMAN: On the same policy is

Page 36

1    what he's asking.
2    Q. On the same policy number.
3    A. You can have more than one boat on the same
4    policy.
5    Q. This may be a better copy, if you just want
6    to take the time to make sure that this is
7    everything. This is copies made from
8    another production of documents from --
9         MR. FOLAN: Why don't we mark
10   that. I'm going to have this marked.
11        (Exhibit 3 marked for
12   identification.)
13   Q. Why don't you just take a look at that to
14   see --
15        MR. GOLDMAN: Off the record.
16        (Discussion off the record.)
17   A. This would appear to be the underwriting
18   file.
19   Q. For the personal watercraft -- not the
20   personal watercraft, the RD503 as compared
21   to the --
22        MR. GOLDMAN: Why don't you just
23   ask him what it is.
24   Q. -- Edgewater?

Page 37

1    A. This is the policy for -- which contains the
2    boat, the Pursuit, and the 1996 Tiara.
3    Q. And it appears to be the underwriting file
4    for that -- for those boats or vessels?
5    A. Yes.
6         MR. FOLAN: And why don't we have
7    that marked as Exhibit No. 4.
8         (Exhibit 4 marked for
9    identification.)
10        MR. FOLAN: And just for the
11   record, what we've marked as Exhibit No. 3
12   contains the documents sent by Attorney
13   Goldman to Attorney Gentilli containing the
14   underwriting files from Markel. It says, In
15   connection with vessels insured by your
16   client, meaning Mr. Madonna.
17        And Exhibit No. 4 is another copy.
18   And that would contain the underwriting file
19   for the Policy No. RD0000503, and that would
20   be the seasoned yacht program coverage that
21   Markel had for Mr. Madonna.
22        THE WITNESS: I'm confused as to
23   the question. I thought -- did I answer
24   that question?

10 (Pages 34 to 37)

1    MR. FOLAN: Just for the record, I
2  just want that identified.
3        MR. GOLDMAN: Tell him what Exhibit
4  4 is.
5        THE WITNESS: Exhibit 4 is policy
6  RD0000503 for the 2000 Pursuit and 1996
7  Tiara which would fall within our seasoned
8  yacht program.
9        MR. GOLDMAN: And which I think
10  there's no dispute but that Markel insured.
11        MR. FOLAN: I just want to make ·
12  sure.
13  Q. Looking at what is on Exhibit 4 at a
14    document headed Cape Wide Insurance Agency,
15    Inc., and it says Endorsement Request and on
16    the bottom it says a fax in handwriting
17    (262) 548-3288. Is that a fax number for
18    Markel American Insurance Company?
19  A. I believe that's our fax number that reaches
20    our customer service department.
21  Q. And is there a different fax number for the
22    underwriting department?
23        MR. GOLDMAN: Is your question
24    directed to the present time or do you want

1    to phrase that in terms of a specific date?
2  Q. Well, we'll start with the present time.
3  A. There is a fax number that reaches the
4    marine underwriting department which is
5    548-9448.
6  Q. That number, 548-9448, was that in existence
7    in June of 2003?
8  A. I'm not certain.
9  Q. Is there some way you could check to see if
10    that was in existence?
11  A. I will do my best.
12  Q. And provide it to your counsel.
13  A. Mm-hmm.
14  Q. In June of 2003, was the fax number (262)
15    548-3288, was that into the underwriting
16    department?
17  A. It was in the customer service.
18  Q. Now, physically where is the customer
19    service department in your business, in your
20    building in relationship to the underwriting
21    department?
22  A. They're right next to each other.
23  Q. And would that be a different room or is it
24    a matter of cubicles?

1  A. It's cubicles actually. They're 20 steps
2    apart.
3  Q. And was there a procedure in June of 2003
4    with regard to reception of faxes at -- I'll
5    just call it 548-3288, if that cuts down a
6    little on numbers here, if it's received by
7    the customer service department in giving
8    that to the appropriate person in the
9    underwriting department?
10  A. Was there a procedure?
11  Q. Yes.
12  A. Yes.
13  Q. And what was that procedure?
14  A. The person who was responsible for clearing
15    the fax that given day would go through the
16    faxes and then distribute them.
17  Q. And could the customer service department
18    receive faxes for other departments other
19    than customer service and underwriting?
20        MR. GOLDMAN: Objection to the
21    form. Meaning could they do it physically
22    or could they do it -- were they permitted
23    by Markel procedures? I'm not sure I
24    understand your use of the term "could." Do

1    you mean in a physical sense?
2  Q. We'll start out with physically.
3  A. Yes.
4  Q. Was it permitted?
5  A. We can't stop an incoming fax.
6  Q. Was it permitted for that individual in the
7    customer service department to take it to a
8    department other than the underwriting
9    department?
10  A. Yes.
11  Q. It could go to the claims department?
12        MR. GOLDMAN: Object to the form of
13    the question. I think his testimony was
14    that they could be brought to whoever was
15    supposed to be the recipient. I think
16    that's what he said.
17  Q. And how many people are in the customer
18    service department?
19  A. I don't know.
20  Q. How many people were in the underwriting
21    department in June of 2003?
22  A. I don't know.
23  Q. Any approximation as to --
24  A. I could guess.

11 (Pages 38 to 41)

Page 42

1  Q. Your best judgment.
2  A. Less than ten.
3  Q. And presently, you're in charge of that
4     department. How many people are in it at
5     the present time?
6  A. There's still less than ten.
7  Q. So approximately the same in 2003 as at the
8     present time?
9  A. Mm-hmm.
10 Q. And who is the person in charge of the
11    underwriting department?
12 A. Currently?
13 Q. Yes.
14 A. I'm sorry.
15 Q. Who is the supervisor of the underwriting
16    department --
17 A. I am.
18 Q. -- in the marine?
19 A. I'm the marine director.
20 Q. Who was the marine director in 2003?
21 A. Lenny Richeleau.
22 Q. Can you spell it?
23 A. R-i-c-h-e-l-e-a-u.
24 Q. In reviewing what's Exhibit No. 4, and I'm

Page 43

1     just saying it appears to run -- once again,
2     correct me if I'm wrong -- from back to
3     front in terms of time entries or how the
4     documents are put together. Is that the
5     procedure of holding your files at the
6     present time in the underwriting department?
7  A. Typically, that's how they're assembled.
8  Q. And has that been the procedure in your
9     understanding from 2001 to the present time?
10 A. Yes.
11 Q. So that would essentially reflect what was
12    going on in the file as you read it from the
13    bottom to the top or the back to the front
14    or however you want to look at it?
15 A. I'm sorry. Could you --
16 Q. I'm asking you, in reviewing Exhibit No. 4,
17    it would be essentially going from what
18    would be the bottom page of that fax to the
19    top would sort of be a chronological review
20    of that file?
21 A. It usually is. However, this one has been
22    copied. It's gone through many hands.
23 Q. Sure.
24 A. I can't comment that this one is in that

Page 44

1     format.
2  Q. Can you just generally take a look at it to
3     see if that's -- I don't mean to -- go
4     ahead.
5        MR. GOLDMAN: Oh, he's going to
6     look through the whole thing before he
7     answers a question like that.
8        Please do. Make sure that
9     everything in there is in reverse
10    chronological order as counsel is
11    insinuating. Perhaps it has been altered,
12    perhaps the pagination has been changed.
13       (Witness reviews file.)
14 A. This document is not in chronological order,
15    or this folder.
16 Q. Okay. And you've reviewed, I don't know,
17    five or six, seven pages, whatever it is.
18    What would indicate to you that it's not in
19    order?
20 A. Just looking at the dates.
21       MR. GOLDMAN: Can I make a
22    suggestion? In situations like this where
23    we're looking at documents that have been
24    produced and it's multipage, whether it's

Page 45

1     the broker's entire file or an underwriting
2     file, it is generally customary to paginate
3     the thing, take a few moments, paginate it
4     from top to bottom.
5        And that way, when the witness is
6     referring to a particular page in the
7     exhibit, you don't have to give it all kinds
8     of description to make sure we all know what
9     we're talking about. He can just say it's
10    page 7 or page 25 of Exhibit 4. We have
11    time. If you're going to be using multipage
12    exhibits, I would respectfully suggest that
13    you do it that way.
14       MR. FOLAN: I appreciate your
15    assistance. But this is the way the
16    documents were produced to me.
17       MR. GOLDMAN: I'm just suggesting
18    that you paginate the one that you're
19    showing the witness so he can tell you that
20    he's looking at page 6 of that exhibit. But
21    if not, we'll take all the time you want.
22 Q. Why don't we just go to the back again and
23    see if you can describe what some of the
24    documents are. And if it would be a

12 (Pages 42 to 45)

Page 46

1    multipage document as you see it, just let
2    me know what they are.
3        MR. GOLDMAN: For the record, the
4    witness is referring to Exhibit 4.
5    A. The first document on the very bottom is
6    Massachusetts Amendatory Endorsement
7    WC5061-0498. The next document is an
8    endorsement Slip and Mooring Liability
9    Coverage, WC5015.
10       The next document is Yacht
11   Endorsement, WC5047. The next document is
12   Certification of Completion awarded to
13   Robert Madonna for U.S. Power Squadron
14   boating course.
15   Q. Is there some significance to Markel America
16   with regard to that certificate or
17   completion of that Coast Guard course?
18   A. Completion of a --
19       MR. GOLDMAN: Object to the form.
20   It's not a Coast Guard course.
21   Q. The course that's described.
22   A. A safety course gives the boat owner or
23   insured a discount.
24   Q. What's the next document, sir?

Page 47

1    A. It is titled Watercraft Insurance
2    Application quote sheet. The next multipage
3    document is Mr. Madonna's credit report.
4    Q. And what is the significance of that to the
5    underwriting file -- underwriting
6    department, excuse me?
7    A. Underwriters would just typically review the
8    information to make sure that an individual
9    is not in debt.
10   Q. And is that something on an application they
11   would typically request, the underwriting
12   department?
13   A. The underwriting department might find the
14   need to run it.
15       The next document in is dated
16   June 19th of 2000. It's titled Further
17   Action Required.
18   Q. And there's some handwriting on that. What
19   is that?
20   A. It appears to be the insured's address.
21   Q. Okay.
22   A. The next document appears to be his motor
23   vehicle record. The next multi -- this is
24   out of order. This appears to be a page

Page 48

1    that's part of an application for request
2    for quote.
3    Q. And does that describe a particular vessel?
4    A. This individual piece does not.
5    Q. Okay.
6        MR. GOLDMAN: There's different
7    pages. Correct me if I'm wrong, I think
8    you've asked him to describe each and every
9    page.
10       MR. FOLAN: No, I said groups. If
11   he sees it as being a group of documents as
12   compared to individual, then that's fine.
13   A. The next three pages appear to be an
14   equipment sheet for one of the boats which
15   also includes or denotes right in the middle
16   factory installed with Yamaha outboards.
17       The next document is actually cut
18   off in the middle but appears to be the
19   continuation of some type of bill of sale
20   for Bob Madonna for the Pursuit. The next
21   page appears to be a component of a request
22   for quote or part of an application process
23   for the 2000 Pursuit.
24       The next two pages appear to be

Page 49

1    from Barnstable Marine Service for a 1996
2    Tiara.
3    Q. Is there some significance to getting that
4    last document you described in the
5    underwriting file?
6    A. A condition in survey could be required
7    depending on the program. Typically surveys
8    are required on ten-year-old boats or older.
9    Q. And a survey being what?
10   A. A condition in survey done by an independent
11   third party telling how -- the condition and
12   components of the boat.
13   Q. Okay.
14   A. There is a fax here, fax cover page from
15   Cape Wide Insurance Agency dated June 14th,
16   2000.
17   Q. And what is that? In looking at that, is it
18   a request for coverage? I just can't read
19   it here.
20   A. I can read it.
21   Q. Sure.
22   A. The entire document?
23   Q. Does it say -- and I'm reading upside
24   down -- Dear Kim?

13  (Pages 46 to 49)

Page 50

1   A.  Okay.  So you're asking me to read it?
2   Q.  Well, does it say, Dear Kim?
3   A.  Yes, it says, Dear Kim.
4   Q.  And who is Kim?
5   A.  Kim Ramsby is an employee.
6   Q.  In the underwriting department?
7   A.  It does not have a last name so I'm assuming
8       it's an employee.
9   Q.  Is there a Kim Ramsby in the underwriting
10      department --
11  A.  Yes.
12  Q.  -- at the present time?
13          Was she there in the year 2000?
14  A.  I'd have to pull her personnel records to
15      get her start date.
16  Q.  Was she there in June of 2003?
17  A.  Yes.
18  Q.  And it says, Dear Kim.  What does it say
19      below that?  Just if you could read that.
20  A.  Reading from Dear Kim, As requested,
21      following please find application and boat
22      information as well as current copy of MVR
23      for proposed insured.
24          Bob took possession of Tiara, in

Page 51

1       caps, today, and wishes to secure coverage
2       immediately.  Please call me at your
3       earliest convenience to that we may arrange
4       for a binder.
5           Thank you for your help.  You truly
6       make my job easier.
7           Sincerely, Cape Wide Insurance
8       Agency, name, Echo K. Bober, CISR.
9   Q.  And is there anything, looking at that
10      document, reflecting it was received by
11      facsimile by Markel?
12  A.  There's a fax transmission towards the top.
13      However, it's cut off.
14  Q.  But receipt of the application by facsimile
15      was appropriate in June of 2000?
16  A.  Yes.
17  Q.  What are the next documents?
18  A.  It's a document, underwriting review for
19      increased limits.  Next is a watercraft
20      insurance binder.
21  Q.  Just getting back to the binder that you
22      had, what vessels, if any, are described in
23      the binder?
24  A.  There's two.  A 1996 Tiara and a 2000

Page 52

1       Pursuit.
2   Q.  And what's the date of the binder?
3   A.  6/20 of 2000.
4   Q.  And what's the next document, sir?
5   A.  It's an invoice.
6   Q.  An invoice from whom and to whom?
7   A.  From Markel American Insurance Company to
8       Robert Madonna.
9   Q.  And is that an invoice that would be issued
10      by Markel directly to Mr. Madonna as
11      compared to his insurance agency?
12  A.  I would have to check with our IT department
13      to make sure that it went to both.
14  Q.  Is it your experience that the billing goes
15      directly to the insured?
16  A.  I believe a copy goes to both.
17  Q.  A copy goes to both or an original goes to
18      both parties?
19  A.  An invoice would be mailed to both parties.
20  Q.  What's the next document?
21  A.  Declarations page for Robert Madonna, 2000
22      Pursuit for a policy period of June 19th,
23      2000 to June 19th, 2001.  The same policy
24      dates; however, the boat is the 1996 Tiara.

Page 53

1           The next document is a Loss Notice
2       for a claim that occurred on May 11th of
3       2001.  The next document is a declarations
4       page for a 1996 Tiara 41-foot for --
5   Q.  Does it say the policy period on that one?
6   A.  Yes.
7   Q.  And what's the policy period?
8   A.  June 19th of '01 through June 19th of '02.
9   Q.  Is renewal done automatically by Markel from
10      2000 to 2005?
11  A.  On a direct bill policy, a renewal offer is
12      automatically generated.
13  Q.  And when you're reviewing that, is that a
14      direct bill policy from the documents that
15      you've seen?
16  A.  This would have been a direct bill policy.
17  Q.  And a direct bill policy is what?
18  A.  We have two options.  One would be an
19      account current or direct bill.  We would
20      not offer account current on a private
21      pleasure policy.
22          The next document appears to be a
23      copy of an invoice for a return with a
24      premium check.  The next document is a

14  (Pages 50 to 53)

Page 54

1    declarations page for a 2000 Pursuit from
2    June 19th of '02 through June 19th of '03.
3    Next declarations page, same term, different
4    boat, 1996 Tiara yacht.
5    Q. And what was the other boat?
6    A. That was the Pursuit.
7    Q. Pursuit, okay. And what is the next
8      document?
9    A. It's an endorsement request from Cape Wide
10     Insurance Agency.
11   Q. And what's the date of that endorsement
12     request?
13   A. It's requested to be changed June 19th of
14     '02. What --
15   Q. And what's -- go ahead.
16   A. What date we received it, I cannot tell.
17   Q. And what is requested?
18   A. A change of address.
19   Q. And I believe that's the document I was
20     referring to before. There's a fax number
21     handwritten on the bottom of that document,
22     of the endorsement request?
23   A. There's a fax number.
24   Q. And is that the fax number that you were

Page 55

1    referring to that went to the customer
2    service department?
3    A. The fax number of (262) 548-3288 handwritten
4    on the bottom of this page is the customer
5    service fax number.
6    Q. And is that a handwriting that you recognize
7      at all?
8    A. No.
9    Q. Okay.
10   A. However, I'm not a handwriting expert.
11   Q. No. And I just --
12   A. The next declarations page is for June 19th,
13     '02 through June 19th of '03 for the 2000
14     Pursuit. Same dates for the '96 Tiara, the
15     policy term -- declarations page, policy
16     term June 19th, '03 through June 19th, '04
17     for '96 Tiara. And the most top document is
18     the same dates for the 2000 Pursuit.
19        MR. GENTILLI: Can we just take a
20     two-minute break?
21        MR. FOLAN: Sure.
22        (Brief recess taken.)
23   Q. In one of the documents it says Underwriting
24     Review Increased Limits up on the top, and I

Page 56

1    took this out of Exhibit No. 4. It says
2    underwriter KDR. Does that refresh your
3    memory as to who Kim is at all?
4    A. KDR would be Kim Ramsby.
5    Q. And that's June 20th of 2000?
6    A. Yes.
7    Q. I'm gonna show you a document. And I will
8      represent to you that this was produced from
9      the file of Cape Wide Insurance. I'm just
10     gonna ask you if it's a document that you
11     have seen before.
12        (Witness reviews document.)
13   A. I have not seen this document before.
14   Q. Once again, it's not a document in your
15     experience at Markel America that you've
16     seen before?
17   A. I have not seen this document before.
18   Q. Is that the letterhead of Markel American
19     Insurance Company?
20   A. Yes.
21   Q. And is that a letterhead that you've seen
22     before?
23   A. Yes.
24   Q. And there's a fax number on that

Page 57

1    letterhead.
2    A. Yes.
3    Q. And what is that fax number?
4    A. (262) 548-3288.
5    Q. On the bottom it says, Sincerely, Williette
6      Wagoner.
7    A. I see that.
8    Q. And who is that person?
9    A. The document reflects that her title was
10     customer service supervisor.
11   Q. And do you know her as an employee of Markel
12     America?
13   A. Yes.
14   Q. And is she still there?
15   A. Yes.
16   Q. And what is her position?
17   A. She is currently in the Pewaukee business
18     analyst group.
19   Q. But at least when this letter was executed,
20     she was customer service supervisor?
21        MR. GOLDMAN: Object to the form of
22     the question.
23   Q. If you know.
24        MR. GOLDMAN: This letter is

G&M Court Reporters, Ltd.
617-338-0030

Page 58

1    undated. There's no way to discern when
2    this letter was, as you put it, executed.
3    In fact, as I understand the term in the
4    dictionary, "executed," it has not been
5    executed. Executed to me means signed.
6    This document is undated, unaddressed and
7    unsigned.
8        I think the best you can do is ask
9    whether at the time that the document may
10   have been printed Ms. Wagoner worked there.
11   But there's no way to determine the date of
12   this document.
13       Ask your question and I will object
14   to the form.
15   Q. Do you understand --
16   A. I cannot tell when this letter was
17   generated.
18   Q. When was Ms. Wagoner a customer service
19   supervisor?
20   A. I don't know the dates today.
21   Q. Approximately.
22       MR. GOLDMAN: If you know.
23   A. I'm not certain.
24   Q. Do you see on the bottom it says cc and it

Page 59

1    says John W. Dwyer?
2    A. I see that.
3    Q. And who is John W. Dwyer?
4    A. John W. Dwyer is currently the VP of
5    operations.
6    Q. And is he out of Pewaukee, Wisconsin?
7    A. Yes.
8    Q. And it also says below Mr. Dwyer a John A.
9    Miller.
10   A. Yes.
11   Q. And who is Mr. Miller?
12   A. John Miller was an employee.
13   Q. And in what department?
14   A. I believe he was in customer service.
15       MR. FOLAN: Can we have that
16   marked, please?
17       (Exhibit 5 marked for
18   identification.)
19   Q. I'm going to show you a --
20       MR. GOLDMAN: Let the record
21   reflect that that document which counsel was
22   referring to has now been marked as Exhibit
23   5.
24       MR. FOLAN: Thank you.

Page 60

1    Q. I'm going to show you another document and
2    ask you if you've ever seen this document
3    before today.
4        (Witness reviews document.)
5        MR. GOLDMAN: Let the record
6    reflect it's a multipage document -- or a
7    multipage exhibit.
8    A. I have seen this document before.
9    Q. And when did you see that?
10   A. I believe this is the document that was sent
11   in on or about the same day as when the
12   claim was reported.
13   Q. And can you describe that document just as
14   you observe it, that multipage document?
15       MR. GOLDMAN: Why don't you mark it
16   so he can refer to it.
17   A. Again, each page?
18   Q. Sure. Just take a look at it.
19   A. What the document in front of me reflects is
20   a Cape Wide Insurance Agency letterhead
21   noted as a fax cover sheet dated June 16th
22   of 2003 which requests a change of boat from
23   a 1996 Tiara to a 2003 Tiara.
24       The second document is an agreement

Page 61

1    to purchase a 2003 42-foot Tiara with a
2    purchase price of $607,665.
3        The third page appears to be a
4    continuation of the last in which
5    description of equipment and certain other
6    addendums are noted.
7        The next document is a
8    manufacturer's statement of origin for a
9    2003 Tiara.
10       And the last document is a
11   builder's certificate for a 2003 boat with a
12   hull identification number of SSUR2006K203.
13       MR. FOLAN: Can we have that
14   marked?
15       (Exhibit 6 marked for
16   identification.)
17   Q. Just again referring to what is Exhibit No.
18   6, there is typed fax number and I represent
19   that it appears to have been the typed
20   portion has been crossed out in this
21   document, Exhibit No. 6. What is that fax
22   number that's typed?
23   A. (262) 548-3288.
24   Q. And that is the fax number to, you say, the

16  (Pages 58 to 61)

G&M Court Reporters, Ltd.
617-338-0030

Page 62

1    customer service department?
2    A. Yes.
3    Q. And there is handwritten next to that some
4      four numbers. What are those?
5    A. The document reflects 9448.
6    Q. And do you recognize those numbers
7      reflected?
8    A. (262) 548-9448 is the fax number for the
9      marine department.
10   Q. Any particular portion of the marine
11     department? Underwriting? Claims?
12     Customer service?
13   A. Underwriting.
14   Q. Are there any records kept by Markel with
15     regard to receipt of faxes?
16   A. No.
17   Q. Have there ever been any records kept by
18     Markel with regard to receipt of faxes?
19   A. I can't comment on that.
20   Q. Are you saying you're not aware of any?
21   A. I'm not aware of any.
22   Q. And reading next to those four numbers that
23     you just wrote (sic) on the right-hand side,
24     I will read it. It appears to me to say,

Page 63

1      Faxed to Jessi 2/11/03 with accord. Does
2      that appear to be an accurate reading?
3    A. I'll let the document speak for itself. It
4      is hard to read.
5    Q. Do you know a Jessi?
6    A. Yes.
7    Q. Who is Jessi?
8    A. Jessi has worked in both customer service
9      and in the marine underwriting department.
10   Q. And what is Jessi's last name?
11   A. Clendenning, C-l-e-n-d-e-n-n-i-n-g.
12   Q. And do you know in June of 2003 what
13     department she was working in?
14   A. I believe she was in customers service. I'm
15     sorry. What date? Excuse me.
16   Q. June 2003.
17   A. June of 2003. I'm not certain which
18     department she was in. Sorry.
19   Q. What department is she in at the present
20     time?
21   A. Marine underwriting.
22   Q. Was there a particular number, fax number
23     for the claims department in June 2003?
24   A. Yes.

Page 64

1    Q. And what was that number?
2       MR. GENTILLI: Telephone or fax?
3    Q. Fax. Sorry.
4    A. I don't recall it off the top of my head.
5      I'm sorry.
6    Q. If you know, is it a different number than
7      any of the numbers that are on Exhibit
8      No. 6?
9    A. You know, I don't see it on the document. I
10     don't recall what it is off the top of my
11     head.
12   Q. I'm going to show you a document and ask you
13     if you have seen this document before
14     today.
15       (Witness reviews document.)
16   A. This document does look familiar, yes.
17   Q. And what is that document?
18   A. Again, it's a Cape Wide Insurance Agency
19     letterhead with a fax cover for Robert
20     Madonna requesting a change of boat from a
21     2000 Pursuit to a 2000 Crosby Hawk.
22   Q. And when did you first see that document?
23     What's your first memory of seeing that
24     document?

Page 65

1    A. I believe this was after the claim had been
2      denied.
3       MR. FOLAN: Can we have that
4      marked, please?
5       (Exhibit 7 marked for
6      identification.)
7       MR. GOLDMAN: It's now been marked
8      Exhibit 7.
9    Q. Once again, the fax number referred to in
10     Cape Wide in Exhibit No. 7 is
11     (262) 548-3288. Correct?
12   A. That's what the document says.
13   Q. And are there any records to reflect that
14     that would have -- that fax was received by
15     Markel?
16   A. No.
17   Q. Just once again, so there are no logs that
18     are kept by any persons involved with that
19     particular fax machine reflecting what fax
20     is received in a particular day?
21   A. No.
22   Q. Now, were you involved at all with regard to
23     the claim of Mr. Madonna with regard to the
24     2000 Crosby Hawk boat described in Exhibit

17 (Pages 62 to 65)

Page 66

1    No. 7?
2  A. I was involved with the claim when it was
3    presented.
4  Q. All right.
5  A. But it was not presented as a Crosby Hawk.
6  Q. How was it presented?
7  A. As a 2003 Tiara.
8  Q. And how was it presented to you?
9  A. I believe the first loss notice was faxed
10    into the claim department which was then
11    routed to me.
12  Q. And was there a reason it was routed to you?
13  A. I received all loss notices for disbursement
14    for the department.
15  Q. So as I understand, any loss that comes in,
16    you have to review it before any further
17    work is done on it?
18  A. That's correct.
19  Q. And when that --
20      MR. GOLDMAN: You're referring to
21    December of 2003 in that question. Is that
22    correct?
23      MR. FOLAN: No. As a procedure.
24      MR. GOLDMAN: Even now?

Page 67

1      Did you understand that that
2    previous question referred to today's date?
3      THE WITNESS: No, I did not.
4  Q. I'm sorry. How about in December of 2003,
5    was that the procedure?
6      MR. GOLDMAN: That's why I was
7    asking you to clarify.
8  A. In December of 2003, the procedure was that
9    the fax would come in of a first loss
10    notice, it would then be routed to me.
11  Q. And you were in the claims department at
12    that point in time?
13  A. Yes.
14  Q. Is that the same procedure that is done
15    today?
16  A. I am not certain.
17  Q. And as a result of receiving the claim, what
18    did you do?
19  A. Reviewed the computer to see if I could find
20    records for insuring a 2003 42-foot Tiara.
21    When that didn't -- when I didn't find
22    anything reflective of coverage for that
23    boat, I talked to the underwriting
24    department.

Page 68

1  Q. Who did you speak to in the underwriting
2    department?
3  A. I spoke to Lenny Richeleau.
4  Q. Did you say Lenny?
5  A. Lenny Richeleau. And I also spoke to
6    Jennifer Frederick.
7  Q. Who was Lenny Richeleau?
8  A. Lenny Richeleau was the marine director.
9  Q. Your predecessor in the position that you
10    have today?
11  A. Yes.
12  Q. Okay. And what was your conversation or
13    communication with Mr. Richeleau?
14  A. I'm sure that I asked him that we had a
15    claim, that I can't find coverage on it, and
16    asked him to do some type of investigation
17    and advise.
18  Q. And what, if any, investigation did he do
19    that you're aware of?
20  A. It's my understanding that the claim files
21    were pulled for Mr. Madonna. We could not
22    find any information in support of coverage
23    or request for coverage for a 2003 Tiara.
24  Q. You said they pulled the claims files.

Page 69

1  A. Underwriting files.
2  Q. I thought you said claims files. But it
3    would have been the underwriting files?
4  A. Correct.
5  Q. And then what happened after that with
6    regard to Mr. Richeleau?
7  A. Once we determined that we did not have
8    coverage on the 2003 Tiara, I believe I had
9    had that conversation with Mr. Eldredge at
10    Cape Wide and discussed the situation.
11  Q. You said you believe you had a conversation
12    with Mr. Eldredge. Do you have a specific
13    memory of a telephone conversation?
14  A. I remember talking to him the day after the
15    claim was reported. I don't recall if I
16    spoke to him the same day, on the 11th, as
17    the claim was reported.
18  Q. But you definitely remember having a
19    conversation with Mr. Eldredge either the
20    day the claim was reported or the following
21    day?
22  A. Correct.
23  Q. And who initiated that telephone call?
24  A. I don't -- I don't recall.

18  (Pages 66 to 69)

Page 70

1   Q. And did you have any conversation with -- I
2       believe you said it was a Jenny or a Jen
3       Frederick --
4   A. Mm-hmm.
5   Q. -- was also -- you spoke to her after
6       receiving the notice of the claim?
7   A. Correct.
8   Q. And what was the conversation you had with
9       Jenny Frederick?
10  A. Along the same line as what I discussed with
11      Mr. Richeleau.
12  Q. And Jenny Frederick's position?
13  A. It's not Jenny, it's Jennifer.
14  Q. Okay.
15  A. Underwriter.
16  Q. What was your conversation with Jennifer
17      Frederick?
18  A. Same as what I had with Lenny Richeleau.
19      Advised that I could not find coverage or
20      any evidence of coverage for the 2003 Tiara.
21  Q. And what, if anything, did Jennifer do?
22  A. I believe she took part in the investigation
23      searching computer records as well as
24      pulling underwriting files.

Page 71

1   Q. Have the computer records been printed out?
2   A. I don't believe so.
3   Q. Can they be printed out?
4   A. Yes.
5   Q. And I don't believe that I've seen any, at
6       least what I've seen here that appears to be
7       computer records. Can you have those
8       printed out and provide them to your
9       counsel?
10          MR. GOLDMAN: If those exist and
11      they can be printed out, you shall have
12      them.
13  Q. Did you have any further conversation with
14      Mr. Richeleau other than what we've already
15      discussed with regard to his investigation?
16  A. That was the conversation that I recall.
17  Q. Any conversation that you had with
18      Ms. Frederick other than what we've already
19      discussed?
20  A. Not that I recall.
21  Q. Was a claim file created as a result of
22      receiving the claim form?
23  A. Yes.
24  Q. And that claim file would have a -- I mean,

Page 72

1       just by the fact that there was a claim
2       made, it would generate like a claim number?
3   A. Yes.
4   Q. Do you know, has that claim file been
5       produced?
6   A. I don't recall if it was or was not.
7   Q. I know there's a letter to Mr. Madonna with
8       regard to that. Would that be part of the
9       claim file?
10  A. Yes.
11  Q. And are there other documents that would be
12      made a part of the claim file that was
13      created just as a result of the receipt of a
14      claim, of this claim?
15  A. Yes.
16  Q. What other documents would there be?
17  A. The first loss notice, any other
18      correspondence that was sent in from the
19      producer or broker, anything that we may
20      have found required as far as an
21      acknowledgment to the insured as part of our
22      investigation.
23  Q. And have you ever looked at the claims file?
24  A. It was my claim file.

Page 73

1   Q. I'd just ask you if you can produce those
2       portions of the file.
3   A. Sure.
4   Q. And is there also a computer entry file for
5       that particular claim?
6   A. Yes.
7   Q. And if you could produce a hard copy of the
8       computer printout.
9   A. Certainly.
10          MR. GOLDMAN: Is there some basis
11      for requesting this information for this
12      claim?
13          MR. FOLAN: I just want to know
14      what's in that file.
15          MR. GOLDMAN: For an unrelated
16      claim?
17          MR. FOLAN: No, for this claim.
18          MR. GOLDMAN: Everything relating
19      to this claim has been produced here.
20          MR. FOLAN: We've been told that
21      there's a claim file created, and the only
22      thing I have post-claim is a letter
23      December 12th, 2003 from Markel to
24      Mr. Madonna with a copy to my client.

G&M Court Reporters, Ltd.
617-338-0030

Page 74

1    It appears now that there is --
2    whatever it is, that there is a separate
3    claim file that's been created, and I would
4    just like to see what is part of that
5    business claim file.
6         MR. GOLDMAN:  Well, I'm going to
7    ask you to put your request formally.  The
8    claim file that my client is probably
9    referring to would consist primarily at this
10   point of correspondence communication from
11   coverage counsel, and that's not subject to
12   production.  It certainly is not going to be
13   produced on an informal request on the
14   record in a deposition.
15        If you are asking for something
16   beyond what's already been produced or
17   referred to in written discovery, I'm going
18   to ask you to formally frame your request.
19        MR. FOLAN:  That's fine.
20   Q. Do you know, sir -- and I'm reading from a
21   correspondence, I believe it's from you to
22   Mr. Madonna, December 12th, 2003.  I show
23   you that document.
24   A. Yes, sir.

Page 75

1    Q. And have you seen that document before?
2    A. Yes.
3    Q. And that's a correspondence that -- did you
4    dictate that or handwrite that out yourself?
5    A. I generated this letter.
6    Q. And it says Claim No. -- it says Re: Our
7    Claim No. 03FDRD386.  Did I read that
8    correctly?
9    A. Yes.
10        MR. GENTILLI:  Can I just go on the
11   record?  In one of my requests, I asked for
12   any and all documents constituting evidence
13   and relating or referring to Markel's
14   investigation of any claim by Madonna for
15   loss of any vessel in the yacht yard in
16   2003, including but not limited to the
17   Crosby.
18        So I think a request for a claims
19   file, if one exists, was made.
20        MR. GOLDMAN:  No, that is not a
21   request for a claim file.  You requested
22   investigation.  Investigation exists
23   separate or investigation is part of a claim
24   file.  But whenever anybody asks me for a,

Page 76

1    quote/unquote, claim file in a marine
2    insurance coverage litigation, I assure you
3    they get an objection because a claim file
4    by definition is going to contain privileged
5    documents.
6         MR. GENTILLI:  Well, part of them
7    may be privileged and you may withhold them,
8    but part of them may not.
9         The next category requested all
10   materials contained in any file of Markel
11   relating to either Madonna or any vessel
12   owned by him.
13        So all I'm suggesting is if there
14   is such a file, there may be objections to
15   production of particular materials but that
16   was requested and that was stated on the
17   record.
18        MR. GOLDMAN:  But I understood
19   counsel for Cape Wide to be requesting a
20   claim file.  Any requests for a claim file
21   I'm going to demand be placed formally
22   because I would respond to it with a blanket
23   objection and with an assertion of privilege
24   and work product.

Page 77

1         MR. FOLAN:  Let me just refer to
2    Exhibit No. 1, which is the notice of
3    deposition pursuant to Federal Rule of Civil
4    Procedure 30(b)(5) and make reference to
5    Request No. 8 which requests all records for
6    claims for personal injuries or vessel
7    damage made by Robert Madonna pursuant to
8    his coverage through Markel under policy No.
9    RD0000503 and policy No. RW0009400.
10        MR. GOLDMAN:  You better read your
11   notice, Counsel.  That is not a request for
12   production of documents.  That is paragraph
13   8 of a ten-paragraph statement of areas that
14   you inquire a witness to testify to.  There
15   is no request for production of documents in
16   either of your notices.  Look at the
17   sentence that precedes the ten paragraphs.
18        MR. FOLAN:  There is.  And I will
19   just put this -- Exhibit No. 1, request for
20   production of documents.
21        MR. GOLDMAN:  Look at the sentence
22   before the ten paragraphs.  There is no
23   request for production there.
24        MR. FOLAN:  The deponent shall

G&M Court Reporters, Ltd.
617-338-0030

Page 78

1  produce at the time of said deposition the
2  following documents.
3       MR. GOLDMAN: There is no request
4  for production there.
5       MR. FOLAN: And I'll read, All
6  records -- No. 8, All records --
7       MR. GOLDMAN: If you want, you can
8  take it up with the Court.
9       MR. FOLAN: That's fine. We will.
10  I just want to put this on the record.
11       MR. GOLDMAN: He has not brought
12  the documents.
13       MR. FOLAN: I know he hasn't
14  brought the documents. I'm asking and
15  requesting that these documents consistent
16  with Request No. 8 and No. 9 of Exhibit No.
17  1 be produced.
18       MR. GOLDMAN: I suggest you put it
19  formally in a request for production.
20       MR. FOLAN: Just for the record, it
21  has been made formally.
22  Q. Mr. Conroy, in reference to the December
23  12th letter --
24       MR. FOLAN: Why don't we have this

Page 79

1  marked.
2       (Exhibit 8 marked for
3  identification.)
4  Q. Where it says Re: Our Claim No., would you
5    read what the number says?
6  A. 03, F as in Frank, D as in David, R as in
7    Robert, D as in David, 386.
8  Q. And that is the claim file as a result of
9    receiving the claim for Mr. Madonna for the
10   loss of December 10 of 2003. Is that
11   correct?
12  A. Correct.
13  Q. And it describes in that letter the claim
14   involving a 2003 Tiara. Is that correct?
15  A. That is correct.
16  Q. And once again, you have described what is
17   contained in that claims file with regard to
18   some of the documents that would be produced
19   in the ordinary course of business of Markel
20   when a claim is received?
21  A. The claim file likely does not have every
22   underwriting document.
23  Q. Through your counsel, if you would produce
24   those matters that are kept in the usual

Page 80

1  course of business in that particular claim
2  file, and anything that might be involving
3  reference to dealings with an attorney in
4  this matter can be at least described as to
5  what it is, I would request that it be
6  produced if they're claiming attorney-client
7  privilege.
8       Are you aware if there was any
9  change made to that claim file to describe
10  another vessel or a vessel other than the
11  2003 Tiara?
12  A. The documentation contained within the claim
13   file would hold the documentation that was
14   forwarded to us.
15  Q. And whatever would be in the claims file
16   would be reflected of what you received with
17   regard to any change that the claim was not
18   for the 2003 Tiara but the 2000 Crosby?
19  A. Whatever documentation would be forwarded to
20   us would be contained within that file.
21  Q. Just looking at the top of Exhibit No. --
22  A. 8.
23  Q. -- 8, there's a fax number at the top of
24   that letter, (262) 548-6110.

Page 81

1  A. Right.
2  Q. And is that the fax number for the claims
3    department?
4  A. Yes.
5  Q. You testified you remember having a phone
6    conference with Mr. Eldredge?
7  A. Correct.
8  Q. And can you tell us what was said in that
9    phone conference by yourself and by
10   Mr. Eldredge?
11  A. It was generally -- you know, I don't recall
12   specifics, but the tone of the meeting was,
13   you know, We've reviewed our underwriting
14   files, we don't find any information
15   reflective of insuring a 2003 Tiara.
16       And I believe that the conversation
17   basically ended when he said that he was
18   going to submit the claim to his E&O
19   carrier.
20  Q. Do you have any memory of any other comments
21   being made by Mr. Eldredge that we already
22   haven't discussed?
23  A. No.
24  Q. Any subsequent conversations with

G&M Court Reporters, Ltd.
617-338-0030

Page 82

1    Mr. Eldredge?
2    A. I don't have specific recollection of
3        subsequent conversations.
4    Q. Have you had any other conversations with
5        anyone from Cape Wide Insurance Agency with
6        regard to this particular claim?
7    A. All conversations that I had with
8        Mr. Madonna were with Mr. Eldredge.
9        MR. GOLDMAN: Unless you're
10       referring to the E&O carrier's investigator
11       as somehow part of Cape Wide. Are you?
12       MR. FOLAN: No, I'm not suggesting
13       that. Thank you for your assistance.
14   Q. Any so there's been no one else from Cape
15       Wide. Is that correct?
16   A. I don't recall speaking to anybody other
17       than Mr. Eldredge.
18   Q. Have you had any conversations with
19       Mr. Madonna?
20   A. I don't recall speaking to Mr. Madonna.
21   Q. Did you have any other conversations with
22       any other persons in the claims department
23       with regard to this particular claim?
24   A. This matter was discussed with Robert

Page 83

1    Horner.
2    Q. And who is Robert Horner?
3    A. Robert Horner is the VP of claims.
4    Q. And when did that conversation take place?
5    A. Shortly after the investigation was
6        concluded with underwriting.
7    Q. And what was that conversation?
8    A. Basically, a review of the facts, that we
9        realized that we could not find any coverage
10       for the 2003 Tiara and discussion of what
11       should occur.
12   Q. Was that discussion prior to your writing
13       the correspondence which is Exhibit No. --
14       Is it 8?
15   A. Yes, Exhibit No. 8. And yes, it would have
16       been.
17   Q. Any other conversations with Mr. Horner
18       subsequent to that?
19   A. Yes. I have discussed this case with
20       Mr. Horner. However, I don't recall
21       specifically when or the details.
22   Q. Well, do you have any -- not specific
23       details. Was anything discussed other than
24       what's in the contents of that letter with

Page 84

1    regard to there -- couldn't find a -- no
2    record of insuring the boat?
3        MR. GOLDMAN: You are not asking
4    him about discussions with Mr. Horner that
5    may have included correspondence or
6    communication from outside counsel, are
7    you?
8        MR. FOLAN: No. I'm just asking
9    him in the course of his business.
10   A. It's likely that I discussed this case a
11       number of times with Mr. Horner, but I don't
12       recall specifics.
13   Q. If not specifics, anything else? What the
14       general tenor of the conversation was?
15   A. I don't recall the specific conversations.
16   Q. Anyone else in the claims department you
17       discussed it with?
18   A. It would not be unusual. However, I don't
19       recall speaking to somebody else.
20   Q. Anyone in the underwriting department?
21   A. I also had a conversation as part of the
22       investigation with an individual by the name
23       of Bill Stifnagle.
24       MR. GOLDMAN: Do you want him to

Page 85

1    spell that?
2        THE COURT REPORTER: That would be
3    great.
4        THE WITNESS: I believe it's
5    S-t-i-f-n-a-g-l-e.
6    Q. And who was Mr. Stifnagle?
7    A. Mr. Stifnagle is an individual who helps us
8        on occasion and also is involved in the
9        audit process on the underwriting side.
10   Q. Is he an employee of Markel?
11   A. I believe he would be considered an
12       employee.
13   Q. In what department?
14   A. He's actually -- wherever he's needed. He's
15       helped in claims and he's also helped in
16       underwriting.
17   Q. And what was the conversation you had with
18       Mr. Stifnagle?
19   A. In general, it was basically along the same
20       lines as I had with Robert Horner,
21       discussing what had happened and what the
22       appropriate position should be.
23   Q. Anything other than that?
24   A. No.

22   (Pages 82 to 85)

Page 86

1  Q. Other than that initial request of -- is it
2     Jennifer Frederick, did you have any
3     communication with Jennifer Frederick
4     concerning this claim?
5  A. It would not be unlikely that I had further
6     conversations with her on this matter, but I
7     don't recall them specifically.
8  Q. Lenny Richeleau?
9  A. The same.
10 Q. Anyone else in the underwriting department?
11 A. Not that I recall.
12 Q. Are you aware as to whether there was any
13    investigation done by Markel with regard to
14    the receipt of the faxes of June 16 and
15    June 24 as alleged by Cape Wind?
16 A. I believe, again, you know, we've done an
17    investigation the first time. I believe we
18    did conduct a second investigation and we
19    did the whole thing again. So yes, there
20    was at least two investigations as to what
21    was contained within our file.
22 Q. And just what would that investigation
23    consist of?
24 A. Searching our computer for any records as

Page 87

1     well as pulling Mr. Madonna's underwriting
2     files, looking for any evidence of those
3     faxes which we did not find.
4  Q. And when you say "files," there was a small
5     boat file? Was it RW9400?
6  A. There were -- we searched through any file
7     that we could find in existence for
8     Mr. Madonna, the Edgewater and also the one
9     that contained the 1996 Tiara and Pursuit.
10 Q. And I think there was a claim file created
11    for the Edgewater, the 15-foot Edgewater?
12 A. Yes.
13 Q. And was an investigation done by Markel with
14    regard to examining that file, the claim
15    file for the Edgewater?
16 A. The Edgewater, I don't recall looking at the
17    Edgewater claim file.
18 Q. I'll ask you if you could review the
19    Edgewater claim file and produce the
20    contents of that file for us.
21    MR. GOLDMAN: We'll give you
22    whatever exists on the Edgewater claim
23    file.
24 Q. The mailing address for Markel is Pewaukee,

Page 88

1     Wisconsin. Is that correct?
2  A. It can be either.
3  Q. And is the fax number at least identified as
4     being in Waukesha?
5  A. I'm not a phone expert, but it's my
6     understanding that the prefix is Waukesha
7     related.
8  Q. Well, are you aware whether or not that
9     telephone number, (262) 548-3288, reflects
10    it to be Waukesha, Wisconsin? Would you
11    disagree with that?
12 A. It may.
13 Q. I'm going to show you what I count to be
14    nine pages of documents and ask you if you
15    can review them to see if you recognize what
16    any of those documents are.
17    (Witness reviews documents.)
18 A. The first two pages appear to be a brochure
19    and a quotation sheet form.
20 Q. And do you recognize what those documents
21    are other than that? I mean, have you seen
22    that document?
23 A. I have not seen these two specific documents
24    before.

Page 89

1  Q. And at least on the first page, does it
2     describe XS, EX the letters we had talked
3     about before? Is there somewhere that it
4     says --
5     MR. GOLDMAN: EX?
6     MR. FOLAN: EX, right.
7     MR. GOLDMAN: I think it's XS.
8  A. It appears to be a tri-fold brochure. I'm
9     not sure. I guess it depends on which way
10    you folded it.
11 Q. But it's a document that you haven't seen
12    prior to today?
13 A. I have not seen this document.
14 Q. But as I understand it, XS Insurance Agency
15    is an agency with which Markel has a written
16    contract?
17 A. Correct.
18    MR. FOLAN: For the purpose of
19    identification, just mark those two pages.
20    (Exhibit 9 marked for
21    identification.)
22 Q. Can I have you read the following documents
23    or document?
24    MR. GENTILLI: What number was the

23  (Pages 86 to 89)

Page 94

1    2003 Tiara.
2    A. Correct.
3    Q. So we have no record of a 2003 Tiara being
4       insured. What did he say in response to
5       that?
6    A. I do recall that the information was
7       provided that was originally asserted to be
8       sent earlier, either the same day as the
9       loss notice or thereabouts.
10   Q. And when you got that information, which I
11      presume was a copy of the faxes which we
12      looked at or one or more of the faxes that
13      we looked at which were Exhibits 6 and -- 5
14      and 6? No, not 5 and 6. 6 and 7.
15      Presumably you got copies of one or both of
16      those. Is that correct?
17   A. If I recall correctly, the information that
18      was received via fax at or about the same
19      time as the loss was reported was a longer
20      fax and there was mismatched documentation
21      that we've found as part of that whole
22      package.
23   Q. I guess my question is, you got some fax
24      from Mr. Eldredge --

Page 95

1    A. Yes.
2    Q. -- which purported to be materials that had
3       been sent previously. Is that correct?
4    A. That's correct.
5    Q. What did you do, you or anyone else at
6       Markel that you're aware of, what was done
7       to investigate whether those materials had
8       been received previously?
9    A. We pulled the underwriting files that we had
10      in existence for Mr. Madonna.
11   Q. Was any effort made to interview any of the
12      employees responsible for receipt of faxes
13      or for distribution of faxes that were
14      received?
15   A. I don't recall that. That likely would have
16      been done by Lenny Richeleau.
17   Q. You weren't a part of that?
18   A. I don't recall asking anybody to see if
19      there were records incoming.
20   Q. Have you heard from any source that anybody
21      at Markel indicated a recollection of
22      receiving faxes from or a fax from Cape Wide
23      Insurance Agency relating to a change of
24      vessels on Mr. Madonna's insurance policy in

Page 96

1    June of '03?
2    A. We could not find anybody who had any
3       recollection of a fax being received
4       pertaining to these boats.
5    Q. And were the customer service employees
6       interviewed to your knowledge on this
7       subject?
8    A. I don't know that.
9    Q. You said that there's a person responsible
10      for clearing faxes at the customer service
11      fax machine. Did that change every day or
12      was that somebody who was generally
13      responsible for that? Again, we're talking
14      in '03.
15   A. I don't know in '03.
16   Q. How about today?
17   A. There's a devoted person.
18   Q. There is a devoted person. Is that fax
19      machine that we've been referring to, the
20      one with the last four digits 3288, was that
21      fax machine in someone's office? In a
22      hallway? Or where was it within the
23      customer service area?
24   A. It was in a hallway.

Page 97

1    Q. In a hallway? So have you had occasion to
2       walk by that machine and see that there were
3       faxes that had piled up that needed
4       distribution?
5    A. Yes.
6    Q. And presumably the person responsible at
7       some regular interval would pull them out
8       and pass them around to whoever they were
9       directed?
10   A. That would be my assumption.
11   Q. You've had somebody bring you a fax, for
12      example, from that machine at some point?
13   A. Yes.
14   Q. Now, you said a fax was sent to you and it
15      was garbled. Was that a fax to -- strike
16      that. Rephrase it.
17        You indicated that at some point in
18      December you received a garbled kind of
19      mismatched fax. Was that a fax that was
20      transmitted to Jessi along with the accord?
21        MR. GOLDMAN: Objection. You said
22      the term "garbled." I don't believe that
23      was a term he used, Counselor.
24        MR. GENTILLI: He did use

Page 98

1    mismatched.
2         MR. GOLDMAN: Mismatched, but I
3    don't believe he said garbled. To me that
4    suggests something else.
5         Did you say garbled?
6         THE WITNESS: I don't believe so.
7         MR. GENTILLI: No, he said
8    mismatched.
9    Q. A mismatched fax in December, was that to
10   your knowledge received by Jessi?
11   A. I don't recall if she was the one who had it
12   in her possession or not.
13   Q. And what was her last name?
14   A. Clendenning.
15   Q. Let me show you a fax cover sheet which was
16   previously identified as Eldredge Exhibit 9
17   and ask you if this is the fax cover sheet
18   that accompanied the mismatched fax that you
19   referred to?
20        MR. GOLDMAN: Does your question
21   presume all of that --
22        MR. GENTILLI: Not the
23   handwriting. The handwriting Mr. Eldredge
24   testified was his. I'm talking about the

Page 99

1    printed or the typed portions.
2         (Witness reviews document.)
3         MR. GOLDMAN: Let the record
4    reflect that Eldredge Exhibit 9 apparently
5    refers to a fax cover sheet from
6    Mr. Eldredge addressed to Jessi at Markel
7    dated December 11, 2003 purporting to fax
8    over 15 pages. It appears to be the notice
9    of claim.
10   A. Yes, this does appear to be the document
11   that reflects that a prior fax had been
12   sent.
13   Q. And actually, counsel for Cape Wide has been
14   kind enough to hand me a packet of documents
15   along with that fax cover sheet which
16   appears to be at least a portion, if not
17   all, of that fax and ask you --
18        MR. GOLDMAN: Let me see if it's
19   got 15 pages.
20        MR. GENTILLI: It does, if you look
21   at the top.
22        MR. GOLDMAN: So this appears to be
23   it.
24   Q. Is that the complete fax that you're

Page 100

1    referring to?
2    A. Yes.
3    Q. And that's the order you received it in
4    based on the fax legend at the top of each
5    page. Is that correct?
6         MR. GOLDMAN: Make sure.
7         (Witness reviews documents.)
8    A. It does not appear to be in order.
9    Q. Are there pages out of order?
10   A. It appears that way.
11   Q. Perhaps you could put them in the correct
12   order before we mark them, or I can do it.
13        MR. GENTILLI: I believe the
14   confusion is that there are two fax legends
15   and the higher one is cut off. That's what
16   I think the problem is.
17        MR. GOLDMAN: These had been faxed
18   from something called Racepoint, one word.
19        MR. GENTILLI: Correct.
20        MR. GOLDMAN: Also possibly from
21   Oyster Harbor Marine.
22        MR. GENTILLI: The Oyster Harbor
23   Marine appear to be earlier fax dates.
24        MR. GOLDMAN: Right. It appears

Page 101

1    that this 15-page document -- I think we can
2    all agree that it's a 15-page document, that
3    it consists of at least two earlier faxes
4    provided to Cape Wide, and that Cape Wide
5    sent over the entire 15-page document.
6         MR. GENTILLI: That's what I'm
7    trying to establish.
8         MR. GOLDMAN: That's certainly what
9    my file reflects and that's what I
10   produced.
11        MR. GENTILLI: Why don't we mark
12   this as the next exhibit, whatever number
13   we're up to.
14        (Exhibit 15 marked for
15   identification.)
16   Q. Have you learned from anybody at Markel that
17   any portion of Exhibit 15 -- strike that --
18   that a copy of any portion of Exhibit 15 was
19   located in the files of Markel having been
20   received independent and prior to your
21   receipt of Exhibit 15?
22        MR. GOLDMAN: Do you understand the
23   question?
24   A. If I could just hear it one more time.

26 (Pages 98 to 101)

Page 102

1    Q. I'm simply trying to establish whether
2       you've heard from any source that any of the
3       documents that comprise Exhibit 15 were
4       found in any file at Markel indicating a
5       receipt prior to December of '03?
6    A. No.
7    Q. You have absolutely no information from
8       anybody that that's the case?
9    A. We could not find any evidence of any of
10      these documents prior to December of '03.
11   Q. What other conversations did you have with
12      Bill Eldredge, if any, besides this initial
13      one that we talked about in December of
14      '03?
15      MR. GOLDMAN: You mean concerning
16   this matter?
17      MR. GENTILLI: Yeah.
18   A. I remember the conversation which occurred
19      either December 11th or December 12th. I
20      believe there were a couple other
21      conversations, but I don't remember them
22      specifically.
23   Q. Did you have any conversations with a
24      Mr. Burkett?

Page 103

1    A. I don't recall having a conversation with
2       Mr. Burkett.
3    Q. R & G Investigations. You don't recall?
4    A. I don't recall that.
5    Q. At some point do you recall being advised
6       that, in fact, the vessel that was destroyed
7       in the fire was the Crosby and not the
8       Tiara?
9    A. Yes, at some point down the road we were
10      advised that it was actually a Crosby.
11   Q. Do you remember how you were so advised?
12   A. Without a review of the documentation --
13      MR. GOLDMAN: Do you want to show
14   him the letter of April 6th?
15      MR. GENTILLI: I was gonna ask him
16   if he recalls.
17   A. I don't recall specifically the first
18      notification, whether it was a verbal from a
19      conversation with somebody or whether it was
20      written documentation.
21   Q. When that notification was received, was a
22      new investigation conducted to see whether
23      that vessel was insured?
24   A. Absolutely.

Page 104

1    Q. And what did that investigation consist of?
2    A. The same as the first. We reviewed the
3       computer, looked for any evidence of
4       insuring a Crosby, see if there was any
5       evidence of any fax information.
6    Q. Now, I think you testified there are no logs
7       of fax receipts maintained by Markel for its
8       machines?
9    A. Correct.
10   Q. Do you know if the machines daily or at some
11      regular period print out logs of all fax
12      receipts?
13   A. I don't know if they're done daily. I have
14      checked with our IT department and they
15      could not recover any information.
16   Q. And paper copies aren't kept?
17   A. No, sir.
18   Q. In your experience, are you aware of any
19      other situation besides Mr. Madonna's where
20      an issue arose as to whether a request for
21      insurance on a vessel had been received or
22      not by Markel?
23   A. No, we have not had any other similar cases.
24   Q. So there's no other case where there was no

Page 105

1       insurance but an agent purported to have
2       sent a request for insurance or a change in
3       the vessel described?
4    A. I am not aware of any cases.
5    Q. Now, you mentioned the computer records.
6       Can I just understand what's in the computer
7       records that are maintained? I assume
8       there's multiple screens you can look at?
9    A. On the underwriting side, they show who the
10      insured is, the boat type, coverages
11      selected. It shows the navigation. Motor
12      information. Basically the information that
13      prints and generates as shown on the
14      declarations page.
15   Q. Is there a running summary of contacts with
16      an agent or a customer regarding a policy or
17      a vessel?
18   A. There's no contact management system as part
19      of our system.
20   Q. So you don't have short summaries of oral
21      conversations and the like listed on your
22      computer system. Is that correct?
23   A. Correct.
24      MR. GOLDMAN: Again, for the

27 (Pages 102 to 105)

Page 106

1    record, we'll produce the computer screens.
2         MR. GENTILLI: A lot of companies
3    have kind of running, you know, contact with
4    the customer or contact --
5         MR. GOLDMAN: Claims files
6    frequently still have that.
7  A. An underwriter can make a comment into a
8    notes area. It's not a contact management
9    system per se.
10 Q. Were there any notes that you saw on any
11   underwriting -- computerized underwriting
12   file for Mr. Madonna or his vessels?
13 A. I believe there was a few notes, but I
14   don't -- there was nothing specific to
15   these -- this issue.
16 Q. And in the claims file, computerized file,
17   is there a running -- what did you call it?
18   A communications management?
19 A. Contact management system.
20 Q. -- contact management system?
21 A. My notes would have been written on a piece
22   of paper.
23 Q. On a hard copy not in the computer?
24 A. Correct.

Page 107

1  Q. Would anybody enter any comments on the
2    computer directly?
3  A. No.
4         MR. GOLDMAN: Again, for the
5    record, you'll get the claim file for the --
6         MR. GENTILLI: I understand.
7         MR. GOLDMAN: -- the vessel that we
8    paid on. There is no claim file for this
9    vessel.
10        MR. GENTILLI: There is no claim
11   file for the Crosby?
12        MR. GOLDMAN: Well, you've got
13   everything in the claim file.
14 Q. Let me ask the witness. There is a claim
15   file for the Crosby?
16 A. There is a claim file that was established
17   due to this fire.
18 Q. And it has everything of any loss for
19   Mr. Madonna. Correct?
20 A. Only due to this fire.
21 Q. To this fire, yes.
22 A. Yeah. Yes. So the claim in '01 and the
23   Edgewater would be contained separately.
24 Q. The Edgewater would be in a separate folder?

Page 108

1  A. Yes.
2  Q. So what's in this claim file? And by "this
3    claim file," the claim file on this fire on
4    Policy RD0000503. What documents would be
5    contained to your recollection in that claim
6    file?
7  A. It would contain the first loss notice, an
8    acknowledgment, likely an acknowledgment.
9    However, we may have been able to make a
10   claim determination before an acknowledgment
11   would have been mailed in this case. My
12   letter to Mr. Madonna and also my notes
13   during my conversation with Mr. Eldredge.
14 Q. Well, I certainly want to see the notes of
15   your conversation with Mr. Eldredge and just
16   ask that that be produced along with the
17   claim file.
18        MR. GOLDMAN: I'll make sure to
19   take a look at my file when I get back to
20   the office.
21 Q. Just a couple more questions, but I'm just
22   about done here. Did you have any
23   conversations with Mr. Madonna?
24 A. I don't recall speaking to Mr. Madonna.

Page 109

1  Q. Did you have any conversations with
2    Christopher Stavros?
3  A. I don't believe so.
4         MR. GENTILLI: And just for the
5    record, Counsel, I had similarly marked a
6    30(b)(6) of Markel. I take it that
7    Mr. Conroy is the designee for purposes of
8    my notice as well as Mr. Folan's?
9         MR. GOLDMAN: Yes.
10        MR. GENTILLI: I have no further
11   questions at this time.
12   EXAMINATION BY MR. HOLBROOK:
13 Q. Seth Holbrook representing Crosby Yacht. Do
14   I understand that Markel insured an
15   Edgewater belonging to Mr. Madonna?
16 A. Yes.
17 Q. That was destroyed in the fire?
18 A. That's my understanding, yes.
19 Q. Do you know whether Markel insured any other
20   vessels owned by anybody that were destroyed
21   in the fire?
22 A. I don't know.
23 Q. How much was paid on the Edgewater?
24 A. I don't have any information with me on the

G&M Court Reporters, Ltd.
617-338-0030

Page 110

1    Edgewater.
2    Q. Do you know whether Markel hired any kind of
3       marine surveyor or investigator to look into
4       the circumstances surrounding the loss of
5       the Edgewater?
6    A. I recall that a marine surveyor may have
7       been assigned to that file. I don't
8       remember if a C&O investigator was hired.
9    Q. Do you know who the marine surveyor was?
10   A. I believe it was Steven Charette, but I'm
11      not certain.
12   Q. Do you know if Mr. Charette produced a
13      report?
14   A. Without the claim file here, it's really
15      hard for me to comment on that file since I
16      was not the claim examiner for that file.
17   Q. Do you know who was?
18   A. Boy, I can guess.
19   Q. And who would you guess it would be?
20   A. Casey Matthews.
21   Q. Does he still work for the company?
22   A. Yes, he does.
23   Q. Can you make an estimate as to what the
24      insured value of the Edgewater was?

Page 111

1         MR. GOLDMAN: Object. I don't
2       think he's here to make estimates. You can
3       ask him if he knows.
4    Q. Do you know or can you make a --
5    A. I don't recall what the Edgewater was
6       insured for.
7         MR. GENTILLI: Off the record.
8         (Discussion off the record.)
9    Q. Do you have any information about the cause
10      or the origin of the fire at Crosby Yacht
11      Yard?
12   A. I have no knowledge of the cause.
13   Q. Were you involved with the retaining of
14      Steve Charette or was that --
15   A. I was not.
16   Q. And do you know whether he was charged with
17      trying to find out the extent of the damage
18      to the Edgewater or was he involved with
19      trying to ascertain something about the fire
20      or both?
21   A. I really don't know. I did not review the
22      Edgewater claim file before coming here
23      today.
24   Q. Do you know whether Markel engaged anyone

Page 112

1       other than Steve Charette to look into
2       anything having to do with the Crosby fire?
3    A. I don't know.
4         MR. HOLBROOK: I don't have
5       anything else.
6    EXAMINATION BY MR. FOLAN:
7    Q. Making reference to Exhibit No. 1 and it was
8       notice of deposition of keeper of records
9       pursuant to 30(b)(5), I'm just going to ask
10      you if there are any records -- and I'm
11      reading here. Documents of Markel regarding
12      practices and procedures of Markel regarding
13      the application for marine/boat insurance
14      from January 1 of 2000 to the present time.
15      Are there written documents reflecting that?
16   A. I could not find any written documents
17      supporting that.
18   Q. Are there any documents concerning practices
19      and procedures of Markel for amending or
20      changing coverages on existing policies
21      issued by independent insurance agents or
22      brokers from January 1, 2000 to the present?
23   A. I was not able to find written documentation
24      on that.

Page 113

1    Q. Any and all documents concerning the
2       practices and procedures of Markel regarding
3       changes in coverage including changes to
4       add, exclude, or change the identity of
5       boats/vessels on an existing insurance
6       policy issued through an independent
7       insurance agent or broker from January 1,
8       2000 to the present time?
9    A. I'm sorry. Can you read that again?
10   Q. Maybe it's easier if you read it.
11         (Witness reads document.)
12   A. I was not able to locate any documents.
13   Q. If you could just read No. 4 either out loud
14      or to yourself.
15         MR. GOLDMAN: Read it out loud,
16      please.
17   Q. No. 4.
18   A. Any and all documents concerning the
19      practices and procedures of Markel regarding
20      the receipt of and/or documentation of
21      receipt of fax communications from
22      independent insurance agents or brokers for
23      amendments to existing marine policies
24      covering boats or vessels from January 1,

Page 114

1   2000 to the present.
2   Q. Are there any documents?
3   A. I could not locate any documents for that.
4   Q. Read No. 5, please.
5   A. Any and all documents concerning the
6     practices and procedures of Markel regarding
7     confirming and or rejecting requests for
8     change or amendments to coverage sought by
9     independent insurance agents or brokers from
10    January 1, 2000 to the present. I believe
11    that was produced.
12  Q. Practices and procedures?
13  A. It was part of our agreement with XS Brokers
14    as part of when we would respond.
15       MR. GOLDMAN: Those documents were
16    produced to you.
17  Q. Agreements with XS, letters?
18  A. XS Brokers, letter X and S.
19  Q. Would you read No. 6.
20  A. Any and all documents concerning the
21    underwriting practices and procedures of
22    Markel regarding amendments or changes to
23    coverages for existing marine insurance
24    policies covering boats or vessels from

Page 115

1   January 1, 2000 to the present.
2       I believe we have produced our
3     underwriting guidelines as well as the
4     contract with XS. Those would be the
5     documents that exist.
6       MR. GOLDMAN: Those were produced.
7   Q. No. 7.
8   A. The underwriting file for Markel for all
9     coverages which it provided to Robert
10    Madonna through Cape Wide Insurance under
11    policy No. RD000503 and policy No.
12    RW0009400.
13       MR. GOLDMAN: Those have been
14    produced.
15       MR. GENTILLI: Off the record.
16       (Discussion off the record.)
17  Q. No. 8.
18  A. All records for claims for personal injuries
19    or vessel damage made by Robert Madonna
20    pursuant to his coverage through Markel
21    under policy No. RD000503 and policy No.
22    RW0009400.
23       MR. GOLDMAN: Again, insofar as
24    those pertain to the Edgewater claim, those

Page 116

1   will be produced.
2       MR. FOLAN: With regard to the
3   claim of?
4       MR. GOLDMAN: The Edgewater. The
5   vessel we're speaking of here.
6       MR. FOLAN: With regard to the
7   claim number referred to in Exhibit No. 8,
8   03FDRD386?
9       MR. GOLDMAN: The documents that
10  constitute the claim file that is the
11  subject of this litigation have been
12  produced with the exception of
13  correspondence between my office and
14  Markel.
15      There is also a memo. That memo
16  refers specifically -- and I'll produce it
17  for in camera inspection by the Court. But
18  it refers specifically -- my name is on it.
19  It refers to conversations with me. It is
20  subject to privilege.
21      MR. GENTILLI: There's some
22  handwritten notes, though, that the witness
23  did testify to.
24      MR. GOLDMAN: That is what he's

Page 117

1   testifying to. There are no handwritten
2   notes.
3       MR. GENTILLI: He said he had notes
4   of conversations with Mr. Eldredge.
5       MR. GOLDMAN: He's referring to a
6   written memo to the file.
7       MR. FOLAN: Let him respond as to
8   whether or not -- I mean, he can respond to
9   us in writing, whatever, after he's looked
10  at that file as to -- or through you as to
11  what --
12      MR. GOLDMAN: I will have him look
13  at the file and he can satisfy himself about
14  what I just told you.
15      MR. FOLAN: And it's my memory that
16  his testimony has been that there are other
17  matters that are in that file kept in the
18  regular course of business when a claim
19  comes in and a claim file is created of
20  information that goes in there.
21      MR. GOLDMAN: The claim file in
22  this case consists of the faxes from your
23  client, his correspondence from RMG
24  Investigation, and this internal memorandum

30  (Pages 114 to 117)

Page 118

1  that I just made reference to. Everything
2  but that memorandum has been produced to
3  you.
4          MR. GENTILLI: His notes of his
5  conversation with Bill Eldredge, are you
6  saying those are privileged?
7          MR. GOLDMAN: I'm saying that --
8  I'll let him testify again as to whether
9  there are any handwritten notes. My
10  understanding is that there are no
11  handwritten notes. He's referring to an
12  internal memorandum that he dictated. It's
13  typed.
14          MR. GENTILLI: Reflecting his
15  conversation with Bill Eldredge --
16          MR. GOLDMAN: Ask him the question.
17          MR. GENTILLI: Steve, if he
18  dictated a memo to the file to you or
19  whatever but summarizing his discussion --
20          MR. GOLDMAN: If there are
21  handwritten notes, you can have them.
22          MR. GENTILLI: -- summarizing,
23  among other things, his discussion with Bill
24  Eldredge, certainly that portion relating --

Page 119

1          MR. GOLDMAN: He will look --
2          MR. GENTILLI: -- relating to his
3  conversation with Bill Eldredge cannot under
4  any circumstance be deemed privileged or --
5  I mean, that's his recollection recorded.
6          MR. GOLDMAN: He will look for
7  anything handwritten. I will only produce
8  this typed document, if you continue to
9  insist on it, for an in camera inspection
10  because it arises after he has referred to
11  outside counsel, sought legal advice from
12  outside counsel. It refers explicitly to me
13  and to my advice as outside counsel. And again, I will only produce it
14  counsel. And again, I will only produce it
15  for an in camera inspection if you persist
16  in seeking it.
17          Just when you were talking about
18  production of handwritten notes, if those
19  exist -- and I suggest to you gentlemen they
20  do not -- but he will look and if they do,
21  you can have them.
22          MR. FOLAN: Fair enough. When you
23  say handwritten, whether they're typed or
24  they're something that is put in by

Page 120

1  computer?
2          MR. GOLDMAN: Correct. If there
3  are any notes about his conversations with
4  Mr. Eldredge, anything prior to the
5  appointment of outside counsel, you can have
6  them. He will look again just to make
7  certain.
8          I'm only sensitive to the
9  production of the claims file insofar as it
10  contains or reflects discussions with me
11  after I'm appointed or consulted. Anything
12  prior to that, you're welcome to.
13  Q. And you will check your file with your
14      counsel in terms of those documents that
15      existed prior to any communication from your
16      counsel?
17  A. Absolutely.
18  Q. And if you would read No. 9.
19  A. All records of Markel for claims for damage
20      to boats/vessels brought by Robert Madonna
21      concerning the fire which occurred at Crosby
22      Yacht Yard on or about December 10/11, 2003
23      which is the subject of this lawsuit.
24  Q. Once again, those matters that would be

Page 121

1  involved in the claim prior to any contact
2  by your coverage counsel.
3          MR. GOLDMAN: You have them all,
4  but we will double and triple check to make
5  sure that these phantasmal notes do not, in
6  fact, exist. If they do, you can have them.
7          Are we done?
8          MR. GENTILLI: I don't have
9  anything further.
10          MR. GOLDMAN: He is going to read
11  and sign.
12          MR. FOLAN: Why don't you make
13  copies of all --
14          MR. GOLDMAN: Hold on. Because
15  these are multipage exhibits which you
16  refused to paginate, I am going to ask that
17  they be entrusted to the court reporter,
18  that she keep the originals. You simply
19  refused to paginate them. I am very
20  reluctant --
21          MR. GENTILLI: That's what he was
22  telling her to do.
23          MR. FOLAN: That's what I was gonna
24  say.

31 (Pages 118 to 121)

Page 122

```
1          MR. GOLDMAN: I thought you were
2   gonna keep them. That's fine.
3          MR. FOLAN: I was asking her to do
4   it.
5          MR. GOLDMAN: Terrific.
6          (Whereupon the deposition was
7   concluded at 1:46 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 124

```
1   DEPONENT'S ERRATA SHEET
2   AND SIGNATURE INSTRUCTIONS
3
4       The Original of the Errata Sheet has
5   been delivered to Steven E. Goldman, Esq.
6       When the Errata Sheet has been
7   completed by the deponent and signed, a copy
8   thereof should be delivered to each party of
9   record and the ORIGINAL delivered to John F.
10  Folan, Esq., to whom the original deposition
11  transcript was delivered.
12
13       INSTRUCTIONS TO DEPONENT
14
15       After reading this volume of your
    deposition, indicate any corrections or
16  changes to your testimony and the reasons
    therefor on the Errata Sheet supplied to you
17  and sign it. DO NOT make marks or notations
    on the transcript volume itself.
18
19  REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20  COMPLETED AND SIGNED ERRATA SHEET WHEN
21  RECEIVED.
22
23
24
```

Page 123

```
1        C E R T I F I C A T E
2
3   COMMONWEALTH OF MASSACHUSETTS
4
5       I, Mary E. Rinne, Registered
6   Professional Reporter and Notary Public for
7   the Commonwealth of Massachusetts,
8   do hereby certify that the foregoing
9   transcript of the deposition of Thomas
10  Conroy, having been duly sworn on Wednesday,
11  August 17, 2005, is true and accurate to the
12  best of my knowledge, skill and ability.
13      IN WITNESS HEREOF, I have hereunto set
14  my hand and notarial seal this 1st day of
15  September 2005.
16
17
18
19
            Mary E. Rinne
20          RPR and Notary Public
21
22  My Commission Expires: January 1, 2010
23
24
```

Page 125

```
1   ATTACH TO THE DEPOSITION OF THOMAS CONROY
    CASE: MARKEL v. MADONNA
2
          ERRATA SHEET
3
    INSTRUCTIONS: After reading the transcript
4   of your deposition, note any change or
    correction to your testimony and the reason
5   therefor on this sheet. DO NOT make any
    marks or notations on the transcript volume
6   itself. Sign and date this errata sheet
    (before a Notary Public, if required).
7   Refer to Page 124 of the transcript for
    errata sheet distribution instructions.
8
    PAGE LINE
9   ___   CHANGE: _____
          REASON: _____
10  ___   CHANGE: _____
          REASON: _____
11  ___   CHANGE: _____
          REASON: _____
12  ___   CHANGE: _____
          REASON: _____
13  ___   CHANGE: _____
          REASON: _____
14  ___   CHANGE: _____
          REASON: _____
15  ___   CHANGE: _____
          REASON: _____
16  ___   CHANGE: _____
          REASON: _____
17  ___   CHANGE: _____
          REASON: _____
18  ___   CHANGE: _____
          REASON: _____
19
20      I have read the foregoing transcript
    of my deposition and except for any
21  corrections or changes noted above, I hereby
    subscribe to the transcript as an accurate
22  record of the statements made by me.
23
24  _____    _____
    Thomas Conroy        Date
```

32 (Pages 122 to 125)